UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

_____

)
FEDERAL TRADE COMMISSION,                    )
                                             )
                        Plaintiff,           )
                                             )
              v.                             )
                                             )
HORNBEAM SPECIAL SITUATIONS,                 )
LLC; CARDINAL POINTS HOLDINGS,               )
LLC; CARDINAL POINTS                         )
MANAGEMENT, LLC, also d/b/a                   )
CLEAR COMPASS DIGITAL GROUP;                 )
GYROSCOPE MANAGEMENT                         )
HOLDINGS, LLC; EDEBITPAY, LLC;               )
PLATINUM ONLINE GROUP, LLC,                  )
also d/b/a as PREMIER                        )
MEMBERSHIP CLUBS;                            )
CLICKXCHANGE MEDIA, LLC;                     )
ISTREAM FINANCIAL SERVICES,                  )
INC.; JERRY L. ROBINSON, EARL G.             )
ROBINSON, and JAMES MCCARTER,                )
individually and as members of Hornbeam      )
Special Situations, LLC; Cardinal Points     )
Holdings, LLC; Cardinal Points               )
Management, LLC; and Gyroscope               )
Management Holdings, LLC; KEITH              )
MERRILL, individually and as an officer      )
of EDebitPay, LLC; Platinum Online           )
Group, LLC; clickXchange Media, LLC;         )
Cardinal Points Management, LLC, and         )
Gyroscope Management Holdings, LLC;          )
MARK WARD, individually and as an            )
officer of Cardinal Points Management,       )

1

LLC; Gyroscope Management )
Holdings, LLC; DALE PAUL )
CLEVELAND AND WILLIAM R. )
WILSON, individually and as members of )
EDebitPay, LLC; Platinum Online Group, )
LLC; and clickXchange Media, LLC; )
KRIS AXBERG, RICHARD JOACHIM )
and CHET ANDREWS, individually )
and as officers of iStream Financial )
Services, Inc., )
 )
                       Defendants. )
_____ )

## COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its

Complaint alleges:

1. The FTC brings this action under Section 13(b) of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. § 53(b), the Restore Online Shoppers'

Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401 *et seq.*, and the Telemarketing and

Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§

6101 – 6108, to obtain permanent injunctive relief, rescission or reformation of

contracts, restitution, refund of monies paid, disgorgement of ill-gotten monies,

and other equitable relief for Defendants' acts or practices in violation of Section

5(a) of the FTC Act, 15 U.S.C. § 45(a); Section 4 of ROSCA, 15 U.S.C. § 8404;

and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

2.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

3.   Venue is proper in this district under 28 U.S.C. § 1391(b), (c) and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.   The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-05, which, among other things, bans the use of negative option features in transactions effected on the internet that do not meet certain conditions for disclosure, consent, and cancellation.  The FTC further enforces the Telemarketing Act, 15 U.S.C. §§ 6101-08.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

5.   The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, ROSCA, and the TSR, and to secure such equitable relief as may be appropriate in each case, including

rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 6102(c), and 6105(b).

## DEFENDANTS

6.   Defendant Hornbeam Special Situations, LLC, is a Georgia limited liability company formed in March 2013 with its principal place of business at 1409 Peachtree Street NE, Suite 202, Atlanta, Georgia 30309.  Hornbeam Special Situations owns 100% of Cardinal Points Holdings, LLC, which, in turn, owns 100% of both Cardinal Points Management, LLC, and Gyroscope Management Holdings, LLC (collectively, "Hornbeam Entities").  Hornbeam Special Situations transacts business in this District and throughout the United States.

7.   Defendant Cardinal Points Holdings, LLC, is a Delaware limited liability company formed in June 2013 with its principal place of business at 1409 Peachtree Street NE, Suite 202, Atlanta, Georgia 30309.  Cardinal Points Holdings transacts business in this District and throughout the United States.

8.   Defendant Cardinal Points Management, LLC, also doing business as Clear Compass Digital Group ("Clear Compass Digital Group"), is a Delaware limited liability company formed in June 2013 with its principal place of business at 16133 Ventura Boulevard, Suite 1140, Los Angeles, California 91436.  Clear Compass Digital Group transacts business in this District and throughout the United States.

4

9.   Defendant Gyroscope Management Holdings, LLC ("Gyroscope"), is a Delaware limited liability company formed in June 2013 with its principal place of business at 16133 Ventura Boulevard, Suite 1140, Los Angeles, California 91436. Gyroscope Management Holdings transacts business in this District and throughout the United States.

10.   Defendant EDebitPay, LLC, is a Nevada limited liability company with its principal place of business at 16133 Ventura Boulevard, Suite 1080, Los Angeles, California 91436. EDebitPay, LLC, owned 100% of clickXchange Media, LLC, and Platinum Online Group, LLC (collectively, "EDP Entities"). EDebitPay, LLC, transacts business in this District and throughout the United States.

11.   Defendant clickXchange Media, LLC, is a California limited liability company with its principal place of business at 16133 Ventura Boulevard, Suite 1080, Los Angeles, California 91436. clickXchange Media transacted business in this District and throughout the United States and dissolved its corporate status in May 2014.

12.   Defendant Platinum Online Group, LLC, also doing business as Premier Membership Clubs and Money Plus Saver, was a California limited liability company with its principal place of business at 16133 Ventura Boulevard, Suite 1080, Los Angeles, California 91436. Platinum Online Group transacted business

in this District and throughout the United States and dissolved its corporate status in May 2014.

13.   Defendant iStream Financial Services, Inc. ("iStream"), is a Wisconsin corporation with its principal place of business at 13555 Bishops Court, Brookfield, Wisconsin 53005.  It is engaged in the business of providing payment processing services to merchants, including the EDP Entities and the Hornbeam Entities.  iStream transacts business in this District and throughout the United States.

14.   Defendant Jerry L. Robinson is a Member of Hornbeam Special Situations and its subsidiary companies and resides in Atlanta, Georgia.  Jerry Robinson serves on the Board of Managers for the Hornbeam Entities and owns no less than 28% of the combined companies.  Jerry Robinson also served as Chief Strategy Officer for Clear Compass Digital Group.  Individually or in concert with others, Jerry Robinson has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Hornbeam Entities set forth herein.  He transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

15.   Defendant Earl G. Robinson is a Member of Hornbeam Special Situations and its subsidiary companies and resides in Atlanta, Georgia.  Earl Robinson has

served on the Board of Managers for the Hornbeam Entities and owns no less than 13% of the combined companies. Earl Robinson also served as the Chief Revenue Officer for Clear Compass Digital Group. Individually or in concert with others, Earl Robinson has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Hornbeam Entities set forth herein. He transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

16. Defendant James McCarter is a Member of Hornbeam Special Situations and its subsidiary companies and resides in Alpharetta, Georgia. McCarter serves on the Board of Managers for the Hornbeam Entities and owns no less than 20% of the combined companies. Individually or in concert with others, McCarter has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Hornbeam Entities set forth herein. He transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

17. Defendant Keith Merrill served as the Chief Operating Officer of the EDP Entities from January 2012 through September 2013. From September 30, 2013 until September 30, 2015, Merrill served as the President and Chief Operating Officer of the Hornbeam Entities. Individually or in concert with others, Merrill

has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the EDP Entities and the Hornbeam Entities set forth herein.  He transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

18.   Defendant Mark Ward has served as the President of the Hornbeam Entities since January 2016.  Individually or in concert with others, Ward has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Hornbeam Entities set forth herein.  He transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

19.   Defendant Dale Paul Cleveland is or has been one of two Managing Members of EDebitPay, LLC, and its subsidiaries.  He is also the Chief Executive Officer of the EDP Entities.  Individually or in concert with others, Cleveland has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the EDP Entities set forth herein.  He transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

20.   Defendant William R. Wilson is or has been one of two Managing Members of EDebitPay, LLC, and its subsidiaries.  He is the President of the EDP Entities.

Individually or in concert with others, Wilson has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the EDP Entities set forth herein.  He transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

21.   Defendant Kris Axberg is the Chief Executive Officer and Chief Financial Officer of iStream.  Individually or in concert with others, Axberg has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of iStream set forth herein.  He transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

22.   Defendant Richard "Fred" Joachim is the President of iStream.  Individually or in concert with others, Joachim has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of iStream set forth herein.  He transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

23.   Defendant Chet Andrews was, until early 2015, the Senior Vice President for New Business Development at iStream.  Individually or in concert with others, through January 2015, Andrews formulated, directed, controlled, had the authority to control, or participated in the acts and practices of iStream set forth herein.  He

transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

## COMMON ENTERPRISES

24.  From July 2010 through September 2013, Defendants EDebitPay, LLC; Platinum Online Group, LLC; and clickXchange Media, LLC, operated as a common enterprise while engaging in the deceptive, unfair, and unlawful acts and practices alleged below.  The companies operated as a single business entity with common owners – Dale Cleveland and William Wilson – and common officers and employees.  From late 2012, Keith Merrill served as the Chief Operating Officer of the EDP Entities.  Platinum Online Group and clickXchange Media were wholly-owned subsidiaries of EDebitPay and separated the business into two parts:  a lead generation and management business run by clickXchange Media and a direct-to-consumer sales business run by Platinum Online Group.  The companies operated with consolidated financial records and routinely moved money between the various business accounts to satisfy obligations.  The business operated out of a single location in Encino, California, with shared employees, phone numbers, websites, and equipment.  The EDP Entities marketed products or services, including memberships in a series of online discount clubs, to consumers seeking payday, cash advance, or installment loans ("subprime consumers").

10

25.  The EDP Entities have commingled funds and conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, office locations, phone numbers, websites, and centralized payroll functions.  Because the EDP Entities have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below for the stated time period.

26.  Defendants Dale Paul Cleveland, William R. Wilson, and Keith Merrill (collectively, with the EDP Entities, the "EDP Defendants") formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the EDP Entities that constitute the EDP common enterprise.  Collectively, the EDP Entities, Cleveland, Wilson, and Merrill shall be referred to as the "EDP Defendants."  However, Keith Merrill shall be excluded from the "EDP Defendants" with regard to any allegations relating solely to the time period prior to January 2012.

27.   From October 2013 to June 2016, Defendants Hornbeam Special Situations, LLC; Cardinal Points Holdings, LLC; Cardinal Points Management, LLC; and Gyroscope Management Holdings, LLC, have operated as a common enterprise while engaging in the deceptive, unfair, and unlawful acts and practices alleged below.  Like the EDP Entities, the Hornbeam Entities were a consolidated

business separated into subsidiaries.  Hornbeam Special Situations, LLC, the

parent entity, operates solely through its subsidiaries.  Through its primary

subsidiary, Cardinal Points Holdings, LLC, Hornbeam wholly owns Cardinal

Points Management, LLC, doing business as Clear Compass Digital Group, and

Gyroscope Management Holdings, LLC.  After purchasing the EDebitPay

business, Hornbeam "rebranded" the clickXchange Media business into Clear

Compass Digital Group and the direct sales business into Gyroscope Management

Holdings.

28.  From September 2013, the Hornbeam Entities have been controlled by their

Members and a Management Committee consisting of the President and Members.

29.  The Hornbeam Entities have commingled funds and conducted the business

practices described below through an interrelated network of companies that have

common ownership, officers, managers, business functions, employees, office

locations, phone numbers, websites, and centralized payroll functions.  Because the

Hornbeam Entities have operated as a common enterprise, each of them is jointly

and severally liable for the acts and practices alleged below for the stated period.

30.  Defendants Jerry L. Robinson, Earl G. Robinson, and James McCarter,

along with Keith Merrill from September 2013 through September 2015, and Mark

Ward from January 2016 to present, formulated, directed, controlled, had the

authority to control, or participated in the acts and practices of the Hornbeam

Entities that constitute the Hornbeam common enterprise.  Collectively, the

Hornbeam Entities, Jerry L. Robinson, Earl G. Robinson, James McCarter, Keith

Merrill, and Mark Ward shall be referred to as the "Hornbeam Defendants."

However, Keith Merrill shall be excluded from the "Hornbeam Defendants" with

regard to any allegations relating solely to the time period after September 2015,

and Mark Ward shall be excluded from the "Hornbeam Defendants" with regard to

any allegations relating solely to the time period prior to January 2016.

## COMMERCE

31.  At all times material to this Complaint, Defendants have maintained a

substantial course of trade in or affecting commerce, as "commerce" is defined in

Section 4 of the FTC Act, 15 U.S.C. §44.

## DEFENDANTS' BUSINESS PRACTICES

32.  From at least July 2010 through June 2016, first the EDP and then the

Hornbeam Defendants purported to sell consumers memberships in a series of

online discount clubs, including Saving Pays Club, Money Plus Saver, and Saving

Makes Money (collectively, "Discount Clubs").

33.  These Defendants used Remotely Created Payment Orders ("RCPOs") and

Remotely Created Checks ("RCCs") (collectively "electronic checks") to debit

13

consumers' bank accounts for an initial application fee of $49.89 to $99.49 and monthly recurring fees of $14.00 to $19.95, until consumers affirmatively canceled. These Defendants did not have consumers' authorizations to debit their accounts.

34. The EDP and Hornbeam Defendants used the same tactics to obtain consumers' billing information, enroll consumers in their Discount Clubs, and debit consumers' bank accounts with electronic checks.

## EDEBITPAY DEFENDANTS

35. From July 2010 through September 2013, the EDP Defendants charged consumers for enrollment in their Discount Clubs, including initial application fees and automatically-recurring monthly fees. Consumers did not knowingly agree to or authorize these charges.

36. In 2008, EDebitPay, Wilson, and Cleveland settled FTC allegations that they debited consumers' accounts without authorization. Specifically, the complaint alleged they targeted subprime consumers and used RCCs to debit their accounts without authorization for pre-paid Visa or MasterCard reloadable cards.

37. In May 2010, the FTC filed a motion for an order to show cause why EDebitPay, Wilson, and Cleveland should not be held in contempt of the 2008 Stipulated Final Order for, again, targeting subprime consumers and debiting their

14

accounts without authorization for membership in a shopping club.  Without the knowledge of the FTC, the EDP Defendants launched the Saving Pays Discount Club during the pendency of the contempt proceedings.

38.   The EDP Defendants enrolled consumers in the Saving Pays Club online and, starting in 2012, through telemarketing by foreign call centers.  Upon enrollment, the EDP Defendants charged consumers initial application fees, and monthly recurring fees until they affirmatively cancelled the memberships.

39.   The call centers provided both customer service functions for consumers calling about the charges – often to request immediate cancellation or to complain that they did not agree to the charges – and outbound telemarketing.

40.   For the outbound telemarketing, the call centers contacted consumers whose information had been obtained by the EDP Defendants or others in the course of marketing cash advance, payday, or installment loans.  They marketed the Discount Clubs as a stand-alone offer as well as an "upsell" from loan offers.  The return rates for charges from telemarketing enrollments were at least as high, if not higher, than the return rates for charges related to online enrollments.

41.   At first, the EDP Defendants processed their electronic checks for the Saving Pays Club through payment processor Landmark Clearing, which used First Bank of Delaware as the processing bank.

42.  By November 2010, the EDP Defendants started to use Defendant iStream to process for their Discount Club business.  iStream processed Discount Club payments for the EDP Defendants as RCCs through Kenney Bank & Trust.  The same holding company owned iStream and Kenney Bank, and they shared corporate officers.

43.  In February 2011, both First Bank of Delaware and Kenney Bank gave notice that they would no longer process electronic checks for the EDP Defendants due to their high return rates.

44.  iStream reached an agreement with WestSide Bank in May 2011 to process electronic checks for the EDP Defendants.

45.  In October 2012, the EDP Defendants rebranded the Discount Club from Saving Pays Club to Money Plus Saver, using a virtually identical website with new customer service contact information.

46.  Although they stopped new "enrollments" into Saving Pays Club after launching Money Plus Saver, the EDP Defendants continued to charge recurring monthly fees to the consumers they had previously enrolled in Saving Pays Club.

<u>HORNBEAM DEFENDANTS</u>

47.  The Hornbeam Entities purchased all assets of the EDP Entities effective October 1, 2013.  The Hornbeam Defendants took over the business premises and

retained virtually all the EDP Entities' employees.  Keith Merrill became the

President and Chief Operating Officer of the new entities.

48.   Upon purchase, the Hornbeam Defendants assumed control of the Discount

Clubs, including Saving Pays Club, Money Plus Saver, and Saving Makes Money

– a not-yet-released version created by the EDP Defendants.  They continued the

relationships with the telemarketing call center, iStream, and WestSide Bank.

They immediately began charging consumers for Money Plus Saver initial

applications as well as recurring monthly fees for existing memberships.

49.   The Hornbeam Defendants launched the Saving Makes Money iteration of

the Discount Club in December 2013.  Like the EDP Defendants, the Hornbeam

Defendants marketed the Discount Clubs online, through marketing affiliates, and

through outbound telemarketing.  Although the Hornbeam Defendants ceased

direct telemarketing of the Discount Clubs in mid-2015, they continued selling the

Discount Clubs online and through affiliates until at least June 2016.

<u>Targeting Subprime Consumers to Obtain Billing Information</u>

50.   The EDP and Hornbeam Defendants each operated dozens of websites that

offered to match consumers with lenders who could provide payday, cash advance,

or installment loans.  Thousands of consumers completed loan applications on

these websites, providing their names, addresses, social security numbers, dates of birth, and bank account numbers.

51.  The EDP and Hornbeam Defendants also purchased "leads" containing the same sensitive personal and financial information from third party publishers of similar loan-finder websites.

52.  In numerous instances, the EDP and Hornbeam Defendants used the consumer financial information obtained from their own websites and from purchased "leads" to charge consumers for enrollment in their Discount Clubs, even though the consumers never authorized payments.

53.  In some instances, the EDP and Hornbeam Defendants, or their third party affiliate marketers, redirected consumers from loan-finding websites to websites that promoted both the Discount Club and cash advance loan offers.  In many of those instances, the EDP and Hornbeam Defendants and their affiliate-marketers pre-populated much, if not all, of the consumer information on the "enrollment" screens for the Discount Clubs.

54.  In numerous instances, the EDP and Hornbeam Defendants (excluding Mark Ward) used the personal and financial information consumers provided when seeking unrelated payday, cash advance, or installment loans to enroll consumers

in Discount Clubs through foreign telemarketing centers without first obtaining the consumers' oral or written authorization to be charged.

55.   The EDP and Hornbeam Defendants included a negative option feature in their membership sales, meaning they continued to charge consumers monthly fees for the memberships until the consumers took the necessary steps to affirmatively cancel their memberships.

<u>Consumer Complaints and Refund Requests</u>

56.   The EDP and Hornbeam Defendants also used their call centers to handle customer service functions.  From January 2011 through July 2015, the EDP and Hornbeam Defendants classified more than 75% of the customer service calls – more than 600,000 calls – as relating to cancellation and refund requests.

57.   Most, if not all, of the consumers who called the EDP and Hornbeam Defendants complained that they did not authorize the charges.  Indeed, customer service "rebuttal" scripts focused solely on customer authorization, anticipating customer complaints such as, "I told them no, I don't want it," "I was misinformed about this," and "I did not knowingly sign up for this."

58.   When consumers called to contest the charges, the EDP and Hornbeam Defendants routinely told consumers they had authorized the electronic check.  To support this claim, they falsely claimed that records of the date, time, and computer

19

IP address from enrollment prove authorization. They also claimed that their possession of the consumers' personal and financial information demonstrated that they had authorized the charges.

59. Thousands of consumers submitted affidavits and other statements to their banks attesting that they had not authorized the charges. As described below, WestSide Bank and other banks forwarded these statements to iStream.

60. In addition, hundreds of consumers filed complaints with the FTC, the Better Business Bureau, and State Attorneys General, alleging that the EDP and Hornbeam Defendants had taken their money without authorization or caused them to incur NSF bank charges from an unauthorized attempt to take their money.

61. Despite consumers' assertions that they had never authorized the charges, for most of the six-year period, the EDP and Hornbeam Defendants only provided refunds of initial charges and only then if the consumer: (1) proved that he or she requested the refund within 5 days of the date on the bank statement showing the check cleared the account; (2) completed a detailed form; and (3) provided a copy of a bank statement showing the charge had cleared the account.

<u>Using Electronic Checks to Charge Consumers</u>

62. The EDP and Hornbeam Defendants used RCCs and RCPOs to debit consumers' bank accounts.

63. RCCs and RCPOs are processed through the banking system much like traditional paper checks, but without a consumer's signature, instead bearing a statement such as "Authorized by Account Holder."  Both are created by the payee, rather than the individual on whose account the electronic check is drawn.

64. For an electronic check to be legally valid, the creator must obtain the express authorization of the consumer.

65. Consumers' banks may refuse to withdraw funds from an account and return the unpaid check to the issuing bank – commonly referred to as a "return" – for a number of reasons, including the use of incorrect or invalid information on the check, a lack of sufficient funds in the account to pay the check ("NSF"), concerns from the bank regarding whether the consumer authorized the check, or specific claims by the consumer that the check was not authorized.

66. A high return rate indicates that a large percentage of the charges could not be processed through the banking system and shows that the consumers did not knowingly agree to those charges.  This is particularly true where there is a high rate of "Not Authorized" returns.  Banks and regulators calculate return rates based on the number of checks, not their value.

High Return Rates

67.   Consumers' banks returned the vast majority of the EDP and Hornbeam Defendants' electronic checks.  From July 2010 through June 2016, the EDP and Hornbeam Defendants attempted to debit more than $185,000,000 from consumers and succeeded in withdrawing at least $42,000,000.

68.   Because electronic checks are processed through the banking system like paper checks, they are not separately regulated or monitored.  However, according to the Federal Reserve's most recent triennial analysis of payment types and return rates, in 2012 banks returned only 0.3% of all forms of checks, including electronic checks.  Indeed, since 2000, the total return rate for checks has not exceeded 0.5%.  Moreover, in 2012, banks returned only 0.0045% of checks as "Not Authorized."

69.   In contrast, consumers' banks returned approximately 66% of the EDP and Hornbeam Defendants' attempts to charge consumers for their Discount Clubs, more than 200 times the national average.  Further, banks returned approximately 78% of their attempts to charge consumers for initial application fees – more than 250 times the national average.

70.   During their operation of the Discount Clubs from July 2010 through September 2013, the EDP Defendants' total return rate for the Discount Clubs was more than 73%, more than 240 times the national average for check returns.

Moreover, their return rate for initial charges averaged almost 79%.  Their return rate for unauthorized charges averaged almost 3.5% during the same period, almost 800 times the national average for unauthorized checks.

71.  Similarly, from October 2013 through June 2016, the Hornbeam Defendants had an average return rate of more than 50% for all Discount Club charges, more than 150 times the national average, and a return rate of at least 75% for initial Discount Club charges.  Their return rate for unauthorized charges averaged almost 4% over the same period, almost 900 times the national average.

72.  In late 2014, the Hornbeam Defendants implemented a plan to artificially reduce their combined return rate by sending RCCs to themselves and counting those transactions, which had virtually zero returns, in their overall transaction volume.

73.  Specifically, with the knowledge and encouragement of iStream, in October 2014, the Hornbeam Defendants began sending thousands of nominal RCCs (typically $1.00-$1.50) each month from their Clear Compass Digital Group account to their Gyroscope account using a DBA of "Loyalty Leads."  By increasing the volume of monthly RCC transactions going through the iStream account – while not increasing the number of returns – the Hornbeam Defendants

made it appear as if they had lowered their total return rate by 15-20% by the end of 2014.

74.   The Hornbeam Defendants explained to iStream that the purpose of sending these individual electronic checks to themselves was "it's (sic) obvious benefit to our rates, rather than cost effectiveness."

75.   By mid-2015, at least 40% of the electronic checks the Hornbeam Defendants processed through iStream were "Loyalty Leads" checks to themselves.  The Hornbeam Defendants continued to use the Loyalty Leads checks to reduce their total return rate until they stopped operating the Discount Clubs.

<u>Consumers' Non-Usage</u>

76.   Virtually none of consumers enrolled in the Discount Clubs ever used any of the benefits for which the EDP and Hornbeam Defendants charged them.

77.   The EDP and Hornbeam Defendants' Discount Clubs had an average of 13,000 members per month, both new and recurring.  Yet, those members collectively downloaded fewer than 900 coupons over the entire six-year period, an average of fewer than 13 coupons per month – a monthly usage rate of 0.01%.

78.   Further, more than 99.5% of the more than 300,000 consumers who paid the EDP and Hornbeam Defendants for memberships in the Discount Clubs never downloaded a single coupon, the only service for which they had supposedly paid.

79.  Consumers did not use the Discount Clubs for which they had paid because they had not authorized the payments and were not aware that they were paying for access to online coupons.

## CHECK PROCESSING BY ISTREAM DEFENDANTS

80.  For more than five years, iStream and its principals, Kris Axberg, Richard "Fred" Joachim, and Chet Andrews (collectively with iStream, "iStream Defendants") played a critical role in the EDP and Hornbeam Defendants' practices.  The iStream Defendants provided access to the United States banking system, controlled the procedures through which money was debited from consumers' bank accounts, and disbursed consumer funds back to the Defendants.

81.  Defendant iStream Financial Services acted as a payment processor for the Defendants' Discount Clubs from at least November 2010 to May 2016.

82.  Since the formation of iStream in 2004, Defendant Kris Axberg has served as the Chief Financial Officer.  Axberg became the Chief Executive Officer by early 2015.

83.  Since the formation of iStream in 2004, Defendant Richard "Fred" Joachim has served as the President.

84.  In late 2009, the iStream Defendants recruited Defendant Chet Andrews to work for iStream for the purpose of developing a "high return merchant

processing" business, including processing for two customers Andrews had

worked with previously, EDP and Membership Services, LLC. At that time, both

EDP and Membership Services were operating under Stipulated Judgments with

the FTC arising from allegations of unauthorized charges to consumers.

<u>iStream Defendants' Knowledge of Unauthorized Charges</u>

85. Before they started processing Discount Club payments in November 2010,

the iStream Defendants were aware of the 2008 FTC Order settling allegations that

EDebitPay, Wilson, and Cleveland had withdrawn funds from consumers'

accounts without authorization.

86. From January 2010 through October 2010, the iStream Defendants

processed payments for the EDP Defendants for other direct-to-consumer sales,

unrelated to the Discount Clubs. During that period, the iStream Defendants

recorded return rates for the EDP Defendants of more than 80% each month. As a

result, by October 2010, the iStream Defendants knew that processing payments

for the EDP Defendants created significant risk of legal action but, as iStream's

Chief Compliance Officer confirmed to Joachim, "if we are going to have a risky

account . . . we should have all the business, rather than half the business and half

the money but the same risk." Thereafter, the iStream Defendants actively

encouraged the EDP Defendants to increase their processing volume, including by reducing the charges for returned items.

87.   When the EDP Defendants submitted forms requesting to open new processing accounts for processing Discount Club payments, the company stated that the expected return rates would be 70%.  The iStream Defendants approved the requests within one day, and the EDP Defendants immediately began charging consumers for Discount Club fees through the iStream Defendants.

88.   Before agreeing to process Discount Club payments for them, the iStream Defendants knew that the EDP Defendants, and later the Hornbeam Defendants, marketed and sold their Discount Clubs on websites or through telemarketing, without face-to-face contact with the consumer, increasing the risk of unauthorized transactions.

89.   At all times while processing payments for the other Defendants, the iStream Defendants knew that electronic checks, and particularly RCCs, were considered a high-risk payment system, yet they placed no controls or limits on the EDP and Hornbeam Defendants' use of these instruments.

90.   During the course of processing Discount Club transactions for the EDP Defendants, the iStream Defendants knew about multiple legal actions arising from the EDP Defendants' withdrawing money from consumers' accounts without

authorization, including the FTC actions and a case brought by the State of Oregon alleging that the EDP Defendants had debited Oregon consumers' accounts for Discount Clubs without authorization.

91.  During the course of processing Discount Club transactions, the iStream Defendants ignored recommendations from iStream's sister bank, independent compliance auditors, and iStream's own Compliance and Risk Officers to terminate the processing relationship due to the high return rates and the likelihood of fraud.

92.  From November 2010, when the iStream Defendants first started processing Discount Club transactions, they were aware of the EDP Defendants' consistently high return rates.  The iStream Defendants monitored these rates closely, as the company's pricing structure depended on the monthly number of items processed, the number of returns, and the number of unauthorized returns.

93.  As discussed above in paragraphs 70-71, the EDP and Hornbeam Defendants' total return rates were hundreds of times higher than industry averages throughout the entirety of their relationship with the iStream Defendants, even after the Hornbeam Defendants began artificially lowering their total return rates with Loyalty Leads checks.

94.   The iStream Defendants were also aware that the EDP and Hornbeam Defendants' return rates for initial "application fees" never dropped below 72% and ranged as high as 87%.

95.   The specific categories of returns also alerted the iStream Defendants that they were processing unauthorized charges.  Most glaring, the EDP and Hornbeam Defendants' "not authorized" returns far exceeded the industry average of 0.0045% for all forms of checks.  Indeed, from November 2010 through May 2016, the EDP and Hornbeam Defendants averaged more than 3.5% in "not authorized" returns for Discount Club charges, almost 800 times the industry average.

96.   The iStream Defendants also ignored the EDP and Hornbeam Defendants' exceptionally high returns for insufficient funds.  From November 2010 through May 2016, more than 1,000,000 Discount Club electronic checks were returned as "NSF," almost 38% of the checks processed by iStream for the Discount Clubs.

97.   The EDP and Hornbeam Defendants' extraordinarily high return rates, both total and for the specific processing accounts and return reasons, made the iStream Defendants aware they were processing a large number of unauthorized transactions.

98.   Contrary to industry practice, the iStream Defendants also reduced the number of returns they classified as "unauthorized" by excluding categories such

as "Refer to Maker" that banks commonly use when they believe the attempted debit is unauthorized.  Indeed, consumers' banks returned more than 130,000 Discount Club RCCs using the "Refer to Maker" return reason.  Had the iStream Defendants included "Refer to Maker" in its calculation, the EDP and Hornbeam Defendants' percentage of unauthorized returns would have more than doubled.

99.   The iStream Defendants knew their narrow classification of return reasons was contrary to industry practice.

100.  The iStream Defendants helped the Hornbeam Defendants artificially reduce their return rates.  Specifically, as discussed in Paragraphs 73-74, in mid-2014, the Hornbeam Defendants and the iStream Defendants discussed using "Loyalty Leads" checks to reduce the Hornbeam Defendants' total return rate.

101.  The iStream Defendants agreed to open a new processing account for Loyalty Leads after Andrews met with and obtained approval from Joachim. Andrews and Joachim knew that the Hornbeam Defendants were setting up the account to process RCCs for Loyalty Leads in order to reduce their total return rate.

102.  The iStream Defendants also agreed to reduce their fees for processing the Loyalty Leads checks because they knew that the Hornbeam Defendants were using them solely to reduce return rates.

30

103.  WestSide Bank regularly provided to the iStream Defendants "collection letters" from banks returning checks as unauthorized.  These letters included affidavits or other consumer statements attesting that consumers did not authorize the debits.

104.  The iStream Defendants also received numerous complaints from consumers' banks, including Wells Fargo, Wachovia, Bank of America, and Chase, about the overwhelming number of unauthorized returns.  In some instances, the banks raised concerns that WestSide Bank was ignoring OCC and FDIC guidance regarding risks associated with processing transactions for telemarketers and online merchants.

105.   Rather than investigating the banks' concerns, the iStream Defendants falsely claimed that WestSide Bank was performing extensive due diligence to confirm the validity of the transactions.

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

106.  Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

107.  Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.  Acts or practices are unfair under Section 5 of the FTC Act if they cause, or are likely to

cause, substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## COUNT I – Unfair Billing Practices By EDP and Hornbeam Defendants

108.  As described in Paragraphs 32-79, in numerous instances since July 2010, the EDP and Hornbeam Defendants obtained consumers' bank account information and caused billing information to be submitted for payment on those accounts without consumers' express informed consent.

109.  These Defendants' actions caused substantial injury to consumers that consumers could not reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

110.  Therefore, the EDP and Hornbeam Defendants' practices as described in Paragraph 108 of this Complaint constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## COUNT II – Deception By EDP and Hornbeam Defendants

111.  As described in Paragraphs 56-61, in numerous instances, the EDP and Hornbeam Defendants have represented, directly or indirectly, expressly or by implication to consumers who contacted the Defendants to seek refunds that those consumers are not entitled to a refund because, as confirmed by the fact the

Defendants had the consumers' personal and financial information as well as their order details, the consumers agreed:  (i) to purchase the products or services, or (ii) to authorize the Defendants to debit money from consumers' bank accounts to pay for the Defendants' products or services.

112.  As described in Paragraphs 32-79, in truth and in fact, in numerous instances in which the Defendants made these representations, consumers did not agree:  (i) to purchase the Defendants' products or services, or (ii) to authorize the Defendants to debit money from consumers' bank accounts to pay for the Defendants' products or services.

113.  Therefore, the EDP and Hornbeam Defendants' representations set forth in Paragraph 111 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III – Unfair Billing Practices By iStream Defendants

114.  The iStream Defendants' acts or practices in processing fraudulent and unauthorized debit transactions to consumers' bank accounts, as described in Paragraphs 80-105, above, have caused or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

115.  Therefore, the iStream Defendants' acts or practices, as alleged in Paragraph 114, constitute unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

116.  In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq.*, which became effective on December 29, 2010.  Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  15 U.S.C. § 8401.

117.  Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, (2) obtains the consumer's express informed consent before making the charge, and (3) provides a simple mechanism to stop recurring charges.  *See* 15 U.S.C. § 8403.

118.  The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

119.  As described in Paragraphs 32-79 above, the EDP and Hornbeam Defendants have advertised and sold memberships in Discount Clubs, including the Saving Pays Club, Money Plus Saver, and Saving Makes Money, through a negative option feature as defined by the TSR.  16 C.F.R. § 310.2(w).

120.  Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

### COUNT IV – ROSCA Violation By EDP and Hornbeam Defendants

121.  As described in Paragraphs 32-79, in numerous instances since January 2011, in connection with charging consumers for Discount Clubs sold in transactions effected on the Internet through a negative option feature, the Defendants have failed to:

a. clearly and conspicuously disclose all the material terms of the transaction, including the amounts and dates of charges, before obtaining the consumer's billing information; and

b. obtain the consumer's express informed consent before charging the consumer's financial account for products or services through such transaction.

122. The Defendants' practices, as alleged in Paragraph 121, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

## VIOLATIONS OF THE TELEMARKETING SALES RULE

123. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, in 1994. The FTC adopted the original Telemarketing Sales Rule ("TSR") in 1995, extensively amended it in 2003, and amended certain sections thereafter.

124. Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

125. Under the TSR, "preacquired account information" is any information that enables a seller or telemarketer to cause a charge to be placed against a customer's or donor's account without obtaining the account number directly from the

36

customer or donor during the telemarketing transaction pursuant to which the account will be charged.  16 C.F.R. § 310.2(z).

126.  The TSR prohibits any seller or telemarketer from causing billing information to be submitted for payment, or collecting or attempting to collect payment for goods or services, directly or indirectly, without the customer's or donor's express verifiable authorization, except when the method of payment used is a credit card subject to the protections of the Truth In Lending Act, 15 U.S.C. § 1601 *et seq.*, and Regulation Z, 12 C.F.R. § 226, or a debit card subject to the protections of the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.*, and Regulation E, 12 C.F.R. § 205.  When an audio recording of the customer's express oral authorization is used to satisfy this requirement, the TSR requires that the recording must evidence clearly the customer's authorization of payment for the goods or services that are the subject of the telemarketing transaction and the customer's receipt of all of the following information, among other information:

    a.    the number of debits, charges, or payments (if more than one);

    b.    the date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;

    c.    the amount(s) of the debit(s), charge(s), or payment(s);

    d.      a telephone number for customer inquiry that is answered during normal business hours; and

    e.      the customer's billing information, identified with sufficient specificity such that the customer understands what account will be used to collect payment for the goods or services that are the subject of the telemarketing transaction.

16 C.F.R. § 310.3(a)(3)(ii).

127.  It is an abusive telemarketing act or practice and a violation of the TSR for any seller or telemarketer to cause billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer or donor.  In any telemarketing transaction, the seller or telemarketer must obtain the express informed consent of the customer or donor to be charged for the goods or services or charitable contribution and to be charged using the identified account.

16 C.F.R. § 310.4(a)(7).

128.  To evidence express informed consent in any telemarketing transaction involving preacquired account information without a free-to-pay conversion, the seller or telemarketer must:

    a.  At a minimum, identify the account to be charged with sufficient

        specificity for the customer or donor to understand what account will

        be charged; and

    b.  Obtain from the customer or donor his or her express agreement to be

        charged for the goods or services and to be charged using the

        identified account number.

16 C.F.R. § 310.4(a)(7)(ii).

  129.  Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and

Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR

constitutes an unfair or deceptive act or practice in or affecting commerce, in

violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT V – Failure to Obtain Express Verifiable Authorization in Violation of the TSR by EDP and Hornbeam Defendants (Excluding Mark Ward)

  130.  As described in Paragraphs 32-79 above, in numerous instances, in the

course of telemarketing their Discount Clubs, the EDP and Hornbeam Defendants

(excluding Mark Ward) have caused billing information to be submitted for

payment using a payment method other than a credit card subject to the protections

of the Truth In Lending Act, 15 U.S.C. § 1601 *et seq.*, and Regulation Z, 12 C.F.R.

§ 226, or a debit card subject to the protections of the Electronic Funds Transfer

Act, 15 U.S.C. § 1693 *et seq*., and Regulation E, 12 C.F.R. § 205, without the consumer's express verifiable authorization.

131.  The EDP and Hornbeam Defendants' practice as alleged in Paragraph 130 is a deceptive telemarketing practice that violates Section 310.3(a)(3) of the TSR, 16 C.F.R. § 310.3(a)(3).

**COUNT VI – Failure to Obtain Express Informed Consent
in Violation of the TSR By EDP and Hornbeam Defendants (Excluding Mark Ward)**

132.  As described in Paragraphs 32-79 above, in numerous instances, in the course of telemarketing their Discount Clubs, the EDP and Hornbeam Defendants (excluding Mark Ward) have caused billing information to be submitted for payment, directly or indirectly:

a.  without the express informed consent of the customer to be charged for the goods or services and to be charged using a specified account; and

b.  where the telemarketing transaction includes preacquired account information:

i.  without identifying the account to be charged with sufficient specificity for the customer or donor to understand what account will be charged; or

40

ii.  without obtaining from the customer or donor his or her express
agreement to be charged for the goods or services and to be
charged using the identified account number.

133.  The EDP and Hornbeam Defendants' practices, as alleged in Paragraph 132,
are abusive telemarketing practices that violate Section 310.4(a)(7) of the TSR, 16
C.F.R. § 310.4(a)(7).

## COUNT VII – Assisting and Facilitating TSR Violations By iStream Defendants

134.  In numerous instances, the iStream Defendants provided substantial
assistance or support, including payment processing services, as described in
Paragraphs 80-105, above, to the Defendants who engaged in telemarketing
various products and services.  The iStream Defendants did so knowing or
consciously avoiding knowing the Defendants were engaged in violations of the
TSR set forth in Counts V and VI, above.

135.  The iStream Defendants' acts or practices alleged in Paragraph 134
constitute deceptive telemarketing acts or practices in violation of Section 310.3(b)
of the TSR and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

136.  Consumers have suffered substantial injury because of Defendants'
violations of the FTC Act, ROSCA, and the TSR.  In addition, Defendants have

41

been unjustly enriched because of their unlawful acts or practices.  Absent

injunctive relief by this Court, Defendants are likely to continue to injure

consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

137.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to

grant injunctive and such other relief as the Court may deem appropriate to halt

and redress violations of any provision of law enforced by the FTC.  The Court, in

the exercise of its equitable jurisdiction, may award ancillary relief, including

rescission or reformation of contracts, restitution, the refund of monies paid, and

the disgorgement of ill-gotten monies, to prevent and remedy any violation of any

provision of law enforced by the FTC.

138.  Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorizes this

Court to grant such relief as the Court finds necessary to redress injury to

consumers resulting from Defendants' violations of the TSR, including the

rescission or reformation of contracts and the refund of money.

## PRAYER FOR RELIEF

139.  Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15

U.S.C. § 53(b), Section 5 of ROSCA, 15 U.S.C. § 8404, and Section 6(b) of the

Telemarketing Act 15 U.S.C. § 6105(b), and the Court's own equitable powers,

requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC

Act, ROSCA, and the TSR by Defendants;

B.    Award such relief as the Court finds necessary to redress injury to

consumers resulting from Defendants' violations of the FTC Act,

ROSCA, and the TSR, including, but not limited to, rescission or

reformation of contracts, restitution, the refund of monies paid, and

the disgorgement of ill-gotten monies; and

C.    Award Plaintiff the costs of bringing this action, as well as such other

and additional relief as the Court may determine to be just and proper.

Respectfully Submitted,

DAVID C. SHONKA
Acting General Counsel

Dated: 8/15/2017

R. MICHAEL WALLER
Georgia Bar #102886
Federal Trade Commission
225 Peachtree Street, NE, Suite 1500
Atlanta, GA 30303
(404) 656-1371 (Tel)
(404) 656-1379 (Fax)


KORIN EWING FELIX
ELIZABETH J. AVERILL
OMOLARA BEWAJI JOSENEY
REENAH L. KIM
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC 20580
(202) 326-3556 (Felix)
(202) 326-2993 (Averill)
(202) 326-2599 (Joseney)
(202) 326-2272 (Kim)
(202) 326-3197 (Fax)


Attorneys for Plaintiff
FEDERAL TRADE COMMISSION