UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

_____

)
FEDERAL TRADE COMMISSION,               )
                                        )
                    Plaintiff,          )
                                        )
            v.                          )        1:17cv03094-WMR
                                        )
HORNBEAM SPECIAL SITUATIONS,            )
LLC; CARDINAL POINTS HOLDINGS,          )
LLC; CARDINAL POINTS                    )
MANAGEMENT, LLC, also d/b/a             )
CLEAR COMPASS DIGITAL GROUP;            )
GYROSCOPE MANAGEMENT                    )
HOLDINGS, LLC; EDEBITPAY, LLC;          )
PLATINUM ONLINE GROUP, LLC,             )
also d/b/a as PREMIER                   )
MEMBERSHIP CLUBS;                       )
CLICKXCHANGE MEDIA, LLC;                )
ISTREAM FINANCIAL SERVICES,             )
INC.; PATRICIA BRANDMEIER               )
ROBINSON, as executor of the ESTATE     )
OF JERRY L. ROBINSON, EARL G.           )
ROBINSON, and JAMES MCCARTER,           )
individually and as members of Hornbeam )
Special Situations, LLC; Cardinal Points )
Holdings, LLC; Cardinal Points          )
Management, LLC; and Gyroscope          )
Management Holdings, LLC; KEITH         )
MERRILL, individually and as an officer )
of EDebitPay, LLC; Platinum Online      )
Group, LLC; clickXchange Media, LLC;    )
Cardinal Points Management, LLC, and    )
Gyroscope Management Holdings, LLC;     )

1

MARK WARD, individually and as an           )
officer of Cardinal Points Management,      )
LLC; Gyroscope Management                   )
Holdings, LLC; DALE PAUL                     )
CLEVELAND and WILLIAM R.                    )
WILSON, individually and as members of      )
EDebitPay, LLC; Platinum Online Group,      )
LLC; and clickXchange Media, LLC;           )
KRIS AXBERG, RICHARD JOACHIM                 )
and CHET ANDREWS, individually              )
and as officers of iStream Financial        )
Services, Inc.,                              )
                                             )
                              Defendants.    )
_____ )

## SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its

Second Amended Complaint alleges:

1.   The FTC brings this action under Sections 13(b) and 19 of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, the Restore Online

Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401 *et seq.*, and the

Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing

Act"), 15 U.S.C. §§ 6101 – 6108, to obtain permanent injunctive relief, rescission

or reformation of contracts, restitution, refund of monies paid, disgorgement of ill-

gotten monies, and other equitable relief for Defendants' acts or practices in

violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); Section 4 of ROSCA,

15 U.S.C. § 8404; and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R.

Part 310.

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331,

1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), 6105(b), and

8404(a).

3.    Venue is proper in this district under 28 U.S.C. § 1391(b), (c), and (d), and

15 U.S.C. § 53(b).

## PLAINTIFF

4.    The FTC is an independent agency of the United States Government created

by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15

U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting

commerce.  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-05, which, among

other things, bans the use of negative option features in transactions effected on the

internet that do not meet certain conditions for disclosure, consent, and

cancellation.  The FTC further enforces the Telemarketing Act, 15 U.S.C. §§ 6101-

08.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the

TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts

or practices.

5.   The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act, ROSCA, and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 57b, 6102(c), and 6105(b).

## DEFENDANTS

6.   Defendant Hornbeam Special Situations, LLC, is a Georgia limited liability company formed in March 2013 with its principal place of business at 1409 Peachtree Street NE, Suite 202, Atlanta, Georgia 30309.  Hornbeam Special Situations owns 100% of Cardinal Points Holdings, LLC, which, in turn, owns 100% of both Cardinal Points Management, LLC, and Gyroscope Management Holdings, LLC (collectively, "Hornbeam Entities").  Hornbeam Special Situations transacts or has transacted business in this District and throughout the United States.

7.   Defendant Cardinal Points Holdings, LLC, is a Delaware limited liability company formed in June 2013 with its principal place of business at 1409 Peachtree Street NE, Suite 202, Atlanta, Georgia 30309.  Cardinal Points Holdings

transacts or has transacted business in this District and throughout the United States.

8.   Defendant Cardinal Points Management, LLC, also doing business as Clear Compass Digital Group ("Clear Compass Digital Group" or "Clear Compass"), is a Delaware limited liability company formed in June 2013 with its principal place of business at 16133 Ventura Boulevard, Suite 1140, Los Angeles, California 91436. Clear Compass Digital Group transacts or has transacted business in this District and throughout the United States.

9.   Defendant Gyroscope Management Holdings, LLC ("Gyroscope"), is a Delaware limited liability company formed in June 2013 with its principal place of business at 16133 Ventura Boulevard, Suite 1140, Los Angeles, California 91436. Gyroscope transacts or has transacted business in this District and throughout the United States.

10.   Defendant EDebitPay, LLC, is a Nevada limited liability company with its principal place of business at 16133 Ventura Boulevard, Suite 1080, Los Angeles, California 91436. EDebitPay owned 100% of clickXchange Media, LLC, and Platinum Online Group, LLC (collectively, "EDP Entities"). EDebitPay transacts or has transacted business in this District and throughout the United States.

11.   Defendant clickXchange Media, LLC, is a California limited liability company with its principal place of business at 16133 Ventura Boulevard, Suite 1080, Los Angeles, California 91436.  clickXchange Media transacted business in this District and throughout the United States and dissolved its corporate status in May 2014.

12.   Defendant Platinum Online Group, LLC, also doing business as Premier Membership Clubs and Money Plus Saver, was a California limited liability company with its principal place of business at 16133 Ventura Boulevard, Suite 1080, Los Angeles, California 91436.  Platinum Online Group transacted business in this District and throughout the United States and dissolved its corporate status in May 2014.

13.   Defendant iStream Financial Services, Inc. ("iStream"), is a Wisconsin corporation with its principal place of business at 13555 Bishops Court, Brookfield, Wisconsin 53005.  It is engaged in the business of providing payment processing services to merchants, including the EDP Entities and the Hornbeam Entities.  iStream transacts business in this District and throughout the United States.

14.   Jerry L. Robinson was a Member of Hornbeam Special Situations and its subsidiary companies and resided in Atlanta, Georgia.  Jerry Robinson served on

the Management Committee for the Hornbeam Entities and owned approximately
36% of the combined companies.  Jerry Robinson also served as Chief Strategy
Officer for Clear Compass Digital Group.  Individually or in concert with others,
Jerry Robinson formulated, directed, controlled, had the authority to control, or
participated in the acts and practices of the Hornbeam Entities set forth herein.  As
set forth herein, Jerry Robinson knew, was recklessly indifferent to whether, or
willfully disregarded that consumers did not know about or authorize the debits to
their accounts by the Hornbeam Entities.  He transacted business in connection
with the matters alleged herein in this District and throughout the United States.

15.   Defendant Patricia Brandmeier Robinson is the executor of the Estate of
Jerry L. Robinson and was substituted as a party for Jerry L. Robinson by Order of
the Court on February 7, 2018 (Dkt. No. 132).

16.   Defendant Earl G. Robinson is a Member of Hornbeam Special Situations
and its subsidiary companies and resides in Atlanta, Georgia.  Earl Robinson
serves or has served on the Management Committee for the Hornbeam Entities and
owns approximately 20% of the combined companies.  Earl Robinson also served
as the Chief Revenue Officer for Clear Compass Digital Group.  Individually or in
concert with others, Earl Robinson has formulated, directed, controlled, had the
authority to control, or participated in the acts and practices of the Hornbeam

Entities set forth herein.  As set forth herein, Earl Robinson knew, was recklessly indifferent to whether, or willfully disregarded that consumers did not know about or authorize the debits to their accounts by the Hornbeam Entities.  He transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

17.  Defendant James McCarter is a Member of Hornbeam Special Situations and its subsidiary companies and resides in Alpharetta, Georgia.  McCarter serves or has served on the Management Committee for the Hornbeam Entities and owns approximately 24% of the combined companies.  Individually or in concert with others, McCarter has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Hornbeam Entities set forth herein. As set forth herein, McCarter knew, was recklessly indifferent to whether, or willfully disregarded that consumers did not know about or authorize the debits to their accounts by the Hornbeam Entities.  He transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

18.  Defendant Keith Merrill served as the Chief Operating Officer of the EDP Entities from January 2012 through September 2013.  From September 30, 2013 until September 30, 2015, Merrill served as the President and Chief Operating

Officer of the Hornbeam Entities.  Individually or in concert with others, Merrill

formulated, directed, controlled, had the authority to control, or participated in the

acts and practices of the EDP Entities and the Hornbeam Entities set forth herein.

As set forth herein, Merrill knew, was recklessly indifferent to whether, or

willfully disregarded that consumers did not know about or authorize the debits to

their accounts by the EDP and Hornbeam Entities.  He transacts or has transacted

business in connection with the matters alleged herein in this District and

throughout the United States.

   19.   Defendant Mark Ward served as the President of the Hornbeam Entities

from January 2016 through August 2016.  Individually or in concert with others,

Ward has formulated, directed, controlled, had the authority to control, or

participated in the acts and practices of the Hornbeam Entities set forth herein.  As

set forth herein, Ward knew, was recklessly indifferent to whether, or willfully

disregarded that consumers did not know about or authorize the debits to their

accounts by the Hornbeam Entities.  He transacts or has transacted business in

connection with the matters alleged herein in this District and throughout the

United States.

   20.   Defendant Dale Paul Cleveland is or has been one of two Managing

Members of EDebitPay and its subsidiaries.  He is also the Chief Executive Officer

of the EDP Entities.  Individually or in concert with others, Cleveland has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the EDP Entities set forth herein.  As set forth herein, Cleveland knew, was recklessly indifferent to whether, or willfully disregarded that consumers did not know about or authorize the debits to their accounts by the EDP Entities.  He transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

21.  Defendant William R. Wilson is or has been one of two Managing Members of EDebitPay and its subsidiaries.  He is the President of the EDP Entities. Individually or in concert with others, Wilson has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the EDP Entities set forth herein.  As set forth herein, Wilson knew, was recklessly indifferent to whether, or willfully disregarded that consumers did not know about or authorize the debits to their accounts by the EDP Entities.  He transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

22.  Defendant Kris Axberg is the Chief Executive Officer and Chief Financial Officer of iStream.  Individually or in concert with others, Axberg has formulated, directed, controlled, had the authority to control, or participated in the acts and

practices of iStream set forth herein.  As set forth herein, Axberg knew, was

recklessly indifferent to whether, or willfully disregarded that consumers did not

know about or authorize the debits to their accounts by the EDP and Hornbeam

Entities.  He transacts or has transacted business in connection with the matters

alleged herein in this District and throughout the United States.

23.   Defendant Richard "Fred" Joachim is the President of iStream.  Individually

or in concert with others, Joachim has formulated, directed, controlled, had the

authority to control, or participated in the acts and practices of iStream set forth

herein.  As set forth herein, Joachim knew, was recklessly indifferent to whether,

or willfully disregarded that consumers did not know about or authorize the debits

to their accounts by the EDP and Hornbeam Entities.  He transacts or has

transacted business in connection with the matters alleged herein in this District

and throughout the United States.

24.   Defendant Chet Andrews was, until early 2015, the Senior Vice President

for New Business Development at iStream.  Individually or in concert with others,

through January 2015, Andrews formulated, directed, controlled, had the authority

to control, or participated in the acts and practices of iStream set forth herein.  In

addition, after his January 2015 departure from iStream, Andrews participated in

the acts and practices of the Hornbeam Defendants set forth herein.  As set forth

herein, Andrews knew, was recklessly indifferent to whether, or willfully

disregarded that consumers did not know about or authorize the debits to their

accounts by the EDP and Hornbeam Entities.  He transacts or has transacted

business in connection with the matters alleged herein in this District and

throughout the United States.

## COMMON ENTERPRISES

25.   From July 2010 through September 2013, Defendants EDebitPay, Platinum

Online Group, and clickXchange Media operated as a common enterprise while

engaging in the deceptive, unfair, and unlawful acts and practices alleged below.

The companies operated as a single business entity with common owners –

Cleveland and Wilson – and common officers and employees.

26.   From early 2012, Merrill served as the Chief Operating Officer of the EDP

Entities.  Platinum Online Group and clickXchange Media were wholly-owned

subsidiaries of EDebitPay and separated the business into two parts:  a lead

generation and management business run by clickXchange Media and a direct-to-

consumer sales business run by Platinum Online Group.

27.   The companies operated with consolidated financial records and routinely

moved money between the various business accounts to satisfy obligations.

Platinum Online Group and clickXchange Media were disregarded entities for federal tax purposes.

28.  The business operated primarily out of a location in Los Angeles, California, with shared employees, phone numbers, websites, and equipment.  These shared employees routinely worked on all aspects of the business, including lead generation and direct-to-consumer sales.

29.  The EDP Entities marketed products or services, including memberships in a series of online discount clubs, to consumers seeking payday, cash advance, or installment loans ("Subprime Consumers").

30.  The EDP Entities have commingled funds and conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, office locations, phone numbers, websites, and centralized payroll functions.  Because the EDP Entities have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below for the stated time period.

31.  Cleveland, Wilson, and Merrill formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the EDP Entities that constitute the EDP common enterprise.  Collectively, the EDP Entities, Cleveland, Wilson, and Merrill are referred to as the "EDP Defendants."

However, Merrill is excluded from the "EDP Defendants" with regard to any allegations relating solely to the time period prior to January 2012.

32.  Effective September 30, 2013, the Hornbeam Entities purchased the assets of the EDP Entities.

33.   From October 2013 to June 2016, Defendants Hornbeam Special Situations, Cardinal Points Holdings, Clear Compass Digital Group, and Gyroscope have operated as a common enterprise while engaging in the deceptive, unfair, and unlawful acts and practices alleged below.  Like the EDP Entities, the Hornbeam Entities were a consolidated business separated into subsidiaries. Hornbeam Special Situations, the parent entity, operates solely through its subsidiaries.  Through its primary subsidiary, Cardinal Points Holdings, Hornbeam Special Situations wholly owns Clear Compass Digital Group and Gyroscope.

34.  After purchasing the EDebitPay assets, the Hornbeam Entities "rebranded" the clickXchange Media business into Clear Compass Digital Group and the Platinum Online Group direct sales business into Gyroscope.

35.  The Hornbeam Entities operated with consolidated financial records and routinely moved money between the various business accounts to satisfy obligations. Cardinal Points Holdings, Clear Compass Digital Group, and Gyroscope were disregarded entities for federal tax purposes.

14

36.   The business operated primarily out of a location in Los Angeles, California, with shared employees, phone numbers, websites, and equipment.  These shared employees routinely worked on all aspects of the business, including lead generation and direct-to-consumer sales.

37.   Since September 2013, the Hornbeam Entities have been controlled by their Members and a Management Committee consisting of the President and Members.

38.   The Hornbeam Entities have commingled funds and conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, office locations, phone numbers, websites, and centralized payroll functions.

39.   In January 2015, Martha Leon, Director of Accounting and Administration for the Hornbeam Entities, received approval from Merrill to submit to the State of California (in support of an application for a California Finance Lenders License) the following description of the relationships between the Hornbeam Entities:

> The new [Hornbeam] companies formed effectively operate as one company, because the parent companies are really just holding companies, with no separate staff or revenue generating activity of their own. . . . The ultimate parent, Hornbeam Special Situations, LLC, does not conduct any revenue-generating activity of its own, nor do Cardinal Points Holdings, LLC, or Cardinal Points IP LLC. Cardinal Points IP is merely a holding company for our intellectual

property, which is utilized by the bottom two entities, CPM [Clear
Compass Digital Group] and Gyroscope Management Holdings.
These last two entities are where all of the revenue-generating activity
is conducted. . . . Also, all employees are CPM employees. . . .

40.   Because the Hornbeam Entities have operated as a common enterprise, each
of them is jointly and severally liable for the acts and practices alleged below for
the stated period.

41.   Defendants Jerry Robinson, Earl Robinson, and McCarter, along with
Merrill from September 2013 through September 2015, and Ward from January
2016 to August 2016, formulated, directed, controlled, had the authority to control,
or participated in the acts and practices of the Hornbeam Entities that constitute the
Hornbeam common enterprise.  Collectively, the Hornbeam Entities, Jerry
Robinson, Earl Robinson, McCarter, Merrill, and Ward are referred to as the
"Hornbeam Defendants."  However, Merrill is excluded from the "Hornbeam
Defendants" with regard to any allegations relating solely to the time period after
September 2015, and Ward is excluded from the "Hornbeam Defendants" with
regard to any allegations relating solely to the time period prior to January 2016.

## COMMERCE

42.  At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

43.  From at least July 2010 through June 2016, first the EDP Defendants and then the Hornbeam Defendants purported to sell consumers memberships in a series of online discount clubs, including Saving Pays Club, Money Plus Saver, and Saving Makes Money (collectively, "Discount Clubs").

44.  These Defendants used Remotely Created Payment Orders ("RCPOs") and Remotely Created Checks ("RCCs") (collectively "Electronic Checks") to debit consumers' bank accounts for an initial application fee of $49.89 to $99.49 and monthly recurring fees of $14.00 to $19.95, until consumers affirmatively canceled.  These Defendants did not have consumers' authorizations to debit their accounts.

45.  The EDP and Hornbeam Defendants used the same tactics to obtain consumers' billing information, enroll consumers in their Discount Clubs, and debit consumers' bank accounts with Electronic Checks.

17

EDEBITPAY DEFENDANTS

46.   From at least July 2010 through September 2013, the EDP Entities operated

a nationwide business located in the greater Los Angeles, California area.  The

EDP Entities operated as a small, closely-held company with approximately 25

employees.

47.   Throughout this period, Wilson and Cleveland were the sole owners of the

EDP Entities, served as President and CEO, respectively, of the business, and had

final authority over all business matters, including directly controlling all

operations of the EDP Entities.  Wilson and Cleveland had signatory authority over

the EDP Entities' financial accounts and signed agreements on behalf of the

company, including agreements with iStream to act as the payment processor for

Discount Club charges and agreements with Access VG, LLC, to act as the

fulfillment company operating the online coupon network used by the Discount

Clubs.

48.   Cleveland and Wilson operated out of the same office space as EDP Entities

employees and oversaw day-to-day operations.  They communicated regularly with

each other and with EDP Entities employees regarding all aspects of the EDP

Entities' business generally and the Discount Clubs specifically.

49.   From January 2012 through September 2013, Merrill acted as the Chief Operating Officer of the EDP Entities and exercised operational control, under the authority of Wilson and Cleveland, over all aspects of the business.  Nonetheless, Wilson and Cleveland took primary responsibility for managing and directing the direct sales portion of the EDP Entities' business, including overseeing the employees with day-to-day responsibilities for the Discount Clubs.

50.   In 2008, EDebitPay, Wilson, and Cleveland settled FTC allegations that they debited consumers' accounts without authorization (hereinafter, "2008 FTC Order").  Specifically, the complaint alleged they targeted Subprime Consumers and used Electronic Checks to debit their accounts without authorization for pre-paid Visa or MasterCard reloadable cards.

51.   In May 2010, the FTC filed a motion for an order to show cause why EDebitPay, Wilson, and Cleveland should not be held in contempt of the 2008 FTC Order for, again, targeting Subprime Consumers and debiting their accounts without authorization for membership in a shopping club.

52.   The EDP Entities launched the Saving Pays Discount Club during the pendency of the contempt proceedings.

53.   In February 2011, the Court held the EDP Entities, Cleveland, and Wilson in contempt of the 2008 FTC Order (hereinafter, "2011 Contempt Order").  In August 2012, the 2011 Contempt Order was affirmed by the Ninth Circuit.

54.   From July 2010 through September 2013, the EDP Entities, under the direction and control of Wilson and Cleveland – as well as Merrill from January 2012 forward –charged consumers for enrollment in their Discount Clubs, including initial application fees and automatically-recurring monthly fees.

55.   Consumers did not know about or authorize the Discount Club charges.

56.   At the direction of Wilson and Cleveland, the EDP Entities marketed their Discount Clubs online and through outbound telemarketing.

57.   At the direction of Wilson and Cleveland, the EDP Entities included a negative option feature in their Discount Club sales, meaning they continued to charge consumers monthly fees for the memberships until the consumers took the necessary steps to affirmatively cancel their memberships.

<u>Targeting Subprime Consumers Seeking Short-Term Loans</u>

58.   At the direction of Wilson and Cleveland, the EDP Entities targeted their Discount Club business, like their previous direct sales activities, toward Subprime Consumers who were seeking, but not qualified to obtain, short-term loans, including payday loans, cash advances, and installment loans.

20

59. The EDP Entities operated dozens of websites that offered to match consumers with lenders who could provide payday, cash advance, or installment loans. Tens of thousands of consumers completed loan applications on these websites, providing sensitive personal information including their names, addresses, social security numbers, dates of birth, and bank account numbers.

60. Where consumers did not meet the criteria for obtaining a short-term loan, the EDP Entities could not sell that "lead" to their lender or loan aggregator affiliates. To profit from this consumer information, the EDP Entities instead enrolled those consumers, without their knowledge or authorization, into the Discount Clubs.

61. The EDP Entities also purchased "leads" containing the same sensitive personal and financial information from third-party publishers of similar loan-finder websites.

62. The EDP Entities enrolled the consumers, whose information they had purchased but who did not qualify for short-term loans, into the Discount Clubs, without the consumers' knowledge or authorization.

63. In some instances, the EDP Entities, or their third-party affiliate marketers, redirected consumers from loan-finding websites to websites that promoted both the Discount Club and cash advance loan offers. In many of those instances, the

21

EDP Entities and their affiliate-marketers pre-populated much, if not all, of the consumer information on the "enrollment" screens for the Discount Clubs.

<u>Telemarketing the Discount Clubs</u>

64.  In numerous instances, the EDP Entities also used the personal and financial information consumers provided when seeking unrelated payday, cash advance, or installment loans to enroll consumers in Discount Clubs through foreign call centers without first obtaining the consumers' oral or written authorization to be charged.

65.  Starting in January 2012, the EDP Entities used call centers to enroll consumers in the Saving Pays Club.  They continued to use foreign telemarketing centers, along with their websites, to enroll consumers in the Discount Clubs through the time of the asset sale in September 2013.

66.  The call centers provided both outbound telemarketing and customer service functions for consumers calling about the charges – often to request immediate cancellation or to complain that they did not agree to the charges.

67.  For the outbound telemarketing, the call centers contacted consumers whose information had been obtained by the EDP Entities or others in the course of marketing cash advance, payday, or installment loans.  They marketed the Discount Clubs as a stand-alone offer or as an "upsell" from loan offers.

22

Payment Processing

68.  The EDP Entities used Electronic Checks to debit consumers' bank accounts.

69.  Electronic Checks are processed through the banking system much like traditional paper checks, but without a consumer's signature.  Instead, Electronic Checks bear a statement such as "Authorized by Account Holder."  Both are created by the payee, rather than the individual on whose account the Electronic Check is drawn.

70.  For an Electronic Check to be legally valid, the creator must obtain the express authorization of the consumer, but the consumer is not required to take any action prior to the account being debited to affirm to his or her bank that the check has been authorized.

71.  Consumers' banks may refuse to withdraw funds from an account and return the unpaid check to the issuing bank – commonly referred to as a "return" – for a number of reasons, including the use of incorrect or invalid information on the check, a lack of sufficient funds in the account to pay the check ("NSF"), concerns from the bank regarding whether the consumer authorized the check, or specific claims by the consumer that the check was not authorized.

72.   A high number of returns compared to overall transactions ("return rate") indicates that a large percentage of the charges could not be processed through the banking system and shows that the consumers did not knowingly agree to those charges.  This is particularly true where there is a high rate of "Not Authorized" returns.  Banks and regulators calculate return rates based on the number of checks, not their value.

73.   At first, the EDP Entities processed their Electronic Checks for the Saving Pays Club through payment processor Landmark Clearing, which used First Bank of Delaware as the processing bank.  By August 2010, the EDP Entities had started using Automated Electronic Checking, Inc. ("AEC"), as the processor for Discount Club payments, and they ceased using Landmark Clearing for that business.

74.   By November 2010, the EDP Entities started to use iStream as the payment processor for their Discount Club business and stopped using AEC.  iStream initially processed Discount Club payments for the EDP Entities through Kenney Bank & Trust ("Kenney Bank").

75.   The same holding company, iTeam Companies, Inc. ("iTeam"), owned iStream and Kenney Bank, and they shared many corporate officers, Board members, and employees.  For example, until late 2014, Ken Biel was Chief Executive Officer of both iTeam and iStream.  In July 2015, First State Bank of

Illinois acquired the assets of Kenney Bank.  In October 2015, iTeam and iStream entered into a "reverse merger," where iTeam was dissolved and iStream was the surviving entity.

76.   In February 2011, Andrews, Biel, and Joachim met to plan for notifying the EDP Entities that Kenney Bank would be terminating its processing relationship. In a follow-up email dated February 17, 2011, Andrews confirmed to Biel and Joachim that he had scheduled a meeting with Cleveland for the following day and would inform the EDP Entities that "we will continue to process POG [Platinum Online Group] transactions for another 30 days, at which time we will suspend all further origination business for POG. . . . I will notify Paul [Cleveland] that he will receive a formal letter of termination from Jim Button, which we need to have on file for our annual audit which starts on Feb 28."

77.   On February 23, 2011, James Button, General Counsel for both Kenney Bank and iStream, notified the EDP Entities and Cleveland that Kenney Bank would no longer process Electronic Checks for the EDP Entities due to their high return rates.  Despite trying "every commercially available product to reduce" the volume of returns, Button noted that transaction volume had increased and recent return rates were "very high (75-80%)."  Button stated that the bank was unwilling to take the risk of continuing to process the EDP Entities' transactions.  Cleveland

replied to Button that "I should have known better" than to increase the transaction volume.

78.   Despite notifying the EDP Entities that it was terminating the processing relationship, Kenney Bank agreed to continue processing payments for the EDP Entities while iStream searched for a replacement processing bank.

79.   Andrews and iStream searched for a new processing bank for the EDP Entities.  As part of the search process, Andrews explained to Cleveland that, by the time Kenney Bank sent the February 2011 termination letter, he had already spoken to several banks about taking over the EDP Entities' processing business. Andrews cautioned, however, that the banks "find an issue with the 75% returns percentage  . . . 75% is too much to bear."

80.   Andrews also reminded Cleveland that "the returns that bother banks the most are the unauth or consumers who say that they do not know what this purchase is for . . . ."

81.   Andrews further recommended implementing search engine optimization to ensure that banks searching for the business would see the EDP Entities' websites as the first hits in search results, rather than "consumer blogs" that might negatively affect the banks' perception of the business.

26

82.  iStream reached an agreement with WestSide Bank in May 2011 to serve as the processing bank for its processing of Electronic Checks for the EDP Entities' Discount Clubs.  Kenney Bank continued to serve as the processing bank for the EDP Entities' Discount Clubs until the business was transitioned to WestSide Bank.

<u>High Return Rates</u>

83.  The EDP Entities' return rates for their Discount Club charges were exceptionally high throughout their operation of the Discount Clubs.

84.  Consumers' banks returned the vast majority of the EDP Entities' Electronic Checks.  From July 2010 through September 2013, the EDP Entities attempted to debit more than $130,000,000 from consumers and succeeded in withdrawing at least $27,000,000.

85.  Because Electronic Checks are processed through the banking system like paper checks, they are not separately regulated or monitored.  However, according to the Federal Reserve's 2013 triennial analysis of payment types and return rates (the most recent analysis for which check return data has been released), in 2012 banks returned only 0.3% of all forms of checks, including Electronic Checks. Indeed, from 2000 through 2012, the total return rate for checks did not exceed

0.5%. Moreover, in 2012, banks returned only 0.0047% of checks as "Not Authorized."

86. Another form of payment commonly used to debit consumers' accounts is debits through the Automated Clearing House ("ACH") Network. ACH debits are often used for bill payments and online banking payments, including automatic, recurring payments.

87. The electronic payments association, NACHA, administers the ACH network and provides industry guidance regarding return rates for ACH transactions.

88. In September 2015, NACHA implemented new risk monitoring rules regarding ACH debit return rates. Prior to that time, NACHA had a return rate threshold of 1% for unauthorized ACH debit returns, meaning participants in the self-regulating ACH Network were expected to monitor their merchant clients to ensure that none had unauthorized return rates above 1%. Processing ACH debits for a merchant client with unauthorized return rates above 1% violated NACHA's rules and would trigger enforcement action, including an inquiry and possible penalties ranging from fines to expulsion from the ACH Network.

89. In September 2015, NACHA reduced that unauthorized return rate threshold from 1% to 0.5%. NACHA expressly defined "unauthorized" ACH debits to

include any returned under ACH return codes R05 (Unauthorized Debit to

Consumer Account Using Corporate SEC Code), R07 (Authorization Revoked by

Customer), R10 (Customer Advises Not Authorized), R29 (Corporate Customer

Advises Not Authorized), and R51 (Item Ineligible).

90.   In addition, as of September 2015, NACHA set return rate levels for

Administrative Returns – those using return codes R02 (Account Closed), R03

(Unable to Locate Account), and R04 (Invalid Account Number) – and overall

return rates.  Under NACHA's revised guidelines, participants in the ACH

Network should monitor their merchant clients to ensure that Administrative

Returns do not exceed 3% and total returns do not exceed 15%.

91.   Prior to September 2015, NACHA did not have a set return rate level for

total returns.  However, iStream, like others involved in ACH debit processing,

generally used 10% as a total returns rate threshold in order to avoid potential

NACHA inquiries.

92.   As early as 2011, the EDP Entities considered using ACH debits, rather than

Electronic Checks for some Discount Club charges, because ACH debits were less

costly per transaction.  In October 2011, EDP Entities Controller Martha Leon

discussed with Andrews whether the EDP Entities could use ACH debits, instead

of Electronic Checks, for the recurring monthly Discount Club charges.  Those

charges had the lowest return rates of the three types of Discount Club charges: initial charges, recurring monthly charges, and repeated attempts to debit accounts that had returned initial charges for NSF ("NSF Redeposits"). Leon noted that the unauthorized return rate for recurring monthly charges was below NACHA's 1% threshold.

93. After looking into it, Andrews reported that "this change is not as quick and easy as I had thought due to the high percentage of total returns." As he later explained, "[t]he issue with the ACH is the percentage of total returns being in the 50-60% range for these reoccurring items. When we get above 10% total returns for one company we start setting off alarms with NACHA. So I have having [sic] issues with both compliance and our FED contact…. The nice thing about drafts [Electronic Checks] is that they fall below the radar for most reporting and we don't need to create any additional scrutiny attention."

94. In fact, throughout their operation of the Discount Clubs, the EDP Entities' return rates, both unauthorized and total, were well beyond the levels that would be acceptable under NACHA guidelines for ACH debits.

95. From July 2010 through September 2013, consumers' banks returned approximately 73% of the EDP Entities' total attempts to charge consumers for their Discount Clubs, more than 240 times the national average for check returns.

30

96.   Banks returned almost 79% of the EDP Entities' attempts to charge consumers for initial application fees – more than 250 times the national average.

97.   The EDP Entities' return rate for unauthorized charges averaged almost 3.5% during the same period, almost 750 times the national average for unauthorized checks and more than three times NACHA's unauthorized returns threshold for ACH debits at that time.

98.   The return rates for charges from telemarketing enrollments were at least as high, if not higher, than the return rates for charges related to online enrollments.

99.   Cleveland and Wilson knew of the high return rates for Discount Club charges and knew that those return rates increased the risk of legal or regulatory action against them and the EDP Entities.

<u>Complaints and Refund Requests</u>

100.  The EDP Entities also used call centers to handle customer service functions.  From January 2011 through September 2013, the EDP Entities classified more than 76% of the customer service calls – almost 475,000 calls – as relating to cancellation and refund requests.  For the last nine months the EDP Entities ran the Discount Clubs – January through September 2013 – they classified more than 85% of the customer service calls as relating to cancellation and refund requests.

101.  Most, if not all, of the consumers who called the EDP Entities complained that they did not authorize the charges.  Indeed, a February 2013 EDP Entities customer service refresher training emphasized the likelihood that customers would assert they did not authorize the charge or had thought they were applying for a loan, not enrolling in a coupon club.

102.  The EDP Entities reminded the customer service representatives to "[c]larify any inaccuracies stated by the customer," such as by reminding them that:  (1) "[w]e do not support anything else" besides the Discount Club; (2) "[t]he only way to have a charge is with your authorization for our membership;" or (3) "[w]e do not support loans or give loans…."  They also reiterated that customer service representatives should remind consumers repeatedly that they "authorized" the order.  For instance, the EDP Entities counseled customer services representatives to include such reminders in asking for information to search for the order (e.g., to ask for "social security number as that was also given as part of the order authorization," or the "email address which was also given to authorize the order"), to ensure that they read the "proof of authorization" details in every call, and to "[c]larify what was actually agreed and authorized as often as needed" throughout the call.

103.  In fact, when consumers called to contest the charges, the EDP Entities' customer services representatives refused to discuss the charges until the consumers first confirmed their bank account numbers and other personal information, including name, address, personal email address, and date of birth. Even if the consumers were calling to report unauthorized charges, the customer service representatives insisted they provide this information.

104.  If the consumers confirmed their information, as discussed above, the customer service representatives, following scripts provided by the EDP Entities, told the consumers repeatedly that they had authorized the Electronic Checks. They often used the information they had used to enroll the consumers as "evidence" that the consumer had provided his or her authorization.

105.  For most, if not all, of the time the EDP Entities were operating the Discount Clubs, they generally would not grant any refund requests – even where a consumer called to allege unauthorized charges – unless the consumer met onerous requirements.  Specifically, the EDP Entities would only return consumers' money if they:  (1) called to request the refund within five days of receiving a bank statement showing the charge; (2) completed a form detailing their personal and financial information; and (3) faxed the form and a copy of the bank statement to the EDP Entities.

33

106.  The EDP Entities also typically refused to refund any charges beyond the initial enrollment fee, unless they were offering a "courtesy" refund, for example, in response to a consumer's complaint to  Better Business Bureau ("BBB") or a State Attorney General.

107.  In addition to the hundreds of thousands of consumers who contacted the EDP Entities directly, numerous consumers sent complaints to online complaint forums, such as www.scambook.com.

108.  The EDP Entities knew about the prevalence of online complaints about the Discount Clubs.  As recommended by Andrews, they attempted to use search engine optimization to "bury" the complaints further down in any search results, so that banks and consumers would be less likely to see them when searching for the Discount Clubs.  In a January 2013 email, Wilson, copying Merrill, requested that Velia Murillo, EDP Entities Director of Customer Service, "ask the current SEO team with [sic] have with Reputation management to try to get our placement above scam book in the [f]ew ways people would look online for Money Plus Saver."

109.  Moreover, more than two thousand consumers submitted affidavits and other statements to their banks attesting that they had not authorized the charges by the EDP Entities.  The consumers' banks provided those affidavits, commonly referred

to as "collection letters," to Kenney Bank and WestSide Bank in support of demands for the return of consumers' money.  These returns were typically made after the charge had initially gone through (which is permitted under banking regulations in limited circumstances, such as when the account holder alleges the charge was unauthorized), requiring the bank to affirmatively return the payment. As described below, Kenney Bank and WestSide Bank forwarded these collection letters to iStream, which, in turn, forwarded them to the EDP Entities.  iStream charged the EDP Entities a separate fee for each collection letter.

110.  Numerous banks also reached out to Kenney Bank or WestSide Bank separately regarding the numerous attempts to debit their customers' accounts without authorization for the Discount Clubs.  Kenney Bank shared such complaints with iStream.  WestSide Bank also forwarded such complaints to iStream, and Andrews took the lead in forwarding the complaints to the EDP Entities and preparing draft responses on behalf of the banks.

111.  On February 14, 2011, Wachovia employee Benita Sheffield sent a letter to Kenney Bank's Chief Executive Officer stating that Wachovia had received more than 350 complaints in the prior 60 days from customers stating that Electronic Checks had been paid out of their accounts without authorization and that "no permission or authority was given for the charge to be processed against their

35

account."  Wachovia had traced the charges to Kenney Bank and requested to know "when Wachovia/Wells Fargo customers might expect some relief from these claims of unauthorized drafts."  Sheffield enclosed sample RCCs, which included Discount Club RCCs.

112.  On February 17, 2011, Andrews emailed Joachim and Ken Biel, then-CEO of iTeam and iStream, to summarize "our conversation of this morning."  Andrews stated that he had scheduled a meeting with Cleveland for the next day and that he would "explain the issues with the BOA / Wachovia inquiries" and discuss iStream's desire to "further devise a processing platform which will allow us to prove the consumer authorizations to a RDFI bank [consumer's bank] or regulator."

113.  On the same day, Andrews forwarded to Biel and Joachim his "first cut at a response letter to both Wachovia and BOA."  Although Andrews indicated that he had "not seen the original Wachovia letter," he took "the response direction of fully confronting the non-auth claims, letting the banks know that we are aware and monitoring this activity very closely, thanking them for their same attention to detail, and then asking for their further assistance with this issue – which I would guess will put this issue into a file as they will not want to get involved with any additional work on their side."

36

114.  On behalf of Kenney Bank, James Button, General Counsel of both iStream and Kenney Bank, responded to the Wachovia complaint on March 16, 2011, asserting that the identified merchants were ones "whose processing activity we monitor very closely."  Button asserted that consumers were claiming charges were not authorized as an alternative to seeking a refund or as a means of obtaining a "double refund" by requesting a refund from the merchant and also getting their banks to return the RCCs through false claims of unauthorized transactions. Button claimed that Kenney Bank requested "evidence of . . . electronic authorizations" from its merchants for all disputed transactions.  Button further asserted that the Bank was working to find "the best method to dispute these improper consumer claims" and "investigating the best method to notify each consumer that the merchant does in fact have proper payment authorization on file for every transaction."  Button concluded by asking Wachovia to provide the "name and DDA account numbers for each of the consumer claims," so that Kenney Bank could "identify how many of these consumers have in fact received a refund from the merchant and have then made a claim of non-authorization." Button asked for Wachovia's "cooperation" in addressing this "consumer fraud."

115.  On June 3, 2011, Andrews forwarded to EDP Entities employee Loris Desa an email from iStream's Chief Technology Officer, Michael McGuire, regarding a

discussion he had with a Bank of America representative.  McGuire reported that,

according to Bank of America, the EDP Entities were attempting to charge

consumers for Discount Club fees using a Bank of America routing number that

was only for certain types of payroll accounts.  McGuire cautioned, "Bank of

America said they had seen the ripoffreport.com, Complaint Board, WikiScams,

and other websites showing increases in consumer reports about this company

[Platinum Online Group].  Need to get Platinum not to use that routing number, or

Bank of America will just automatically return the items."  In forwarding the

email, Andrews emphasized to Desa that, if the EDP Entities did not stop using

that routing number immediately, "BOA will black list all POG consumer checks."

   116.  On February 2, 2012, Kris Barron, the Vice President of Check Fraud

Claims for Bank of America wrote to the President of WestSide Bank complaining

about Premier Membership Clubs, a d/b/a the EDP Entities used for Discount Club

sales.  As he explained, in the prior month, "over 700 . . . Bank of America

accounts [were] debited in amounts ranging from $14 to $99.49 via demand draft. .

. . Our customers are advising us that these transactions were not authorized.

These transactions occur daily."  In addition to demanding reimbursement for an

enclosed list of more than 180 RCCs that had not been previously returned by

Bank of America, Barron reminded WestSide Bank of the consent order between

38

the Office of the Comptroller of the Currency and Wachovia Bank "with regard to unauthorized remotely created checks Wachovia accepted for deposit from payment processors and telemarketers."   As Barron emphasized, the Wachovia settlement "serves as a cautionary tale for all financial institutions that accept deposits from telemarketers with high rates of returned items."

117.  After receiving a copy of the Bank of America letter from WestSide Bank, Andrews forwarded it to Cleveland and EDP Entities employees, asking them to "investigate" the claims.  Andrews suggested that "[i]t would also be a good idea to call a sampling of the people on these drafts and inquire about did they authorize or not.  That would be a great analysis to provide if we can get some positive responses to dispute the BOA claims.  Please ask Velia [Murillo] to give that a try and let me know what she learns."

118.  On February 14, 2012, Barron wrote a second letter to WestSide Bank, stating that, by that time, more than 900 Bank of America accounts had been debited by Premier Membership Clubs and, again, the account holders were informing Bank of America that "these transactions were not authorized" (emphasis original).  Barron demanded reimbursement for an additional list of RCCs that had not been previously returned and reminded WestSide Bank again of

the Wachovia settlement.  WestSide Bank forwarded the letter to Andrews, who

subsequently forwarded it to Cleveland and EDP Entities employees.

119.  On February 15, 2012, Andrews forwarded to WestSide Bank a proposed

response to Bank of America that did not provide any analysis showing that any of

the consumers on the list had admitted to authorizing the charges.

120.  Instead, Andrews' proposed response on behalf of WestSide Bank falsely

stated that the EDP Entities did not telemarket their products (in fact, the EDP

Entities had begun telemarketing in January 2012).  Andrews also proposed that

the bank assure Bank of America that, "[w]e . . . sample these transactions with

consumers to assure that any fraud which may be taking place in this marketplace

is being perpetuated by consumers against the merchant and not the other way

around."

121.  Andrews made this statement knowing that neither iStream nor WestSide

Bank took any steps to independently "sample" the EDP Entities' transactions.

122.  Andrews forwarded his draft  letter responding to the Bank of America

complaint to Defendants Axberg and Joachim, as well as to iStream General

Counsel James Button and other iStream personnel.  Axberg, Joachim, and iStream

also knew that iStream did not engage in any efforts to sample the EDP Entities'

transactions.

123.  On February 17, 2012, Andrews forwarded to WestSide Bank a proposed response to the second Bank of America complaint.  Andrews reiterated that "100% of these orders are WEB based orders" and proposed that WestSide Bank again assure Bank of America that, "we sample all orders to confirm authentication of each order placed and to verify consumer identity."  Further, Andrews proposed that WestSide Bank assure Bank of America, "[w]e will also be expanding our sampling of consumer orders in effort to confirm that all consumer orders are in fact legitimate orders and to reduce the number of returned items."

124.  Again, Andrews knew that neither iStream nor WestSide Bank performed such a sampling.

125.  Several iStream employees received copies of Andrews' draft response to the second Bank of America complaint letter.  In addition, Andrews forwarded the draft response to Axberg and Joachim, iStream General Counsel James Button, and other iStream officers.  Again, iStream engaged in no such sampling efforts.

126.  On May 8, 2012, Wells Fargo Financial Crimes Manager Bart Hodges sent a letter to the Chief Executive Officer of WestSide Bank, stating that it had received more than 450 complaints over the prior 60 days from customers asserting that their accounts had been debited without authorization.  Wells Fargo had determined that WestSide Bank was the processing bank for these transactions, and

Hodges requested to know "when Wells Fargo customers might expect some relief from these allegedly unauthorized drafts."  Hodges included four sample RCCs, all of which were EDP Entities' charges for Saving Pays Club.  WestSide President Tren Watson forwarded the letter to Andrews.

127.  Andrews, in turn, forwarded the Wells Fargo letter to Wilson and EDP Entities employees.  As before, Andrews requested that the EDP Entities investigate the claims and, if appropriate, "call[] each consumer to confirm that they placed an order."

128.  As before, Andrews drafted a proposed response to the letter on behalf of WestSide Bank.  First, in response to concerns that the issues arose from the use of a third-party payment processor, Andrews proposed assuring Wells Fargo that "there is no third party payment processor involved in the subject transactions."  Moreover, Andrews proposed WestSide Bank assure Wells Fargo that its "extensive Customer Identification Program requirements, underwriting due diligence, site visitations, monitoring, reporting and oversight processes ensure that we are processing only for legitimate enterprises that do not engage in fraudulent activity."

129.  Andrews made this statement knowing that WestSide Bank did no independent due diligence on the EDP Entities, performed no site visits on the EDP Entities, and had no monitoring, reporting, or oversight processes in place.

130.  Andrews also suggested that WestSide Bank assure Wells Fargo that its "research into this type of return activity" showed that these charges were authorized but claimed to be unauthorized by consumers seeking to avoid NSF bank fees; thus, any fraud was being committed by the consumer, not the merchant.

131.  Andrews made this statement knowing that WestSide Bank had done no research into "this type of return activity" and had no evidence to show that consumers were making false claims of unauthorized transactions in order to avoid NSF fees.

132.  Andrews had WestSide Bank request that Wells Fargo provide copies of all 450 items referenced in its complaint letter so that the bank could "assure ourselves that our customers have properly obtained consumer authorizations for each and every transaction."

133.  On August 14, 2012, Andrews reported to EDP Entities Controller Martha Leon that Wells Fargo had contacted WestSide Bank that morning, "requesting an immediate hold on all Premier drafts drawn upon any of their customers."

134.  In April 2012, WestSide Bank President Tren Watson forwarded to Andrews a copy of the May 2011 FTC Press Release regarding the 2011 Contempt Order against the EDP Entities, as well as a summary report from scambook.com indicating that Premier Membership Clubs – the d/b/a of the EDP Entities – had amassed more than 2,000 complaints from August 2011 through March 2012.  The sample complaints included in the report highlighted consumers' claims that the charges were unauthorized.

135.  Watson commented that the attachment showed "pages of complaints against Premier Club" and made him "very concerned that we may get in another situation like we did in 2008 when all the accounts were frozen [as part of the 2007 FTC action against the EDP Entities, when WestSide Bank served as a processing bank for its direct sales products] and we had to submit all the monies to the Attorney General [sic].  In order to give us a better comfort level, I would like to establish a significant Reserve in an account name that would not be subject to seizure."

136.  Andrews forwarded Watson's email to Cleveland, noting that "[t]he excess level of returns is always of concern to everyone, including yourself.  We may need to provide Tren with a different reserve account [aside from the reserve

account already in use for the processing of Discount Club payments] as requested to put him at ease."

137.  On May 16, 2012, Axberg, on behalf of iStream, formally agreed to establish a separate reserve account at WestSide Bank "to protect the bank against any future claims should Premier stop processing activity for any reason."

138.  iStream agreed that WestSide Bank would open the reserve account in its own name, giving iStream and the EDP Entities no access to the account, to protect it from being subject to any freeze a law enforcement agency might place on the EDP Entities' accounts.  Axberg suggested "that we move an initial deposit into this new reserve balance account in the amount of $500,000.00" and gave his "authorization to move this amount from the current Premier processing account held with WestSide Bank."

139.  In June 2012, iStream employee Julie Kimball questioned why the account was in the name of WestSide Bank.  In response, Andrews, copying Axberg, explained that setting up the reserve under the bank's name was "a Westside Bank request so in case the [EDP Entities'] Bank accounts were frozen by regulators, that they would then have monies to cover returned items."

140.  In addition to the complaints consumers filed with the EDP Entities and their own banks, hundreds of consumers filed complaints with the FTC, BBBs, and

State Attorneys General, alleging that the EDP Entities had taken their money without authorization or caused them to incur NSF bank charges from an unauthorized attempt to take their money.

141.  According to their records, the EDP Entities received almost fifty complaints or inquiries from State Attorneys General from January 2011 through September 2013, most, if not all, of which related to the Discount Clubs.

142.  In September 2012, at the direction of Wilson and Cleveland, the EDP Entities entered into an Assurance of Voluntary Compliance with the Iowa Attorney General ("Iowa AVC") regarding their marketing of buying clubs, specifically Saving Pays Discount Club.  As part of the Iowa AVC, the EDP Entities agreed to refund any moneys paid by Iowa consumers for Saving Pays Club fees.  Cleveland signed the Iowa AVC on behalf of the EDP Entities.

143.  In February 2013, the EDP Entities, Wilson, and Cleveland entered into an Assurance of Voluntary Compliance with the Oregon Department of Justice ("Oregon AVC"), regarding their marketing of Discount Clubs, including both Saving Pays Club and Money Plus Saver, to Oregon consumers.  As part of the Oregon AVC, the EDP Entities and Wilson and Cleveland agreed to cease doing business in the State of Oregon and to refund to Oregon consumers all monies they had paid in fees relating to the membership clubs, including Saving Pays Club and

Money Plus Saver.  Wilson and Cleveland signed the Oregon AVC for themselves

individually, and Wilson signed on behalf of the EDP Entities.

144.  In addition, in January 2012, the FTC announced it had reached a settlement

in an action against payment processor Landmark Clearing, Inc., alleging that,

from Fall 2008 through Spring 2011, Landmark Clearing had used Electronic

Checks to debit – or attempt to debit – millions of dollars from consumers'

accounts without their authorization.  The complaint specifically included

allegations relating to Landmark Clearing's processing of payments for the EDP

Entities.

145.  The EDP Entities, Cleveland, and Wilson knew that the Landmark Clearing

case was based, in part, on its processing of direct sales payments for them, as

detailed in the complaint in that action.

146.  In April 2013, Andrews forwarded to the EDP Entities, Cleveland, and

Wilson both a March 2013 Press Release from the FTC announcing a settlement

with AEC, another payment processor used by the EDP Entities, and an article

discussing the Oregon AVC.

147.  The EDP Entities, Cleveland, and Wilson knew that the AEC case was

based, in part, on its processing of direct sales payments for them, as detailed in the

complaint in that action.

148.  Also in April 2013, at the direction of Wilson and Cleveland, the EDP

Entities agreed to a proposed class action settlement of allegations of unauthorized

charges for various membership clubs, including the Saving Pays Club.

<u>Consumers' Non-Usage</u>

149.  Virtually none of the consumers enrolled in the Discount Clubs ever used

any of the benefits for which the EDP Entities charged them.

150.  The EDP Entities' Discount Clubs had an average of 12,000 members per

month, both new and recurring.  Yet, those members collectively downloaded

fewer than 400 coupons from July 2010 through September 2013, an average of

fewer than 12 coupons per month – a monthly usage rate of 0.1%.

151.  Further, more than 99.75% of the more than 200,000 consumers who paid

the EDP Entities for memberships in the Discount Clubs never downloaded a

single coupon, the only service for which they had supposedly paid.

152.  Consumers did not use the Discount Clubs for which they had paid because

they had not authorized the payments and were not aware that they were paying for

access to online coupons.

153.  In December 2011, Wilson expressly requested a report from the Discount

Clubs' fulfillment company, Access VG, LLC, on consumers' usage of the Saving

Pays Club Discount Club.

154. According to the report prepared by Access VG, members had downloaded only 55 coupons during the sixteen months between the time the Discount Clubs were first launched in July 2010 and the end of November 2011.

### Rebranding and Masking the Discount Clubs

155. During their operation of the Discount Clubs, at the direction of Wilson and Cleveland, the EDP Entities took steps to mask both EDebitPay's ownership of the Discount Clubs and any publicly-available connection between the Discount Clubs and their lead generation/lead marketing business.

156. In addition to operating each business through separate subsidiary companies – each with names wholly distinct from EDebitPay – the EDP Entities also used available tools to keep their registration of the Discount Club websites "private," used d/b/as on the Discount Club websites, used separate private mailboxes for the lead generation activities and the Discount Clubs, and allowed consumers to contact them only via fax, email to a generic email address (e.g., yoursupportdepartment.com), or 1-800 phone numbers – which they changed with each new iteration of the Discount Clubs.

157. Indeed, Cleveland acknowledged to the FTC that the EDP Entities formed Platinum Online Group to create distance from EDebitPay's history of consumer complaints.

49

158. From July 2010 until October 2012, the Discount Club was called Saving Pays Club.

159. From July 2010 until February 2011, however, the EDP Entities used the name Platinum Online Group or the acronym "POG" as the payee on Discount Club Electronic Checks and referenced Saving Pays Club only in the memo fields.

160. During his November 2010 deposition in the FTC's ongoing contempt action, Cleveland confirmed that Platinum Online Group was the new "consumer interface" for EDebitPay and that it was formed to "get away from the cut-and-paste complaints [against EDebitPay] we were getting from RipOff Report and the Better Business Bureau."

161. Cleveland also confirmed that, "if a consumer got a bill for a charge from the EDebitPay website . . . it would say 'Platinum Online Group.'"

162. On February 3, 2011, the court held EDebitPay, Cleveland, and Wilson in contempt of the 2008 FTC Order.

163. Barely two weeks after entry of the 2011 Contempt Order, knowing that the FTC was aware that Platinum Online Group was a subsidiary of EDebitPay, Cleveland met with Andrews and requested that iStream allow the EDP Entities to change the name of the payee on Discount Club Electronic Checks from "Platinum

Online Group" to "Premier Membership Clubs," a new d/b/a of Platinum Online Group.

164.  Due to the change in processing banks, the name change did not become effective until August 2011, despite Cleveland's personal appeal to Andrews in May 2011 to speed up the process.

165.  From August 2011 forward, the EDP Entities debited initial and recurring charges for the Saving Pays Club Discount Club using the name "Premier Membership Clubs" as the payee, removing all references to Platinum Online Group from the Electronic Checks.

166.  In early 2012, the EDP Entities began working on a plan to rebrand the Discount Club to "Money Plus Saver."  Merrill was part of the team responsible for the rebranding effort, under the direction of Wilson.

167.  In March 2012, EDP Entities Controller Martha Leon reported to Merrill and others that she had spoken with "the processor" about the possibility of rebranding. The EDP Entities had recently submitted a "direct sales quality control manual" to WestSide Bank and iStream.  As Leon explained, "[t]hey [iStream] are having an internal audit next week, and will include review of our manual.  Because renaming is often found-upon [sic] by banks, I want to make sure the internal review of our QC goes smoothly, before initiating that change."

168.  In Fall 2012, iStream notified the EDP Entities that it was planning to terminate the processing relationship.  In response, Wilson reached out to numerous payment processors to find a replacement for iStream.  In addition, Andrews worked to find banks willing to allow him, using a separate business, to serve as the payment processor.  Neither effort was successful.

169.  As a result, the EDP Entities attempted to preserve the relationship with iStream.  The EDP Entities again proposed rebranding the Discount Club and assured iStream they would make changes to the Discount Club program that would increase the "value" to consumers.

170.  Internally at the EDP Entities, however, Wilson explained to Cleveland, Merrill, and EDP Entities employees that part of the purpose of the rebranding was to create a single URL for sales, customer support, and coupon network log-in, to "help the consumer be reminded where the sale originated, to help lower better business complaints."

171.  iStream agreed to open new processing accounts to process charges in the name of the rebranded Discount Club, and, in October 2012, the EDP Entities rebranded the Discount Club from Saving Pays Club to Money Plus Saver, using a virtually identical website with new customer service contact information.

172.  Aside from including a few additional categories of coupons in the "network" and a slightly lower initial application fee ($89 instead of $99.49) with higher recurring fees ($19.95 instead of $14), which the EDP Entities touted as demonstrating a better value for consumers, there were no significant changes between Saving Pays Club and Money Plus Saver.  The EDP Entities used the name "Money Plus Saver" as the payee on the Electronic Checks for the rebranded Discount Club.

173.  Although they stopped new "enrollments" into Saving Pays Club after launching Money Plus Saver, the EDP Entities continued to charge recurring monthly fees to the consumers they had previously enrolled in Saving Pays Club.

174.  In mid-2013, the EDP Entities began the process of rebranding the Discount Club again, this time to "Saving Makes Money."

175.  Wilson put Merrill, along with EDP Entities Controller Martha Leon and EDP Entities Director of Customer Service Velia Murillo, in charge of developing the new version.  He explained that this was "JUST Brand Name Change" and not a substantive change to the Discount Club.

176.  Initially, Wilson indicated that the EDP Entities should be ready to launch the new brand, and stop taking new orders under the Money Plus Saver name, by mid-August 2013.  However, he postponed the implementation of the new brand

and, instead, handed the materials over to the Hornbeam Entities as part of the September 2013 asset sale.

Discount Clubs Were the Primary Business of the EDP Entities

177. From July 2010 through September 2013, the majority of the EDP Entities' revenues came from net direct sales to consumers (excluding returns), including primarily the Discount Clubs, rather than from the company's lead generation activities. For example, the EDP Entities' financial records show that more than 75% of their revenues were from direct sales in 2010, and at least 56% were from direct sales in 2011 and 2012. From January through September 2013, direct sales accounted for 67% of their revenues.

178. Lead generation and marketing activities, by comparison, cost the EDP Entities more money than they generated in income. According to their own financial records, the EDP Entities' cost of goods sold for their lead generation business (costs directly attributed to that activity) consistently exceeded the revenues generated by that activity.

179. In other words, the EDP Entities were dependent on the direct sales business, including primarily the Discount Clubs, to generate income and profits.

## EDP Entities Individual Defendants' Control, Participation, and Knowledge

180.  Cleveland and Wilson created, directed, and controlled all aspects of the EDP Entities' Discount Club business, including the operations, the targeting of Subprime Consumers, the use of loan-finding websites to obtain consumer financial information, the outbound telemarketing, the customer service representatives' misrepresentations to complaining consumers that they had authorized the charges, and the stringent refund policies.

181.  Although they delegated some responsibility to Merrill, including putting him on the teams responsible for creating the Money Plus Saver and Saving Makes Money versions of the Discount Club, Cleveland and Wilson were the creators of the entire business.

182.  Throughout the EDP Entities' operation of the Discount Clubs, Cleveland and Wilson were the final decision-makers on all matters.

183.  Cleveland and Wilson communicated regularly with Andrews at iStream, as well as with EDP Entities employees, regarding all aspects of the Discount Clubs.

184.  Cleveland and Wilson knew about the complaints and the high return rates.

185.  Cleveland and Wilson knew that a number of banks, including Bank of America, Chase, Wells Fargo, and Wachovia, had complained about the high level of unauthorized charges by the EDP Entities against their account holders.

55

186.  Cleveland and Wilson were aware of the many legal actions for unauthorized charges brought against the EDP Entities and companies that acted as payment processors for them.  They negotiated and signed the agreements with the payment processors and fulfillment company, as well as the Iowa AVC, the Oregon AVC, and the private class action settlement.

187.  Merrill knew about the 2008 FTC Order, the 2011 Contempt Order, and the Oregon AVC.

188.  Merrill had operational control over all aspects of the EDP Entities' business, although he was not the final decision-maker.

189.  Cleveland, Wilson, and Merrill also knew that the Discount Clubs targeted Subprime Consumers, obtaining their sensitive personal and financial information from payday and other short-term loan applications.

190.  As discussed above, Cleveland, Wilson, and Merrill knew, were recklessly indifferent to, or willfully disregarded whether consumers were being charged Discount Club fees without their knowledge or authorization.

191.  In addition, as part of the sale of the EDP Entities' assets to the Hornbeam Entities, the Hornbeam Entities agreed to pay Cleveland a monthly amount to cover personal and family health insurance costs for the subsequent two years. Cleveland also agreed to a "Seller's Note" as part of the transaction, allowing the

Hornbeam Entities to pay $240,000 of the amount due through monthly payments for two years after the close of the sale.  Thus, from October 2013 through September 2015, the Hornbeam Entities paid Cleveland approximately $13,000 per month from their revenues.

192.  As part of the sale of the EDP Entities' assets to the Hornbeam Entities, Wilson and Cleveland entered into a Transition Services Agreement, whereby they agreed to be available to assist the Hornbeam Entities for 18 months after the close of the sale.  In December 2013, Wilson also sought to buy payday websites from the Hornbeam Entities in order to generate subprime leads for them.

193.  After the sale of the EDP Entities' assets, Wilson formed Delivery Notion, LLC.  In addition, Wilson and others formed a new company, AdMediary, LLC. Through AdMediary, Wilson worked with the Hornbeam Entities by directing consumer traffic to the Discount Clubs.  Wilson and AdMediary have continued to target subprime consumers who are seeking financial products, purchasing leads related to, and operating websites designed to attract, financially vulnerable consumers.

194.  In early 2016, Michael Wilson, who is Wilson's brother, left his employment as Vice President of Marketing for the Hornbeam Entities. Subsequently, Michael Wilson began his own company, ArrowCentric, LLC,

which he formed with Arthur Welch.  Arthur Welch is also a partner in

AdMediary, LLC, with Wilson.  ArrowCentric runs email marketing campaigns,

focusing in large part on subprime consumers seeking short-term loans and other

financial products.

195.  Prior to working for the Hornbeam Entities, Michael Wilson had served as

Vice President of Marketing at the EDP Entities.  At both the EDP Entities and the

Hornbeam Entities, Michael Wilson played a significant role in the targeting of

subprime consumers for enrollment in the Discount Clubs.

196.  In Summer 2016, Wilson approached Defendant Mark Ward about taking

over existing contractual relationships with email service providers then used by

the Hornbeam Entities to send numerous emails, often described as spam, to entice

consumers who were seeking short-term loans into opening landing pages and

inputting their personal and financial information in hopes of obtaining a loan.

Those email service provider relationships had been managed at the EDP Entities

and Hornbeam Entities by Michael Wilson.

197.  The Hornbeam Entities, at the recommendation of Ward and with the

approval of McCarter and Jerry Robinson, agreed to allow Wilson to assume

control of the contractual relationships with these email service providers.  Ward

assisted in effectuating that transfer, which was done without Wilson negotiating a

new contract with the email service providers but simply taking control of the
existing relationship.  Michael Wilson and ArrowCentric have since taken control
of some or all of these relationships with the email service providers, working with
Wilson and AdMediary in the targeting of subprime consumers seeking short-term
loans.

   198.   Wilson, through AdMediary and Delivery Notion, and Michael Wilson,
through ArrowCentric, employ or work with multiple former employees of the
EDP and Hornbeam Entities who were directly involved in the Discount Clubs.
For example, Connor Christiansen, who previously worked with Michael Wilson at
the Hornbeam Entities, now serves as the Vice President of Marketing for
ArrowCentric.  Martha Leon, who worked as the Controller for the EDP Entities
and the Director of Accounting and Administration for the Hornbeam Entities, now
works for both AdMediary and ArrowCentric.  Jerry Villanueva, who worked for
both the EDP Entities and the Hornbeam Entities, now works for AdMediary.
Through Delivery Notion, Wilson has hired former EDP and Hornbeam Entities'
employee Bogdan Bogdaniuc, a website and graphic designer, to create websites,
including payday loan lead generation sites.

   199.  Since 2016, Wilson, through AdMediary or otherwise, has worked with
ArrowCentric to engage in lead generation offering to connect consumers with

short-term lenders.  In particular, Wilson, AdMediary, and ArrowCentric have targeted subprime consumers.

200.  After the sale, Cleveland also sought and engaged in business relationships with individuals involved in targeting subprime consumers.  In 2015, Cleveland contacted Merrill to engage the Hornbeam Entities in a new online business. Through at least April 2016, Cleveland received regular payments from Wilson as his consultant.

201.  Although the Nevada Secretary of State has revoked EDebitPay's corporate status, the company has not been dissolved and can be reinstated to active status with the payment of fees.

## HORNBEAM DEFENDANTS

202.  The Hornbeam Entities purchased all assets of the EDP Entities effective September 30, 2013.  The Hornbeam Entities took over the business premises and retained virtually all the EDP Entities' employees.  Merrill became the President and Chief Operating Officer of the new entities.

203.  The Hornbeam Entities were owned by five Members, including Jerry Robinson, Earl Robinson, and James McCarter, who have held the three largest ownership shares since the formation of the company.

204.  The Hornbeam Entities were controlled by their Members, with day-to-day authority delegated to the Management Committee.  The Management Committee, referred to internally as the "Board," consisted of Jerry Robinson, Earl Robinson, McCarter, and the President – first Merrill and then Ward.  For some period of time, a fourth Hornbeam Entities owner, Ed Greco, also participated in formal meetings of the Board.  In September 2015, McCarter's son, Matthew McCarter, was named a member of the Management Committee.

205.  The President (Merrill then Ward) had day-to-day responsibility for overseeing operations and employees in the Los Angeles offices, but his authority was subject to the oversight and approval of the Members on the Management Committee.

206.  As discussed below, throughout the operation of the Hornbeam Entities, the President (Merrill then Ward) communicated regularly with the Management Committee through frequent teleconferences to discuss all aspects of the business, informally through emails and unscheduled phone calls, and during quarterly Board meetings to update all Members on the business.

207.  Jerry Robinson, Earl Robinson, and McCarter (collectively, "Hornbeam Owners") regularly participated in these communications with the President

(Merrill or Ward) and provided guidance and oversight with regard to all business matters.

208. Each of the Hornbeam Owners also visited the Los Angeles offices, meeting with various employees to discuss all aspects of the business.

209. When they purchased the EDP Entities' assets, each of the Hornbeam Owners and the Hornbeam Entities knew that the business relied on the Discount Club business, including the targeting of Subprime Consumers, for the majority of its revenues and profits. The Discount Club business remained the primary revenue driver for the Hornbeam Entities after the purchase.

210. The President, first Merrill and then Ward, received daily, weekly, and monthly reports on all aspects of the business and communicated regularly with the Hornbeam Owners. The President was copied on virtually all communications between Hornbeam Entities employees and the Hornbeam Owners.

211. At the time of the purchase, the Hornbeam Entities and Hornbeam Owners knew that the business had two parts – lead generation and direct sales – and that the company depended on the direct sales activities for its revenues.

212. At the time of the purchase, the Hornbeam Owners knew that the business focused on targeting Subprime Consumers who did not qualify for short-term loans

and then enrolling those consumers into the Discount Clubs with initial fees and recurring monthly charges using Electronic Checks.

213. Each of the Hornbeam Owners also knew that the EDP Entities, and Cleveland and Wilson, had been sued twice by the FTC for unauthorized charges relating to their direct sales products targeting Subprime Consumers. Each knew that the EDP Entities had signed the Oregon AVC for unauthorized charges for membership clubs and had reached a proposed settlement of a class action lawsuit also alleging unauthorized charges for membership clubs.

214. Each of the Hornbeam Owners also knew that the Discount Clubs' high return rates raised significant concerns both of regulatory or law enforcement action and of the loss of third-party relationships, such as with the processing bank.

215. In September 2013, prior to the closing of the purchase of the EDP Entities' assets, EDP Entities Controller Martha Leon (who would become Director of Accounting and Administration for the Hornbeam Entities) emailed Jerry and Earl Robinson, copying Merrill, regarding concerns about Jerry Robinson's statement to her that the new owners were considering moving from WestSide Bank to a new bank for Discount Club processing. Leon recommended Earl and Jerry Robinson consider whether that move could be avoided for a number of reasons, including:

[1] It is quite difficult to develop a trusting relationship with a new ODFI [bank for depositing RCCs], especially when dealing with internet or telemarketing sales.  Banks consider these high-risk relationships and tend to either avoid them altogether or are much more likely to end the relationship quickly.  Is Signature [the proposed bank] aware of our type of sales and return rates?....

[2] Our direct sales membership is a high-return business, something that banks usually have a big problem with, because they believe it implies fraud, if not company instability, at the least.  Our FTC and Class Action history does not help this impression.

[3] . . . If we were to need a new processor, too, the same issues described above would apply.  It is not easy to find a processor willing to work with us, because of our history and high return rates.

216.  Leon counseled that, if a bank switch was necessary, they should consider "[s]plitting our volume and keeping WestSide bank, too.  We are entering our highest volume season for direct sales and starting with a new bank is risky, because they might be especially turned off by our high return volume."

217.  As an alternative, Leon suggested "[s]lowly phasing our volume over from WestSide to Signature.  In our experience, hitting a new processor or bank with our full volume all of a sudden is a recipe for disaster.  They are unprepared and completely put-off by our return volume, leading them to end the relationship."

218.  Ultimately, Leon noted that, "there's no way around our return rates, even with no FTC history.  If there's any way of avoiding an ODFI change, I recommend we stick with WestSide."

219.  After Leon's recommendation, the Hornbeam Owners provided Andrews with information to share with WestSide Bank to solidify the bank's willingness to continue as the processing bank for the Discount Clubs after the sale.  As Andrews explained to WestSide Bank Vice President Rhonda Thomas, "[a]s you will see from the resumes and the business forecast from the new owners, they are aware of this business type and plan to expand it.  They are aware of the recent increased regulatory scrutiny of this type of business and are planning to address and expand the business as well."  Andrews included biographies provided by Earl Robinson, Jerry Robinson, and McCarter in his submission to WestSide Bank.

220.  The Hornbeam Owners also provided an Executive Summary of the transaction, which Andrews forwarded to WestSide Bank.  In it, the Hornbeam Owners emphasized that "[t]he company is controlled by Jerry L. Robinson, Earl G. Robinson (no relation) and Jim McCarter . . . .  All three men have strong resume's and operational and management experience to assist the guidance of the business."  The Executive Summary's Financial Highlights recognized that, since

2011, direct sales (primarily the Discount Clubs) accounted for the majority of the revenues.

221.  The Executive Summary acknowledged the prior FTC actions and identified "regulatory" and the entire "direct sales business" as risks for the business.  For the latter, the Hornbeam Owners claimed the "primary protection for the business is to create a marketer and servicer relationship."  Such a relationship would separate the lead generation business – as the marketer – from the direct sales business.  As a result, the Hornbeam Owners claimed, "[i]n case of legal or regulatory activity the marketer should not be affected other than a loss of revenue."

222.  Upon purchase, the Hornbeam Entities assumed control of the Discount Clubs, including Saving Pays Club, Money Plus Saver, and the not-yet-released version, Saving Makes Money.  They took over the office space in Los Angeles, California, where the EDP Entities had operated, and assumed control of the loan-finding and Discount Club websites, the contracts with the call center, the contracts and relationships with the lead generation and marketing affiliates, and the relationship with the Discount Club fulfillment company (Access VG, LLC).

223.  The Hornbeam Entities also took over the EDP Entities' relationships with the Discount Club processing bank, WestSide Bank, and the payment processor, iStream.

224.  They also retained virtually all EDP Entities employees and had them maintain business as usual.  Indeed, functionally, the transition was seamless, with the EDP Entities operating the business one day, and the Hornbeam Entities operating the exact same business, the exact same way, the next day.

225.  The Hornbeam Entities continued the Discount Club business without change and immediately began charging existing "members" for recurring monthly fees for their previous enrollments in Saving Pays Club and Money Plus Saver.  In addition, they began enrolling new consumers in the Money Plus Saver Discount Club.

226.  The Hornbeam Entities launched the Saving Makes Money iteration of the Discount Club in December 2013.  Like the EDP Entities, the Hornbeam Entities marketed the Discount Clubs online, through marketing affiliates, and through outbound telemarketing.  Although the Hornbeam Entities ceased direct telemarketing of the Discount Clubs in mid-2015, they continued selling the Discount Clubs online and through affiliates until at least June 2016.

<u>Targeting Subprime Consumers</u>

227.  The Hornbeam Entities took over operation of the dozens of websites that offered to match consumers with lenders who could provide payday, cash advance, or installment loans.  By late 2014, the Hornbeam Entities operated numerous

67

loan-finding websites for consumers seeking payday or short-term loans, including

1-hourpaydayloan.com, boomcashnow.com, cash-in-onehour.com,

easyandsimplecash.com, fiscalcashloans.com, greenmoneycash.com,

localpaydayadvance.com, and phonecashloan.com.

228.  As with the EDP Entities, tens of thousands of consumers completed loan

applications on these websites, providing sensitive personal information, including

their names, addresses, social security numbers, dates of birth, and bank account

numbers.

229.  The Hornbeam Entities also purchased "leads" containing the same sensitive

personal and financial information from third-party publishers of similar loan-

finder websites.

230.  In numerous instances, the Hornbeam Entities used the consumer financial

information obtained from their own websites and from purchased "leads" to

charge consumers for enrollment in their Discount Clubs, even though the

consumers had not authorized payments.

231.  In some instances, the Hornbeam Entities, or their third-party affiliate

marketers, redirected consumers from loan-finding websites to websites that

promoted both the Discount Club and cash advance loan offers.  In many of those

instances, the Hornbeam Entities and their affiliate marketers pre-populated much,

if not all, of the consumer information on the "enrollment" screens for the Discount Clubs.

232.  In numerous instances, the Hornbeam Entities used the personal and financial information consumers provided when seeking unrelated payday, cash advance, or installment loans to enroll consumers in Discount Clubs through foreign call centers without first obtaining the consumers' oral or written authorization to be charged.

233.  The Hornbeam Entities included a negative option feature in their membership sales, meaning they continued to charge consumers monthly fees for the memberships until the consumers took the necessary steps to affirmatively cancel their memberships.

### Telemarketing the Discount Clubs

234.  Like the EDP Entities, the Hornbeam Entities continued to use the same foreign call center to engage in outbound telemarketing for the Discount Clubs.

235.  By March 2014, Earl Robinson was raising significant concerns with Jerry Robinson and Merrill about the telemarketing and the "risk that's inherent in Ennovate's [the call center's] management of SMM [Saving Makes Money] calls." As he explained, "[t]here's something we don't know/are not being made aware of

regarding how Ennovate is closing SMM sales and this is exposing us to an additional (and likely) unnecessary layer of risk."

236. Earl Robinson proposed finding a way to restructure Ennovate's payout to address the "misalignment of interests" that resulted from being paid on approved orders and allowing the Hornbeam Entities to "assume all of the post sale risk." As he noted:

> Ennovate's call center in India sends us tapes of their SMM calls. However, as you know, what they send us is likely only 40% of the actual call/only the backend of the call as Gyro[scope]/CCDG [Clear Compass Digital Group] doesn't 'own' the front end of the call. The front end of the call involves Ennovate closing/trying to close a loan lead. The back end of the call is the post loan discussion SMM pitch. Per nearly 100% of the Ennovate tapes sent to our attention, the prospective SMM customer (with very little pushback) agrees to the SMM terms, conditions and fees, substantiates that they understand the program and fees and then consents to enrolling in SMM and being charged as per [sic]. In a very high percentage of the Ennovate calls, the SMM customers calls us within two weeks to say they didn't know what they were ordering, thought they were receiving a payday loan, et al. In short, there's something we don't know (but must be made aware of) about the front end of the call.

237.  The Hornbeam Entities made no significant changes to the outbound telemarketing of the Discount Clubs and continued to telemarket the Discount Clubs until July 2015, using the same foreign call center and marketing the Discount Clubs in connection with, including as an "upsell" from, short-term loan telemarketing offers.

238.  From October 2013 until July 2015, the return rates for telemarketing sales were as high as, or higher than, the return rates for online Discount Club sales.

<u>Consumer Complaints and Refund Requests</u>

239.  Like the EDP Entities, the Hornbeam Entities also used their call centers to handle customer service functions.  From October 2013 through November 2014 (the latest date for which the Hornbeam Entities provided information), the Hornbeam Entities classified 84% of their customer service calls – almost 150,000 calls, more than 10,000 calls per month – as relating to cancellation and refund requests.

240.  Most, if not all, of the consumers who called the Hornbeam Entities complained that they did not authorize the charges.  Indeed, customer service "rebuttal" scripts focused solely on customer authorization, anticipating customer complaints such as, "I told them no, I don't want it," "I was misinformed about this," and "I did not knowingly sign up for this."

241.  When consumers called to contest the charges, the Hornbeam Entities directed their customer service representatives to tell consumers they had authorized the Electronic Check.  To support this claim, the customer service representatives, following scripts provided by the Hornbeam Entities, falsely claimed that records of the date, time, and computer IP address from enrollment proved authorization.  They also claimed that their possession of the consumers' personal and financial information demonstrated that the consumers had authorized the charges.

242.  Consumers could also leave their contact information on the Discount Club website to request contact from customer service.  Often, consumers added comments to those request forms, highlighting their claims that the charges were unauthorized.  Indeed, on a single day in July 2014, the customer service portal received callback requests with the following additional comments from consumers:

> a.  "Cancel the subscription.  I didn't not athorize any kind of payment or monthly charge from your company.  Thank you."
>
> b.  "I want to cancel this membership and have all my money you have taken refunded back to my account.  I did not authorize these transactions."

72

c.  "I need 300 is this a loan?  I NEED A SHORT TERM LOAN"

d.  "I did not no I was being charged the 87.00 how can I go about getting a refund."

e.  "There was $87.00 taken out of my checking account that I did not approve and want it refunded immediately.  I do not know who you are how you got my information but I can assure you it was not me, I do not join anything on line as there are to many scams out there which I am sure you are one of them"

f.  "I didn't realize I was going to be charged $87, please cancel my membership and please refund me my $87.  Thank you."

g.  "I do not want to be a member of your club.  I only want to apply for a cash advance"

h.  "I have a charge to my bank account from your company.  I did not sign up with you guys.  I need to get this fixed and a refund"

i.  "I have a debit that has appeared on my checking account and I have NOT ordered anything!!  I would like to know what is going on and EXPECT THIS TO BE CREDITED TO MY ACCOUNT ASAP!!! PLEASE ADVISE"

j.  "I did not sign up for you to take money out of my account.  I want the money put back plus the 34 over draft fee.  I was LOOKING AT YOUR SITE!  NOT PURCHASING ANYTHING.  I WILL PUT A STOP ON MY ACCOUNT.  I DO NOT ANSWER UNKNOWN NUMBERS.  PUT MY MONEY BACK INTO MY ACCOUNT. THIS IS A SCAM."

k.  "i put fraud on my account i need that money back in the account for 87.00 fast or there will be charges this was not authorized by me the account holder."

l.  "I want to cancel my membership please.  I do not even remember signing up for this."

243.  In addition to the hundreds of thousands of consumers who contacted the Hornbeam Entities directly, almost two thousand consumers submitted affidavits and other statements to their banks attesting that they had not authorized the charges.  The consumers' banks forwarded these affidavits to WestSide Bank in support of their collection letters.  WestSide Bank then forwarded the collection letters, with consumer affidavits, to iStream, which forwarded them to the Hornbeam Entities.

244.  Numerous consumers also complained about the unauthorized Discount Club charges on various complaint websites.  As the EDP Entities had done, the Hornbeam Entities engaged in search engine optimization, even retaining an outside company for that purpose, in an attempt to hide those complaints from banks, BBBs, and consumers searching for the Discount Clubs online.

245.  In December 2013, Earl Robinson worked with Merrill to attempt to market the Discount Clubs as a benefit for groups to provide their members – e.g., an association offering access to the coupon network as an included benefit of membership, at no extra charge to the member – in an attempt to move the Discount Clubs away from reliance on Subprime Consumers.  As Earl Robinson explained to Jerry Robinson and Merrill, one association they met with had two significant concerns:  (1) a "mishap" in the presentation showed the consumer version of the Discount Clubs, with "payday banner ad pop-ups" rather than the intended "banner ad free mock-up;" and (2) "a Google serach [sic] of Money Plus Saver yields a fair number of 'fraud' claims."

246.  Later that month, Merrill reported to Earl Robinson that two affiliate marketers had decided to stop marketing the Discount Clubs "[b]ecause payday is being looked at so closely anything tied to payday marketing that touches the consumer is also in the daisy chain" of scrutiny.

247.  In addition, hundreds of consumers filed complaints with the FTC, BBBs, and State Attorneys General, alleging that the Hornbeam Entities had taken their money without authorization or caused them to incur NSF bank charges from an unauthorized attempt to take their money.

248.  According to their records, the Hornbeam Entities received more than 40 complaints or inquiries from State Attorneys General in the first six months they operated the Discount Clubs – from October 2013 through early April 2014 – most, if not all, of which related to the Discount Clubs.

249.  Indeed, when the Hornbeam Entities took control of the Discount Clubs, there was a stack of unanswered BBB and State Attorneys General complaints.

250.  In December 2013, Hornbeam Entities Director of Customer and Product Experience Velia Murillo reported to Merrill that, because she had not been able to respond to a growing number of BBB complaints, she had received a letter from a California-area BBB "about their concern with 187 complaints received about Money Plus Saver and concerned with the type of issue (charge)."  She provided a general response to that letter and requested advice on whether to send a similar letter to address the many unanswered complaints she had received from the Business Consumer Alliance (which had formerly been a BBB for a separate region).

76

251.  Starting in February 2014, Earl Robinson took primary responsibility for overseeing the Hornbeam Entities' responses to these, and subsequent, BBB and State Attorneys General complaints.  Thereafter, Murillo drafted initial responses to the complaints and then forwarded the complaints and draft responses to Earl Robinson for review and approval.  Earl Robinson directed Murillo to begin a tracking system for Discount Club complaints, and Merrill added that she should "be 100% sure that any complaint that may arise from the AG is refunded ASAP."

252.  From February 2014 through at least mid-2015, Earl Robinson reviewed numerous State Attorneys General complaints and reviewed and approved the responses thereto.

253.  Despite consumers' assertions that they had never authorized the charges, the Hornbeam Entities only provided refunds of initial charges and, even then, only if the consumer:  (1) proved that he or she requested the refund within 5 days of the date on the bank statement showing the check cleared the account; (2) completed a detailed form; and (3) provided a copy of a bank statement showing the charge had cleared the account.

254.  As a result of their stringent refund practices, the vast majority of consumers requesting refunds were denied.  In February 2014, Murillo responded to a request from Jerry Robinson and Earl Robinson for information regarding the number of

refund requests that were granted and denied.  In response, she noted that, based on

their customer service classifications, almost 37,000 consumers had requested

refunds in 2013 but just over 8,000 received them.  The other 78% of refund

requests were denied, either because the attempted charge was subsequently

returned by the bank or because the consumer did not satisfy the Hornbeam

Entities' refund requirements.  From January through mid-February 2014, the

percentage of consumers who requested but were denied a refund increased to

81%.

255.  In response to this report, Earl Robinson asked Jerry Robinson and Merrill

whether there were "concerns re the significant (ie 36,000) number of annual

refund requests" and noted that the company was "still running at a clip of about

3,000 refund requests/month."  He also questioned whether there were "[a]ny risk

management/risk mitigation or product management initiatives we should be

considering" given that " [t]he large number of refund requests (vs the actual

number of new and recurring SMM clients) gives the BBB, Attorneys General and

our friends who shut down the previous owners lots of data points re one of the

'gaps' in our strategy."

256.  In June 2014, Murillo forwarded to Earl Robinson and Merrill a spreadsheet

showing customer service inbound calls by topic, including "cancel policy" and

"refund policy."  Murillo stated that inbound call volumes had recently increased slightly and noted a correlation between the number of orders one month and the number of refund requests the following month.  Thus, when order volume increased, the number of refund requests increased.  Murillo stated that she would be forwarding the spreadsheet monthly to Earl Robinson and Merrill.

257.  The attached spreadsheet showed the number of monthly inbound customer service calls for January 2011 through May 2014, including how the call was classified by customer service representatives.  According to the report, the vast majority of calls each month related to "refund policy" inquiries, including more than 130,000 calls in 2011, 180,000 calls in 2012, 175,000 calls in 2013, and almost 50,000 calls in the first five months of 2014.

<u>High Return Rates</u>

258.  Consumers' banks returned the vast majority of the Hornbeam Entities' Electronic Checks.  From October 2013 through June 2016, the Hornbeam Entities attempted to debit almost $46,000,000 from consumers and succeeded in withdrawing at least $16,000,000.

259.  From October 2013 through June 2016, the Hornbeam Entities had an average return rate of more than 50% for all Discount Club charges, more than 150 times the national average for all checks, and more than triple the return rate level

set by NACHA in September 2015 for ACH debits.  They also had a return rate of at least 75% for initial Discount Club charges over that same period, more than 250 times the national average.

260.  The Hornbeam Entities' return rate for unauthorized charges averaged almost 4% over the same period, 850 times the national average for all forms of checks.  That unauthorized return rate was also four times higher than NACHA's pre-September 2015 threshold for unauthorized ACH debits, and eight times higher than the post-September 2015 threshold.

261.  The return rates for charges from telemarketing enrollments were at least as high, if not higher, than the return rates for charges related to online enrollments.

262.  From the beginning, the Hornbeam Entities, Jerry Robinson, Earl Robinson, McCarter, and Merrill understood the need to reduce the Discount Club return rates and the risk of losing their processing bank or facing government action if they failed to do so.

263.  In preparation for a December 2013 meeting with Andrews, Jerry Robinson emailed Merrill his notes for the topics he expected to cover.  Jerry Robinson noted that the "goal" for the Discount Clubs was to decrease return rates through "screening" of accepted orders and "[u]sing customer service techniques to reduce returns/refunds."

264. In January 2014, Jerry Robinson explained to Merrill and Hornbeam Entities employees, including McCarter's son, Matthew McCarter, that "[o]verall we want to review the data and attempt to lower the returns from the Saving Makes Money Program and improve the volume and quality of the program." As he explained, "[t]he issue is that returns are 75%."

265. Merrill forwarded Jerry Robinson's email to Hornbeam Entities Vice President of Marketing Operations and Head of List Management, Michael Wilson, who is William Wilson's brother and who had long been responsible for email marketing efforts for both the EDP and Hornbeam Entities. Merrill requested Michael Wilson's assistance in finding ways to reduce Discount Club returns. Michael Wilson responded that he was "not sure if you'll be able to decrease the returns too much with the online sales. This is how it has been historically since I've been at the company, but mainly because of how it is marketed." He suggested that, if they could separate the Discount Clubs from loan offers and "market as a stand-alone maybe [that] would help to decrease the overall return rate."

266. Merrill agreed with Michael Wilson but raised concerns regarding whether the Discount Clubs could "function[] stand alone." Merrill indicated they were testing that approach, and it was not going well. Michael Wilson responded that, if

they were going to succeed selling the Discount Clubs without tying them to payday loan offers, they would need to change their target demographic because "[i]t's also not sexy for payday customers if they know it's something they have to pay for."

267.  Jerry Robinson knew that the Hornbeam Entities had attempted to market the Discount Clubs without connecting the offer to payday or short-term loans.  He also knew that such efforts were unsuccessful.

268.  In early 2014, Jerry Robinson and McCarter visited WestSide Bank, along with Andrews, to introduce themselves as the new owners of the Hornbeam Entities and to cover topics including "describ[ing] the Gyroscope [Discount Club] business model" and reassuring the bank officers about "their efforts to reduce overall percentage of returned item count."

269.  As part of this meeting, the Hornbeam Entities prepared a presentation for WestSide Bank, which was sent to Jerry Robinson, Earl Robinson, McCarter, Merrill, and Andrews for review prior to sharing it with the bank.  In the presentation, the Hornbeam Entities describe their new owners, which include "Georgians, Jerry Robinson, Jim McCarter, & Earl Robinson, all prominent, local entrepreneurs," as well as an "investor," Alden McDonald, the President and CEO of Liberty Bank.

270. In the presentation, the Hornbeam Owners emphasized that "[w]e are aware of the high return rates and have various levels of stringent filtering and account verification processes to prevent as many returns as possible."  They assured WestSide Bank that they were taking actions to improve the return rates, including "[r]esearching the feasibility of eliminating NSF redeposits altogether," which would "translate to the elimination of 7,000-10,000 transactions per month through iStream with our highest return rates."

271. The WestSide Bank presentation highlighted recent "blended" return rates (i.e., combined total return rates for all types of Discount Club charges), both as calculated by iStream (ranging from 51% to 63.5% for the prior three months) and through their own internal reporting (ranging from 43.7% to 55.8% for the same period), which they claimed was a "truer representation of return rates, because we reflect late returns in the original order month."  Again, they emphasized their "plans to move [NSF] redeposits from Westside or eliminate them altogether, [whereby] our average return rates would be further improved to the mid-40%'s . . . ."  Finally, the presentation highlighted that the Discount Clubs had monthly membership ranging from 12,382 to 16,093 over the prior year.

272. Shortly after the meeting with WestSide Bank, Hornbeam Entities Director of Accounting and Administration Leon forwarded to Jerry Robinson, Earl

Robinson, McCarter, Merrill, and Andrews a "full monthly summary" of return rates for the various Discount Club charges for January 2013 through February 2014, although she noted that the last month's number would understate returns since she expected more to arrive.

273.  The attached spreadsheet showed the number of orders, returns, and return percentages by month for initial Discount Club orders, NSF Redeposits, recurring monthly charges, and blended totals for all Discount Club returns.  According to the Hornbeam Entities' internal analysis, return rates for January 2013 through January 2014 ranged from 69.6% to 72.6% for initial orders, 82.2% to 90.2% for NSF Redeposits, 26.1% to 41.4% for recurring monthly charges, and 52.8% to 65.5% for total Discount Club charges.

274.  The spreadsheet also showed that the blended total Discount Club return rates would have decreased by almost 5% if the EDP and Hornbeam Entities had not attempted the NSF Redeposits.

275.  The day after the meeting with WestSide Bank, Andrews emailed Jerry Robinson, Earl Robinson, McCarter, and Merrill, along with Martha Leon and Velia Murillo, to assure them that WestSide Bank's President and Vice President were "comfortable" with the results of the meeting and "were glad to hear from

you that you were aware of the high returned items percentage, understood the concern of this issue and were taking steps to reduce returns."

276.  Thereafter, Leon reported to Jerry Robinson, Earl Robinson, and Andrews that the Hornbeam Entities earned just over $230,000, net of refunds, on the NSF Redeposits from October 2013 through February 2014.

277.  Despite the Hornbeam Owners' assurances to WestSide Bank and the knowledge that eliminating NSF Redeposits would decrease the Discount Club total return rate by almost 5%, the Hornbeam Entities did not discontinue NSF Redeposits until Andrews informed them in September 2014 that WestSide Bank was requiring them to do so.

### Use of "Loyalty Leads" RCCs to Artificially Reduce Return Rates

278.  In late 2014, the Hornbeam Entities implemented a plan to artificially reduce their combined return rate by sending RCCs to themselves and counting those transactions, which had virtually zero returns, in their overall transaction volume.

279.  Specifically, with the knowledge and encouragement of iStream and Andrews, in October 2014, the Hornbeam Entities began sending thousands of nominal RCCs (typically for $1.00-$1.50) each month from their Clear Compass Digital Group account to their Gyroscope account using a d/b/a of "Loyalty Leads."  By increasing the volume of monthly RCC transactions going through the

iStream account – while not increasing the number of returns – the Hornbeam

Entities made it appear as if they had lowered their total return rate by 15-20% by

the end of 2014.

280. Jerry Robinson and Andrews, along with Hornbeam Entities Director of

Accounting and Administration Martha Leon, developed the idea for the Loyalty

Leads program during meetings in September 2014.  Although they initially

discussed forming a new subsidiary for that purpose, Leon suggested to Jerry

Robinson and Merrill that, "[a]s a quick method for testing our blend-down idea of

processing low-priced transactions through Gyroscope, I think we should use the

relationship between CPM [Cardinal Points Management, d/b/a Clear Compass

Digital Group] and GYRO already in place."  She argued that it would be

"pointless" to set up a new company to use in the transfers (as they had originally

contemplated), because the banks involved – WestSide and the company's bank

account that was used to pay the RCCs – would know that the transfers were

between related companies anyway.

281. Jerry Robinson immediately approved the plan, calling it a "[g]reat idea."

282. Over the following weeks, Andrews repeatedly pushed the Hornbeam

Entities to start the Loyalty Leads program, noting in a September 23, 2014  email

to Leon and Merrill that "[t]he addition of that program is what the Bank needs to see so that the overall return rates will continue to reduce."

283.  Later the same day, the Hornbeam Entities formally requested approval from iStream to start the Loyalty Leads transactions.  On behalf of the Hornbeam Entities, Leon, copying Jerry Robinson and Merrill, requested that iStream reduce the processing fee for Loyalty Leads transactions, reminding Andrews that the purpose of sending these individual Electronic Checks between Hornbeam Entities' accounts was "it's obvious benefit to our rates, rather than cost effectiveness."  In the course of seeking approval to allow the Loyalty Leads transactions, Andrews forwarded Leon's email to numerous iStream employees, including Joachim.

284.  iStream approved the Loyalty Leads transactions on October 14, 2014, and the Hornbeam Entities began sending them in mid-October.  By the end of October, the Loyalty Leads volume was "on 'full,'" which, Leon noted to Jerry Robinson and Merrill, was "improving our return rates drastically."

285.  In early November 2014, Leon reported to Jerry Robinson, Earl Robinson, McCarter, Merrill, and Hornbeam Entities employees, on the impact on the total return rate of both stopping NSF Redeposits of initial Discount Club charges and adding Loyalty Leads transactions.  She provided a table of results, broken down

87

by the type of charge, including "the new Loyalty Leads program, which has no returns." As she explained, those actions had brought the total return rate down to 45.7% for October, noting that it would have been 51.6% without those changes.

286. Leon's table showed monthly transactions and returns, by number and by dollar value, for August through October 2014. According to the table, return rates for initial Discount Club sales ranged from 69.2% in September 2014 to 84.8% in October, with unauthorized returns for initial sales ranging from 8.1% to 9%. She referred to the 84.8% October return rate for initial Discount Club sales as an "aberration" and expressed optimism that new account filters would reduce that number in November.

287. In response, McCarter thanked Leon for "explaining a bad situation very well[.] [W]e all hope that the 84.8% is not a reoccurring metric."

288. Subsequently, Leon prepared and circulated an October 2014 profit-and-loss statement to Jerry Robinson, McCarter, and Merrill. She noted that, "Loyalty Leads activity was added because it generates processing fees in COGs [costs of goods sold] that are paid to iStream, and affect both the P&L and balance sheet. The revenue and 'commissions' earned between the sister companies are shown as eliminated accounts in consolidation at the bottom of the P&L."

289.  In December 2014, Leon forwarded the October 2014 monthly financial statements for review by Jerry Robinson, Earl Robinson, McCarter, and Merrill, again noting that they were "a little delayed because of the extra time needed to figure out the extraction of intercompany activity produced by the Loyalty Leads program, which is processed through the iStream mechanism."

290.  In mid-November 2014, because of the "impressive results" shown by adding Loyalty Leads transactions to the return rate calculation, Andrews began encouraging the Hornbeam Entities to increase their processing volume.

291.  A December 2014 presentation for use by the Hornbeam Owners at a periodic meeting for the Members (commonly referred to at the Hornbeam Entities as a "Board" meeting) included highlights of the Loyalty Leads program.  As explained in the presentation, the Hornbeam Entities "[c]reated the Loyalty Leads program for selling SMM [Saving Makes Money] leads to loyalty program companies or other marketers.  Starting the program with CCDG [Clear Compass Digital Group] is helping us reduce our blended return rate from about 56% in August to 33% in November."

292.  In early February 2015, Leon reported to Jerry Robinson and Merrill that Andrews was concerned that the total return rate for January 2015 had increased over prior months.  Leon explained to them that Andrews (who had recently left

iStream), was "worried about spooking Westside, as well as not having consistent attractive numbers to show a new potential bank."  In order to address the problem, Leon suggested increasing the number of Loyalty Leads transactions – which had initially equaled the number of monthly initial Discount Club sales – to a number that would sufficiently bring down the total return rate.  Jerry Robinson immediately approved the idea, finding it the "best option," despite the significant additional fees involved.

293.  By mid-2015, at least 40% of the Electronic Checks the Hornbeam Entities processed through iStream were "Loyalty Leads" checks to themselves.  The Hornbeam Entities continued to use the Loyalty Leads checks to reduce their total return rate until they stopped operating the Discount Clubs.

Consumers' Non-Usage

294.  As with the EDP Entities, essentially none of the consumers enrolled in the Discount Clubs ever used any of the benefits for which the Hornbeam Entities charged them.

295.  The Hornbeam Entities' Discount Clubs had an average of almost 13,000 members each month – both new and recurring.  Starting in February 2014, those members included the Hornbeam Owners and employees, all of whom had free access to the Discount Clubs.

296. At least some Hornbeam Entities employees took advantage of the program and downloaded some coupons.

297. Yet, even including Hornbeam Owners and employees as members of the Discount Clubs, the members collectively downloaded only about 500 coupons from October 2013 through June 2016, an average of barely 15 coupons per month – a monthly usage rate of 0.12%.

298. Further, more than 99.5% of the more than 100,000 consumers who were charged by the Hornbeam Entities for memberships in the Discount Clubs never downloaded a single coupon, the only service for which they had supposedly paid.

299. Consumers did not use the Discount Clubs for which they had paid because they had not authorized the payments and were not aware that they were paying for access to online coupons.

300. In mid-2014, Merrill and other Hornbeam Entities employees requested specific usage data from the Discount Clubs' fulfillment company, Access VG.

301. In July 2014, Access VG provided a series of reports showing consumer usage of the Discount Clubs from January through June 2014.

302. According to the Access VG reports, during the first six months of 2014, Discount Club members downloaded only 49 coupons.  However, the report also showed that 15 of the 49 coupons had been downloaded by user IDs assigned to

Hornbeam Entities employees (who had received free access to the Discount Clubs in early 2014), and another 8 coupons had been downloaded by the courtesy ID that had been given to a company performing due diligence on the Hornbeam Entities in its efforts to obtain a loan.

303.  In other words, no more than 26 coupons had been downloaded by paying members, a download rate of just over 4 coupons per month by all paying consumer "members" of the Discount Clubs.  Moreover, those coupons were downloaded by 21 different members, with only three consumers downloading more than one coupon during that period.  The remaining Discount Club members – averaging almost 13,000 per month – downloaded no coupons during that six-month period.

304.  McCarter's son, Matthew McCarter, began working as a consultant for the Hornbeam Entities in early 2014.  He continued in that position until at least early 2015.  By September 2015, as discussed above, Matthew McCarter had become a member of the Management Committee.

305.  As part of Matthew McCarter's responsibilities as a consultant, he analyzed the various aspects of the business, including sales of the Discount Clubs and the targeting of Subprime Consumers for the Discount Clubs.  He also provided regular feedback to the Hornbeam Owners, particularly Jerry Robinson and

McCarter.  Indeed, Jerry Robinson informed Merrill that one of Matthew

McCarter's primary responsibilities was as a liaison to the Hornbeam Owners.

306.  In July 2014, Merrill forwarded to Matthew McCarter and Jerry Robinson

the usage reports he had received from Access VG, including the number of

coupons members had downloaded.

307.  In August 2014, Access VG provided an updated report that compared year-

to-date usage information for 2013 and 2014.  According to the report, from

January through June 2013, Discount Club members downloaded 90 coupons.  In

other words, usage had actually decreased by almost half, year-over-year.

308.  In August 2014, Matthew McCarter participated with Merrill in a second

teleconference with Access VG to discuss the reports on Discount Club usage.

After that phone call, Matthew McCarter emailed Jerry Robinson, noting that the

usage "numbers were shockingly low."  As he explained, "the majority of people

buy it, login once, and forget about it for on average 3.5 months before canceling.

The people that have been around for awhile aren't using it much at all.  I was

shocked it was so low."

309.  As part of her regular meetings with him, Hornbeam Entities Director of

Customer and Product Experience Velia Murillo updated Earl Robinson on the

calls with the Discount Clubs' fulfillment company Access VG regarding consumer usage.

310.  The Hornbeam Entities made no changes to the targeting of Subprime Consumers, the Discount Club benefits, or the operation of the Discount Clubs as a result of these usage reports.

<u>Search for a New Processing Bank</u>

311.  From the beginning of their ownership of the Discout Clubs, the Hornbeam Entities knew that WestSide Bank was uncomfortable with continuing to process Discount Club payments due to the relentlessly high return rates.  As a result, they, along with Jerry Robinson, Earl Robinson, McCarter, Merrill, and Ward, devoted significant effort to finding a new bank willing to allow them to deposit Discount Club RCCs.

312.  In December 2014, the Hornbeam Entities Director of Accounting and Administration, Martha Leon, updated Jerry Robinson and Merrill on a meeting she and Velia Murillo had with Andrews.  According to Leon, Andrews had informed her and Murillo that "there has been no change in Westside's feeling about us, and they are still uncomfortable with the business.  This is not only due to the high return rate, but because they don't understand, and don't want to understand more, about transaction processing."

313.  Both Andrews and iStream consultant Thomas Olsen, the former President of WestSide Bank who had worked with the EDP Entities previously, worked to find a new bank willing to work with the Hornbeam Entities on the Discount Club business.  When Andrews left iStream at the end of January 2015, he continued working with the Hornbeam Entities on this search.  Despite numerous attempts, neither Andrews nor Olsen could find any banks willing to be a processing bank for the Discount Clubs.

314.  Jerry Robinson also reached out to numerous banks in early 2015, attempting to find one interested in working with the Hornbeam Entities on the Discount Club business.  He also failed.

315.  In March 2015, Andrews reported to Jerry Robinson and Leon that he had spoken to WestSide Bank Vice President Rhonda Thomas, and she was insisting that the company immediately add $150,000 to the processing account to increase the reserve for returns.  As Leon explained to Jerry Robinson, Earl Robinson, McCarter, and Merrill, "the bottomline is that we need to transfer $150K into the processing account by Monday.  Aside from that, Westside has made it clear that they want to terminate the relationship, but have not set a definite time frame."  Leon personally asked them "to put the word out if you have any small bank contacts, preferably board members or others high up enough that could strongly

influence their decision to take our business, please let us know."  She offered to create a "general teaser" to use with any bank.

316.  McCarter agreed to personally loan the Hornbeam Entities $150,000 to preserve the processing relationship with WestSide Bank while the company continued to search for a new bank.  As he later described in an email to Jerry Robinson, "if I did not put that money in, we could not continue all of our day to day business."

317.  In early April 2015, Leon passed along an update from Andrews to Jerry Robinson, Earl Robinson, McCarter, and Merrill:  "[w]ith the $150K deposit preventing any negative balances in the processing account" and the possibility of switching to a new bank in the near future, WestSide Bank was willing to continue working with them.

318.  By April 2015, the Hornbeam Entities had decided to create a fake Discount Club, with a live website that banks could visit online but that would not be actively marketed – and, therefore, would not generate any online or BBB complaints – to present to potential processing banks.

319.  In an April 2015 email, copying Jerry Robinson, Leon informed Merrill, Murillo, and other Hornbeam Entities employees that Jerry Robinson was "urging" them to create a new version of the Discount Club "because he's already

encountered poor bank interest when searching [online] for Saving Makes Money."
As a result, they needed to create a fake version of the Discount Club that could
exist online but not be marketed; it would simply be "something live to show the
banks."

320.  Merrill confirmed that "[b]ased on the push-back from now 2 banks, even
though we had the chicken and the egg discussion Tuesday, we need to move
forward" with the rebranding.

321.  By mid-April 2015, the Hornbeam Entities had decided on the name "Total
Savings Now" for the fake Discount Club and began working to create a new
website for the program.  They also created a bank presentation to support the
existence of the fake Discount Club, one that would present "Total Savings Now"
as their active Discount Club with a long processing history and thousands of
monthly members, but no apparent online complaints.

322.  In one of his regular updates for the Hornbeam Owners, including Earl
Robinson and McCarter, Merrill noted that the Hornbeam Entities were "Re-
skinning / Rebranding SMM with new name and look.  We do this every 12-18
months, but also need to do in order to help secure a new bank."

323.  Murillo also updated Earl Robinson on the "rebranding" efforts as part of
their regular updates.

324.  Jerry Robinson, Earl Robinson, McCarter, and Merrill frequently discussed their unsuccessful efforts to find a new bank.  Both Jerry Robinson and Earl Robinson contacted numerous banks, particularly smaller banks.  In response to a July 2015 suggestion from McCarter that they try "local banks" in the Los Angeles area, Leon explained to McCarter, Jerry Robinson, Merrill, and Andrews that they were focusing on small Georgia banks because they believed they needed a personal connection to the Hornbeam Owners, particularly Jerry Robinson, to convince a bank to take their business.

325.  By June 2015, the Hornbeam Entities had launched the Total Savings Now version of the Discount Club.  Leon had prepared a new bank presentation, which presented Total Savings Now as the active Discount Club, despite the fact that they were not marketing that version, and provided return rates from the actual Discount Clubs, combined with the Loyalty Leads transactions, as the Total Savings Now return rates.  The presentation described former versions of the Discount Club without referencing their names, so banks would not have any reason to search the Internet for (or find complaints relating to) the Discount Clubs.

326.  Leon provided the Total Savings Now materials to Jerry Robinson, McCarter, Merrill, Andrews, and Olsen, as well as to other Hornbeam Entities employees.

98

327.  Despite those efforts, as of June 2015, the Hornbeam Entities and owners, as well as Andrews and iStream consultant Olsen, had been unsuccessful in finding a new bank for the Discount Clubs.   Jerry Robinson, Merrill, Leon, and Andrews discussed the likelihood that WestSide Bank would terminate the relationship in the near future and decided they needed to "do something to significantly cut our returns down" in order "to try and either extend our time at Westside and/or help us get a new bank more easily."  As a result, they discussed pausing telemarketing, "as it is the source of our highest volume and highest return rates."

328.  Effective July 1, 2015, the Hornbeam Entities paused their telemarketing campaign for the Discount Clubs.

329.  The Hornbeam Entities, Hornbeam Owners, and Andrews continued to search for a new bank, without success.  By mid-August 2015, the new bank "teaser" for Total Savings Now was revised to retroactively remove telemarketing sales from the calculation of return rates, allowing them to falsely claim lower return rates.

330.  Despite these efforts – the Loyalty Leads program, the fake Total Savings Now Discount Club, ceasing telemarketing, and reporting historical "Discount Club" return rates that excluded telemarketing sales and included Loyalty Leads

transactions – the Hornbeam Entities could not find another bank willing to process Discount Club payments.

331.  By the time Merrill left the Hornbeam Entities in September 2015, the need for a new bank was pressing.

332.  In November 2015, Leon emailed Jerry Robinson and Andrews, along with iStream consultant Olsen and others, regarding the status of their efforts to find a new processing bank.  She started by reminding everyone, "as Chet [Andrews] has told us several times, . . . in the long run, we need to find a better way of eliminating returns, or try a new product altogether."  She reviewed efforts the Hornbeam Entities had tried to reduce return rates but concluded that there were a number of significant problems, including:  (1) "We need to reduce returns, which appear to be inherent in the online offer and flow placement our membership often has;" (2) "We market (and our marketers usually market) to subprime consumers, because that is the data we have from cash advance campaigns and flows.  This consumer sector tends to have high return rates;" and (3) "We have not been able, so far, to think of a recurring membership that would afford the marketing fees our industry expects, at the same time as having low return rates."

333.  In December 2015, Leon forwarded this email to Jerry Robinson, McCarter, and others, noting the rejection of another potential bank and requesting a call to

discuss the "consequences" of "running out of options."  Leon then set up a screen-sharing conference for Jerry Robinson, McCarter, and others to discuss the "Processing Bank:  Why we're stuck."

334.  In January 2016, when Ward began serving as President of the Hornbeam Entities, Leon prepared a package of information for him on all aspects of the company.  Under the category "Current Significant Challenges," she noted that the direct sales business was faced with "[e]ngaging with a new processing bank to replace our existing bank of nearly 10-years," "[r]educing returns on membership sales," and "[r]educing complaints on membership sales."

335.  One of Ward's priorities as the new President of the Hornbeam Entities was to find a new processing bank or another solution to save the business, and he devoted significant time and effort to both.

336.  Ward had numerous meetings with McCarter, Jerry Robinson, Matthew McCarter, Andrews, and Hornbeam Entities employees about the status of their ongoing efforts.  He reached out to a number of banks and analyzed ways to modify the Discount Clubs in hopes of maintaining the business.

337.  Under Ward, the Hornbeam Entities, for a brief time in February 2016, tried marketing a version of the Discount Clubs that used debit cards.  But that effort

required consumers to provide their debit card numbers, which were not necessary for the loan applications, and it failed.

338. Jerry Robinson, McCarter, and Matthew McCarter knew about and approved the attempt to use debit cards for the Discount Club charges. They also knew that the effort failed.

339. In February 2016, WestSide Bank officially notified the Hornbeam Entities that it was terminating the processing relationship as of the end of March. As a result, the Hornbeam Entities had to pause submitting new transactions to WestSide Bank and iStream in February 2016.

340. At that time, Ward, on behalf of the Hornbeam Entities, was negotiating a new arrangement with a new payment processor, Microbilt Corporation (which the Hornbeam Entities had previously used for its account verification services), and a new processing bank, the Bank of Montreal.

341. When he was unable to finalize the new relationship by March 2016, Ward negotiated with WestSide Bank to extend the processing relationship.

342. Thereafter, the Hornbeam Entities restarted their processing of Discount Club charges through iStream and WestSide Bank, including submitting new "orders" they had held during the suspension of processing.

343.  The Hornbeam Entities continued to process Discount Club charges despite learning information suggesting that the FTC was investigating the Discount Clubs.  In early 2016, Jerry Robinson, McCarter, and Ward learned that the FTC had requested corporate records for Hornbeam Special Situations, LLC and another business owned by Jerry Robinson from Georgia's Secretary of State.  In May 2016, the Hornbeam Entities were served with Civil Investigative Demands issued by the FTC.

344.  In early May 2016, while the Hornbeam Entities were still working to finalize the relationship with MicroBilt and the Bank of Montreal, WestSide Bank abruptly stopped accepting Discount Club charges after receiving a Civil Investigative Demand from the FTC.  The Hornbeam Entities held all Discount Club charges until they could start processing through the Bank of Montreal.

345.  The Bank of Montreal and MicroBilt began processing Discount Club RCCs in mid-May 2016.  Within weeks, however, the Bank of Montreal terminated the processing relationship due to the high return rates.

346.  Jerry Robinson, McCarter, and Matthew McCarter knew of the Bank of Montreal's decision to terminate the processing relationship.

347.  In June and July 2016, the Hornbeam Entities continued to try to identify new ways to charge consumers for Discount Club fees, but were unsuccessful.  The

Hornbeam Entities stopped debiting consumer accounts only because they were unable to find a new processing bank to continue operating the Discount Clubs.

 Hornbeam Entities Individual Defendants' Control, Participation, and Knowledge

 348.  From October 2013 through at least June 2016, the Hornbeam Owners, along with Merrill and then Ward, served on the Management Committee that had day-to-day authority over the Hornbeam Entities.

 349.  The Hornbeam Owners oversaw the business through emails, teleconferences, and visits to the Los Angeles office.  For example, Earl Robinson regularly met or teleconferenced with Hornbeam Entities Director of Customer and Product Experience Velia Murillo regarding complaints and other aspects of customer service.

 350.  In March 2014, Earl Robinson attended a trade show in Las Vegas with Merrill and Hornbeam Entities employees, meeting with affiliate marketers and working to increase the Hornbeam Entities' business.  Afterwards, in response to a request from McCarter, he sent a report on the trade show to McCarter, Merrill, and Jerry Robinson.

 351.  From the beginning of their control over the business, Jerry Robinson, Earl Robinson, and McCarter ensured that they had full knowledge of all aspects of the business.

352.  Indeed, one of their first acts was to require the Hornbeam Entities employees, including Merrill, to create and forward regular reports on numerous topics, including a Working Capital Summary (including cash, available funds from revolving line of credit, amount released by iStream, amount held in the iStream reserve account in anticipation of returns, refunds in queue, accounts receivable, and accounts payable), a BTC ("bottom tier cash") report (daily report on the number of leads for consumers who did not qualify for short-term loans), soft profit-and-loss statements for prior and current months, projections for all lines of business, direct sales complaint tracking (including noting whether it was a BBB or State Attorney General complaint), direct sales renewals and source (online or telemarketing), and analysis of direct sales customer service calls and escalations.

353.  To the extent Jerry Robinson, Earl Robinson, or McCarter chose not to receive one or more of these reports on a regular basis, he could request them from the Hornbeam Entities employees at any time.

354.  Jerry Robinson and McCarter had frequent, often weekly, calls with the President (Merrill then Ward) and Hornbeam Entities Director of Accounting and Administration, Martha Leon, to discuss business matters.

355. Earl Robinson and Merrill also received regular reports on the number of BBB and State Attorneys General complaints that had been filed against the Discount Clubs, as well as the classifications of inbound customer service calls.

356. From at least early 2014 through at least early 2015, McCarter's son, Matthew McCarter, worked as a consultant analyzing the Hornbeam Entities' business and reporting regularly to Jerry Robinson and McCarter.

357. Earl Robinson, Jerry Robinson, Merrill, and Ward had signatory authority over the Hornbeam Entities' financial accounts.

358. Merrill and Ward's authority over those accounts was limited, however, as a Member had to approve expenditures above a predetermined amount.

359. Jerry Robinson and McCarter, along with iStream officers James Gorst and Axberg, were listed as signatories on the processing account held at WestSide Bank.

360. In addition, Jerry Robinson and McCarter signed the March 2014 company resolution naming WestSide Bank as the processing bank for the Discount Clubs.

361. When they purchased the EDP Entities' assests, each of the Hornbeam Owners was aware that the business relied on the Discount Club business, including the targeting of Subprime Consumers, for the majority of its revenues

and profits.  They also knew that the Discount Club business remained the primary revenue driver for the Hornbeam Entities after the purchase.

362.  For example, from October through December 2013, Hornbeam Entities' profit-and-loss reports sent to Jerry Robinson, Earl Robinson, McCarter, and Merrill show that Discount Club net sales (sales after returns and cancellations) accounted for 74% of the Hornbeam Entities' revenues.

363.  From October 2013 through April 2016, the Hornbeam Entities' profit-and-loss statements – sent to Jerry Robinson, Earl Robinson, McCarter, and the President – show that Discount Club net sales accounted for 63.2% of the Hornbeam Entities' revenues.

364.  Jerry Robinson, Earl Robinson, McCarter, Merrill, and Ward also knew that the Hornbeam Entities expended more money on direct costs, or Cost of Goods Sold ("COGS"), for their lead generation business than they made in income on that business.

365.  For example, as each of the Hornbeam Owners and the President knew, from October 2013 through April 2016, the Hornbeam Entities' recorded COGS for the non-Discount Club business was 125% of their revenues for those sales.

366.  In other words, Jerry Robinson, Earl Robinson, McCarter, Merrill, and Ward knew that the Hornbeam Entities depended on the Discount Clubs for their revenues and profits and could not survive financially without that business.

367.  Until at least early 2016, Jerry Robinson served as Chief Strategy Officer for the Hornbeam Entities, had signatory authority on the financial accounts, and actively oversaw many aspects of the business.

368.  From October 2013 through at least June 2016, Jerry Robinson was the largest shareholder in the Hornbeam Entities and, for much of the time, served as "Chairman" of the Management Committee or "Board."

369.  From October 2013 through at least June 2016, Jerry Robinson received regular reports on all aspects of the business, frequently visited the Los Angeles offices, communicated regularly with the other Hornbeam Owners, the President, and Hornbeam Entities employees, and often served as the final decision-maker on day-to-day business decisions.

370.  Jerry Robinson put significant effort into maintaining the Discount Clubs, including implementing the Loyalty Leads program and searching for a new bank to replace WestSide Bank.

371. Jerry Robinson was well aware of the high return rates, the targeting of Subprime Consumers, the extensive number of complaints, the risk of regulatory or

law enforcement action caused by the Discount Club business, and the fact that no consumers were using the Discount Clubs.

372. Jerry Robinson was involved in or informed about virtually every significant activity and decision relating to the Hornbeam Entities' operation of the Discount Clubs.

373. Earl Robinson was, at all times, the third-largest shareholder in the Hornbeam Entities, had signatory authority on the financial accounts, and served as Chief Revenue Officer.

374. From October 2013 through at least late 2015, Earl Robinson also held a position on the Management Committee, which had final authority over all aspects of the Hornbeam Entities' business.

375. From October 2013 through at least late 2015, Earl Robinson received regular reports on all aspects of the business, frequently visited the Los Angeles offices, and communicated regularly with the other Hornbeam Owners, the President, and Hornbeam Entities employees on business matters.

376. Earl Robinson took responsibility for reviewing and approving the Hornbeam Entities' responses to BBB and State Attorneys General complaints, monitoring complaint activity, and working with Hornbeam Entities Director of Customer and Product Experience Velia Murillo on customer service issues.

377.  Earl Robinson received regular reports on the high return rates, complaints, and the Loyalty Leads program.

378.  Earl Robinson assisted in the search for a new bank.

379.  Earl Robinson was well aware of the high return rates, the targeting of Subprime Consumers, the extensive number of complaints, and the risk of regulatory or law enforcement action caused by the Discount Club business.

380.  Earl Robinson knew that the Hornbeam Entities had received information on consumer usage of the Discount Clubs, that the Loyalty Leads program was created to artificially reduce the return rates, and that a fake Discount Club was created to mask the high number of online complaints from potential banks.

381.  Earl Robinson was involved in or informed about virtually every significant activity and decision relating to the Hornbeam Entities' operation of the Discount Clubs.

382.  While McCarter did not hold an officer title, he remained actively involved in managing the Hornbeam Entities' business.

383.  In October 2013, just after the acquisition, McCarter visited the Los Angeles offices to meet with the employees.  As he explained in a recap email to Merrill, Jerry Robinson, and Earl Robinson, "I now understand what we do, and how we do it – and am excited about what we can all do to add little nuances to the

110

organization to help ascend to the next level." He followed up by asking Merrill to forward the company's financial statements for September 2013, as he had not yet seen them.

384. McCarter also held himself out as an owner in control of the business in the March 2014 meeting with WestSide Bank, as part of the effort to give WestSide Bank confidence in continuing to act as the processing bank for the Discount Clubs.

385. In March 2015, McCarter personally loaned the Hornbeam Entities $150,000 for the express purpose of appeasing WestSide Bank and preventing it from terminating the processing relationship.

386. From October 2013 through at least June 2016, McCarter was the second-largest shareholder in the Hornbeam Entities and held a position on the Management Committee, which had final authority over all aspects of the Hornbeam Entities' business.

387. From October 2013 through at least June 2016, McCarter received regular reports on all aspects of the business, visited the Los Angeles offices, and communicated regularly with the other Hornbeam Owners, the President, and Hornbeam Entities employees on business matters.

388.  McCarter focused his attention on the overall profitability of the company, understanding that it was targeting Subprime Consumers and that the Discount Clubs were the primary source of revenues.

389.  McCarter received regular reports on the high return rates and the Loyalty Leads program.

390.  McCarter assisted in the search for a new bank.

391.  McCarter was well aware of the high return rates, the targeting of Subprime Consumers, and the risk of regulatory or law enforcement action caused by the Discount Club business.

392.  McCarter knew that the Loyalty Leads program was created to artificially reduce the return rates, and that a fake Discount Club was created to mask the high number of online complaints from potential banks.

393.  McCarter was involved in or informed about virtually every significant activity and decision relating to the Hornbeam Entities' operation of the Discount Clubs.

394.  Jerry Robinson, Earl Robinson, and McCarter also communicated with each other and shared information they learned from or directives they gave to Hornbeam Entities employees.

395. Although there were rarely formal votes among the Members, those on the Management Committee generally discussed business matters and kept each other apprised of relevant developments.  At various times, they considered whether to replace Merrill as the President, particularly when the Hornbeam Entities were not returning the income they expected.  Ultimately, Merrill chose to leave at the end of his contract term in September 2015.

396. Day-to-day management of employees and operations was delegated to the President, first Merrill and then Ward.

397. While the President managed operations, he did not have the authority to make significant business decisions without the approval of the Management Committee.

398. The President (Merrill then Ward) frequently updated Jerry Robinson, Earl Robinson, and McCarter on all aspects of the business.  Due to the small nature of the company, many of the communications between the President or other Los Angeles employees and the owners were informal and telephonic.

399. The President (Merrill then Ward) was copied on virtually all communications between Hornbeam Entities employees and Hornbeam Owners.

400. From September 2013 through September 2015, Merrill handled day-to-day business decisions, under the oversight of the Management Committee Members.

Merrill put significant effort into maintaining the Discount Clubs, including implementing the Loyalty Leads program and searching for a new bank to replace WestSide Bank.

401.  Merrill was well aware of the high return rates, the targeting of Subprime Consumers, the extensive number of complaints, the risk of regulatory or law enforcement action caused by the Discount Club business, and the fact that no consumers were using the Discount Clubs.

402.  From September 2013 through September 2015, Merrill was involved in virtually every significant activity and decision relating to the Hornbeam Entities' operation of the Discount Clubs.

403.  In December 2015, Defendant Mark Ward was hired to replace Merrill as President.  McCarter and Jerry Robinson met with Ward as part of the interview process.

404.  Ward began working for the Hornbeam Entities in January 2016.

405.  From the start of his employment with the Hornbeam Entities in January 2016, Ward knew that the Discount Clubs targeted Subprime Consumers seeking payday or other short-term loans.

406.  From the start of his employment with the Hornbeam Entities in January 2016, Ward knew that the Hornbeam Entities used information obtained from

consumers' applications for short-term loans – both on the Hornbeam Entities'

loan-finding websites and purchased from affiliate marketers – to enroll consumers

in the Discount Clubs.

407.  From the start of his employment with the Hornbeam Entities in January

2016, Ward knew that WestSide Bank wanted to terminate the processing

relationship due to the high return rates and that the Hornbeam Entities had been

unsuccessful in finding a new processing bank, despite months of effort.

408.  Ward immediately focused his efforts on finding a new bank to replace

WestSide Bank and preserve the Discount Clubs business.  He knew the

importance of the Discount Clubs to the Hornbeam Entities' revenues and tried,

unsuccessfully, to find ways for the business to survive without the Discount

Clubs.

409.  Ward negotiated the agreement with MicroBilt and the Bank of Montreal to

replace iStream and WestSide Bank.

410.  From January 2016 through at least June 2016, Ward received daily, weekly,

and monthly reports on all aspects of the business and communicated regularly

with the Hornbeam Owners.  Ward was copied on virtually all communications

between Hornbeam Entities employees and the Hornbeam Owners.

411.  From January 2016 through at least June 2016, Ward handled day-to-day business decisions, under the oversight of the Management Committee Members.

412.  Ward knew about the reliance on the Loyalty Leads program, the high return rates, and the difficulty in finding any bank willing to work with the Discount Clubs.

413.  From January 2016 through at least June 2016, Ward was involved in virtually every significant activity and decision relating to the Hornbeam Entities' operation of the Discount Clubs.

414.  When they purchased the EDP Entities, Jerry Robinson, Earl Robinson, and McCarter knew about the prior FTC actions against the EDP Entities, the numerous complaints about the Discount Clubs, including BBB and State Attorneys General complaints, as well as the prior actions arising out of complaints about unauthorized charges for the Discount Clubs, including the Oregon AVC and a class action lawsuit.

415.  By early 2014, Jerry Robinson, Earl Robinson, Matthew McCarter, and Merrill were aware of the thousands of customer service calls the Hornbeam Entities' call center received each month from consumers demanding refunds for Discount Club charges.

416.  By early 2014, Jerry Robinson, Earl Robinson, and Merrill knew that the majority of consumers requesting refunds for Discount Club charges did not receive those refunds.

417.  In early 2014, Jerry Robinson, Earl Robinson, McCarter, and Merrill had directed the Hornbeam Entities employees to create monthly reports on the status of BBB and State Attorneys General complaints regarding the Discount Clubs and the numbers of incoming customer service calls requesting refunds for Discount Club charges.  At least Earl Robinson and Merrill received those reports regularly.

418.  Merrill received regular updates at the weekly Los Angeles staff meetings from Hornbeam Entities Director of Customer and Product Experience Velia Murillo on the number of BBB and State Attorneys General complaints.

419.  Until at least early 2015, Matthew McCarter participated in the weekly Los Angeles staff meetings or received copies of the written update summaries, which included a report on the number of pending State Attorneys General and BBB complaints.  As discussed above in paragraph 305, one of Matthew McCarter's primary responsibilities was to serve as a liaison to the Hornbeam Owners on all aspects of the business.

420.  Jerry Robinson, Earl Robinson, McCarter, and Merrill knew, were recklessly indifferent to knowing, or willfully ignored the fact that tens of thousands of

consumers complained to the Hornbeam Entities' customer service representatives, their banks, BBBs, and State Attorneys General that the Discount Club charges were unauthorized.

421.  From October 2013 through at least June 2016, Jerry Robinson, Earl Robinson, McCarter, and the President received monthly Hornbeam Entities profit-and-loss statements showing the initial and recurring Discount Club charges, returns, cancellations, and refunds.

422.  Each monthly Hornbeam Entities profit-and-loss statement Jerry Robinson, Earl Robinson, McCarter, and the President received from October 2013 through at least June 2016 showed that the vast majority of attempts to debit consumers' accounts for Discount Club charges were returned by the consumers' banks.

423.  Jerry Robinson, Earl Robinson, McCarter, and the President regularly reviewed and discussed these monthly profit-and-loss statements, as well as the other reports regularly forwarded to them by Hornbeam Entities employees.  They discussed the information they received with each other and with the President and other Hornbeam Entities employees.

424.  Jerry Robinson, Earl Robinson, McCarter, and the President sent to and received from each other, Andrews, WestSide Bank, Hornbeam Entities employees, and others, numerous emails discussing the high Discount Club return

118

rates, both total and broken out by the type of charge – initial, recurring, and NSF Redeposit.

425.  Jerry Robinson, Earl Robinson, McCarter, and the President also participated in numerous meetings – both in person and telephonic, formal and informal – discussing with each other, Andrews, WestSide Bank, other potential processing banks, Hornbeam Entities employees, and others, the high Discount Club return rates.

426.  Jerry Robinson, Earl Robinson, McCarter, and the President (first Merrill then Ward) also sent to and received from Hornbeam Entities employees, Andrews, and each other, numerous emails highlighting the concerns raised by these high return rates, including the risk of regulatory or law enforcement action, the risk of WestSide Bank terminating the processing relationship, and the inability to find a new processing bank or payment processor.

427.  Jerry Robinson, Earl Robinson, McCarter, and the President (first Merrill then Ward) also participated in numerous meetings – both in person and telephonic, formal and informal – discussing with each other, Andrews, WestSide Bank, other potential processing banks, Hornbeam Entities employees, and others, the concerns raised by these high return rates, including the risk of regulatory or

law enforcement action, the risk of WestSide Bank terminating the processing relationship, and the inability to find a new processing bank or payment processor.

428.  Jerry Robinson, Earl Robinson, McCarter, Merrill, and Ward knew, were recklessly indifferent to knowing, or were willfully ignorant of the Hornbeam Entities' incessantly high Discount Club return rates, both in total and for the separate initial and recurring charges.

429.  Jerry Robinson, Earl Robinson, McCarter, Merrill, and Ward knew, were recklessly indifferent to knowing, or were willfully ignorant of the fact that the Discount Clubs' high return rates indicated that consumers did not knowingly agree to the charges.

430.  Jerry Robinson and Merrill helped create and launch the Loyalty Leads program.

431.  Jerry Robinson expressly directed the Hornbeam Entities to start the Loyalty Leads program, to use Hornbeam Special Situations' subsidiaries as the payors and payees of the Loyalty Leads RCCs, and to increase the number of Loyalty Leads transactions in February 2015 to increase the impact of those transactions on the Hornbeam Entities' total return rate.

432.  Earl Robinson and McCarter learned of the Loyalty Leads program by no later than Fall 2014, including, but not limited to, through emails from Hornbeam

Entities Director of Accounting and Administration, Martha Leon, monthly profit-and-loss reports, and the December 2014 "Board" presentation for the quarterly Members meeting.

433. When the Hornbeam Entities launched the Loyalty Leads program in Fall 2014, the monthly financial reports sent to Jerry Robinson, Earl Robinson, McCarter, and Merrill began including the amount of Loyalty Leads "sales" and "purchases" – as accounts eliminated in consolidating the financials to the Hornbeam Special Situations level – as well as the processing costs associated with the Loyalty Leads transactions.

434. Thus, for the first three months of the Loyalty Leads program (October through December 2014), the profit-and-loss report showed that the program resulted in no net income but incurred processing costs in excess of $20,000.

435. In addition, as highlighted above, Leon called attention to the Loyalty Leads transactions in multiple cover emails forwarding or discussing the profit-and-loss statements, and the December 2014 presentation for the Members' quarterly Board meeting highlighted the impact of the inter-company Loyalty Leads transactions on the total return rate.

436. Ward received these monthly profit-and-loss statements from January 2016 through at least June 2016.

437.  Jerry Robinson, Earl Robinson, McCarter, Merrill, and Ward knew, were recklessly indifferent to knowing, or were willfully ignorant of the fact that the Hornbeam Entities sent Loyalty Leads RCCs from one subsidiary to another for the express purpose of artificially reducing their total return rate.

438.  In Summer 2014, Merrill, Matthew McCarter, and Hornbeam Entities Director of Customer and Product Experience Velia Murillo participated in teleconferences with the Discount Clubs' fulfillment company, Access VG, LLC, to obtain information on how often consumers enrolled in and charged fees for the Discount Clubs actually visited the coupon network website and downloaded coupons.

439.  In Summer 2014, Merrill, Matthew McCarter, and Murillo learned from Access VG that virtually no Discount Club members downloaded any coupons.

440.  In Summer 2014, Merrill forwarded to Matthew McCarter and Jerry Robinson reports he received from Access VG documenting the non-existent consumer usage of the Discount Clubs.

441.  In Summer 2014, Merrill and Matthew McCarter emailed Jerry Robinson regarding the shockingly low consumer usage of the Discount Clubs.

442. In her regular updates with Earl Robinson, Murillo informed him of the calls with Access VG to obtain information on consumer usage of the Discount Clubs.

443. McCarter, as an owner, Member, and Member of the Management Committee of the Hornbeam Entities, focused significant time and attention on the Discount Clubs, including finding ways to maintain the Discount Clubs when WestSide Bank wanted to terminate its processing relationship with the Hornbeam Entities.

444. Ward, as the President, was tasked with finding a way to preserve the Discount Club business, including by finding a new processing bank.

445. Therefore, Earl Robinson, McCarter, and Ward were at least recklessly indifferent to the fact that consumers enrolled in the Discount Clubs were not downloading any coupons.

446. Jerry Robinson, Earl Robinson, McCarter, Merrill, and Ward knew, were recklessly indifferent to knowing, or willfully avoided knowing that consumers did not download coupons from the Discount Clubs for which they were charged.

447. Jerry Robinson, Earl Robinson, McCarter, Merrill, and Ward knew, were recklessly indifferent to knowing, or willfully avoided knowing that consumers did not give their authorization to be charged for the Discount Clubs.

## CHECK PROCESSING BY ISTREAM DEFENDANTS

448.  For more than five years, Defendant iStream Financial Services, Inc., and its principals, Defendants Kris Axberg, Richard "Fred" Joachim, and Chet Andrews (collectively, "iStream Defendants") played a critical role in the EDP and Hornbeam Defendants' practices.  iStream  provided access to the United States banking system, controlled the procedures through which money was debited from consumers' bank accounts, and disbursed consumer funds back to the EDP and Hornbeam Entities.

449.  iStream acted as a payment processor for the EDP and Hornbeam Entities' Discount Clubs from at least November 2010 to May 2016.

450.  Since the formation of iStream in 2004, Axberg has served as the Chief Financial Officer.  Axberg became the Chief Executive Officer by early 2015.

451.  Since the formation of iStream in 2004, Joachim has served as the President.

452.  In late 2009, iStream recruited Andrews to join the company to develop a "high return merchant processing" business, including processing for two customers Andrews had worked with previously, the EDP Entities and Membership Services, LLC.  At that time, both the EDP Entities and Membership Services were operating under Stipulated Judgments with the FTC arising from allegations of unauthorized charges to consumers.

453.  From 2009 through January 2015, Andrews served as Senior Vice President for New Business Development at iStream and was primarily responsible for managing the processing relationship with the EDP and Hornbeam Entities. Andrews reported directly to Joachim and Axberg on matters relating to those processing relationships.

iStream Sought the Discount Club Business Despite Knowing the Risks

454.  Before iStream started processing Discount Club payments in November 2010, iStream was aware of the 2008 FTC Order settling allegations that EDebitPay, Wilson, and Cleveland had withdrawn funds from consumers' accounts without authorization.

455.  From January 2010 through October 2010, iStream processed payments for the EDP Entities for other direct-to-consumer sales, unrelated to the Discount Clubs.  During that period, iStream recorded return rates for the EDP Entities of more than 80% each month.

456.  By March 2010, Michelle Hemerley, then Senior Vice President, Chief Compliance & BSA/AML [Bank Secrecy Act / Anti-Money Laundering] Officer for Kenney Bank, who also acted as the *de facto* Risk Officer for iStream, raised concerns with Andrews about the high return rate for the EDP Entities' business. Hemerley was concerned about defending that return rate and noted that, because

the RCCs did not contain any information beyond payment amounts, she could not even "make the argument that 'the RCC is better because there is more room to write what the customer purchased, so there are less returns.'"  She asked if there was "any way that they are looking at" adding such information to the RCCs.  In response, Andrews dismissed concerns around the 67% return rate Hemerley had raised, arguing that "POG [Platinum Online Group] told us to expect 70% when we boarded their business, and this is my past experience with them as well, so they are doing what they said that they would do."

457.  In August 2010, Andrews reported to Axberg that, based on his conversation with Cleveland that day, there were three things preventing the EDP Entities from increasing their business with iStream, two of which were the pricing – which the EDP Entities indicated was not competitive, particularly with regard to the fees for returned items – and doubts about iStream's commitment to the EDP Entities.  As Andrews summarized the EDP Entities' position, "iStream scares them for the long run – iStream has continued to complain about POG's 82% return percentage, but then asks for more volume.  POG . . . worries that we might terminate their business at any time.  Thus they are spreading their business between two other processors to leverage their position and protect their business."

458.  By September 2010, iStream had agreed to reduce the overall fee for returned items and to offer further reductions on returns where overall transaction volume exceeded set amounts.  Thus, if the EDP Entities increased their transaction volume, each returned item would be cheaper.  In addition, Andrews informed Cleveland that "iStream's Chairman [Ken Biel] and President [Joachim] have offered to visit the POG offices at your concenience to reassure you of iStream's commitment to settlement account processing with POG."

459.  Thus, before it ever began processing Discount Club payments, iStream knew that processing payments for the EDP Entities created significant risk of legal action but, as Hemerley confirmed to Joachim in October 2010, "if we are going to have a risky account . . . we should have all the business, rather than half the business and half the money but the same risk."  Accordingly, iStream actively encouraged the EDP Entities to increase their processing volume, including by reducing the charges for returned items.

460.  Biel, Joachim, and Andrews visited Cleveland and the EDP Entities in late October 2010 to reassure the EDP Entities of iStream's commitment, the result of which, according to Andrews' report, was that Cleveland "assured [Andrews] that [iStream] will see more transactional business in the future."

461. In November 2010, when the EDP Entities submitted forms requesting to open new processing accounts for processing initial and NSF Redeposit Discount Club charges, the company stated that the expected return rates for both charges would be 70%. iStream personnel, including Axberg, approved the requests within one day, and the EDP Entities immediately began charging consumers for Discount Club fees through iStream.

462. Two weeks later, the EDP Entities requested to add recurring monthly Discount Club charges. The request was sent to Axberg, Hemerley, and Joachim, among others, and the request was approved within hours.

463. Before agreeing to process Discount Club payments for them, iStream knew that the EDP Entities, and later the Hornbeam Entities, marketed and sold their Discount Clubs on websites or through telemarketing, without face-to-face contact with the consumer, increasing the risk of unauthorized transactions.

464. At all times while processing payments for the EDP and Hornbeam Entities, iStream knew that Electronic Checks, and particularly RCCs, were considered a high-risk payment system, yet iStream placed no limits on the EDP and Hornbeam Entities' use of these instruments.

<u>iStream Ignored the Legal Actions Against and Relating to the EDP Entities</u>

465.  Before iStream became the payment processor for the EDP Entities, Andrews had disclosed to Joachim, Axberg, and then-General Counsel James Button that the EDP Entities were under the 2008 FTC Order.

466.  iStream also knew of the FTC's contempt action against the EDP Entities, Wilson, and Cleveland.  Indeed, WestSide Bank President Tren Watson attached the FTC's May 2011 press release regarding the 2011 Contempt Order to his April 2012 email to Andrews requesting the reserve account be set up to protect the bank in case of future legal actions against the EDP Entities.  In October 2012, Andrews sent an update on the EDP Entities to Joachim and Biel, highlighting both the 2011 Contempt Order and the Ninth Circuit's decision affirming that order.

467.  In addition, iStream, Andrews, Joachim, Button, and then-CEO Ken Biel were aware by January 2012 of the FTC's settlement with payment processor Landmark Clearing.  In fact, in January 2012, Daniel Welch, a Senior Vice President at Bank of America, forwarded a link to the FTC's press release regarding the Landmark Clearing settlement to iStream's Chief Technology Officer, Michael McGuire, noting that it "mentions a lawsuit involving a customer you might recall that I had complained about:  Platinum Onine Group is mentioned in the FTC complaint. . . . I guess my instincts were spot on."

468. McGuire forwarded Welch's email, with the link to the FTC press release, to Biel, explaining, "below is the information regarding the FTC action against a company that had processed payments for POG I had mentioned . . . . [Y]ou should follow the link below to the full FTC announcement for the complete announcement . . . ."

469. McGuire also forwarded Welch's email to other iStream personnel, including Joachim, who, in turn, forwarded it to Andrews and Button.

470. In January 2012, Andrews notified Cleveland that iStream "expect[ed] an inquiry from our regulators due to Landmark and your name coming up there."

471. In November 2012, just after deciding to rescind the termination of processing activity and to allow the EDP Entities additional time to reduce their return rates, as discussed below, iStream learned of the First Bank of Delaware's settlement with the U.S. Department of Justice of a case involving the processing of payments for payment processors Landmark Clearing, AEC, and others.

472. In November 2012, Nicholas Zillges, the President of Kenney Bank, raised concerns with Joachim, Axberg, and Biel that the Landmark Clearing case was an indicator of what was to come with Membership Services, for which Kenney Bank continued to act as the processing bank. Joachim forwarded the exchange to Andrews.

473.  In response, Andrews defended both Membership Services and the EDP Entities, claiming that the FTC had "reviewed, monitored and [was] intimately aware of the sales activities of both…."  He concluded that "[t]he FTC has no issues with either company at this time."

474.  Andrews' response was forwarded to Zillges, who replied to Joachim:

> There is no way Chet knows what the status of any investigation or pending investigation is or will be.  Regardless of the legitimacy of their business, there are no controls or processes in place to manage these relationships at either the bank or iStream.  Additionally, the risk characteristics of these accounts and their history is beyond any normal level of acceptance.  Chet has his point of view on this business, I have mine, and the regulators have theirs.  I just don't agree with his assessment of this or other high risk business he has.  His interpretation and statements of the situation with the FTC are false, and I caution anyone not to take his statements about it with any sense of comfort.  Be mindful that Chet's business has touched 3 of 4 enforcement actions and takes two FTEs to support and it still is indefensible.

475.  In May 2013, Zillges reported to a Board Member that Kenney Bank had just received notice from the FTC that it was proceeding with a case against Membership Services.  Zillges predicted that the FTC would "most likely move to impose a penalty for the amount of revenue that was received for processing this

activity.  I am fearful that the [EDP Entities'] situation will show that this was not just an isolated issue as well."

476.  iStream also knew about the 2012 Iowa AVC the EDP Entities entered into. In a report to the Board of Directors for iStream's parent company, iTeam, in December 2012, discussed in more detail below, Jeff Kelly, then-Vice President of Risk Management and Compliance for iTeam, discussed the Iowa AVC, along with the prior FTC actions, as creating an "elevated risk of doing business with [the EDP Entities]."

477.  On April 29, 2013, Kelly forwarded to iTeam and iStream CEO Ken Biel links to news articles discussing both the AEC settlement and the EDP Entities' Oregon AVC, both of which are discussed above.  Biel forwarded the email to Joachim who, in turn, forwarded it to Andrews, who promised to "ask Paul Cleveland for his side of the story."

478.  In response, then-EDP Entities Controller Martha Leon, under the direction of Cleveland and Wilson, provided a written response to Andrews for iStream, claiming that the AEC case did not really relate to the EDP Entities, even though the FTC "chose to use EDebitPay's activity as examples in its filing against AEC." Leon assured Andrews that "AEC HAS NEVER processed any orders for our current discount savings membership, MoneyPlusSaver."

479.  In fact, AEC had processed payments for the Discount Clubs in Fall 2010; the Discount Clubs simply operated under the name Saving Pays Club, rather than Money Plus Saver, at that time.

480.  Thus, during the course of processing Discount Club transactions for the EDP Entities, iStream knew about multiple legal actions arising from the EDP Entities' withdrawing money from consumers' accounts without authorization, including the FTC actions and the Iowa and Oregon AVCs, as well as actions against payment processors and banks that had worked with the EDP Entities despite their high return rates.

iStream Ignored the High Return Rates

481.  From November 2010, when iStream first started processing Discount Club transactions, it was aware of the EDP Entities' consistently high return rates. iStream monitored these rates closely, as the company's pricing structure depended on the monthly number of items processed, returns, unauthorized returns, and collection letters.

482.  In fact, iStream took advantage of the high return rates to generate additional income for itself.

483.  For example, in July 2011, Andrews informed the EDP Entities, including Cleveland, that the "returned items rebate" iStream had previously implemented to

reduce the overall fees paid by the EDP Entities for processing would need to be suspended for three months "due to the expenses incurred by iStream and WestSide Bank in the setup of the new POG [Platinum Online Group] process. . . ."

484.  Internally, however, Andrews reported to Joachim and Axberg that the rebate would be used to cover one-third of the salary for a single new accountant employee and would actually result in an additional $48,000 in revenues for iStream, net of that offset and fees due to WestSide Bank.  Andrews concluded, "Life is good."  In response, Joachim agreed with Andrews' conclusion, commenting, "I love you and so does Kris [Axberg]!"

485.  iStream reinstated a returned items rebate for the EDP Entities in September 2011, to encourage a higher volume of transactions.

486.  In July 2012, Andrews notified the EDP Entities, with a follow-up email specifically to Cleveland and Wilson, that iStream was changing its pricing model and would be ending the returned items rebate.  Instead, Andrews explained that iStream was moving to a "risk based compliance initiative" and a "risk based pricing schedule."

487.  Andrews explained to Cleveland and Wilson that iStream had retained an outside consultant to assist in this endeavor and that iStream expected to have its

new pricing structure finalized in 90 days, which would "allow us to charge

merchants according to their risk profile so to cover the added regulatory

compliance monitoring."

488. Andrews emphasized that the "tiered pricing schedule will not be impacted

by any processing volume considerations, so not to penalize high activity

merchants."  Instead, the new pricing schedule would be "based solely upon the

overall returned item percentages for each merchant."

489.  To that end, Andrews indicated that the schedule would likely be similar to

one where merchants with 10% or fewer total returns and fewer than 0.05%

unauthorized returns would pay the lowest fees, with progressively higher fee

brackets for higher levels of returns, the highest of which would be paid by

merchants with 51% or more total returns and no more than 2%  unauthorized

returns.

490.  In response, Cleveland noted that "[i]ncentives for lower returns seems to

satisfy some regulatory issues for processors," but he believed it would be

"difficult [for the EDP Entities] to be anywhere but the highest return rate."  In the

meantime, he requested that current pricing levels be maintained.  Andrews agreed

to this request, with the suspension of the returned items rebate "to pay for the

compliance review and to work on the risk based pricing model."

491. The suspension of the returned items rebate on the EDP Entities' "current" pricing resulted in the same returned item fee as the highest level of returned item fees under the proposed new pricing structure: $1.95 per return.

492. As before, internally at iStream, Andrews told a very different story. He explained that he had independently developed this new pricing structure.

493. Moreover, Andrews sent an email to Joachim in July 2012, with the subject line "Money in the bank." In the email, Andrews explained to Joachim that he did not expect the new pricing to motivate the EDP Entities to reduce their return rates, but he did expect it to increase iStream's profits. As Andrews explained to Joachim, suspending the returned items rebate would allow iStream to "earn an additional $50K this month." More important, Andrews "[saw] that going on permanently." Andrews reiterated that, as a result, this pricing change was "money in the bank."

494. Thus, despite his assertion that the new pricing structure was designed to incentivize merchants to lower return rates, Andrews did not actually expect the EDP Entities to ever reduce their return rates below the highest pricing tier.

495. Joachim was thrilled with Andrews' news of the increased income from the EDP Entities, responding, "God love you my son! Wow, I love Friday the 13th . . .

yeah baby!!"  Joachim then forwarded Andrews' "Money in the bank" email to Biel noting, "I love Chet!!"

496.  As discussed above in Paragraphs 83-99 and 258-277, throughout iStream's processing relationship, the EDP and Hornbeam Entities' total return rates were hundreds of times higher than industry averages.

497.  Moreover, iStream's practice was to review and analyze RCC return rates using the same thresholds set by NACHA for ACH debits.  Thus, in analyzing RCC return rates prior to September 2015, iStream purported to use a 10% total return rate as the threshold for review; after September 2015, iStream purported to use a 15% total return rate as the threshold.  In addition, iStream claimed to use a 1% threshold for unauthorized RCC returns prior to September 2015, and a 0.5% threshold after that date.

498.  Yet, as discussed below, iStream continued to process Discount Club RCCs for the EDP and Hornbeam Entities, despite the fact that their total return rates and unauthorized return rates consistently exceeded these thresholds.

499.  iStream tracked returns by processing account and by return reason in order to calculate the fees to charge the EDP and Hornbeam Entities.  As a result, it could examine not only the total return rate but also the separate return rates for initial charges, recurring monthly charges, NSF Redeposits, and Loyalty Leads.

iStream could also monitor how many returns were for NSF or "not authorized" return reasons.

500.  As a result, iStream was aware that the EDP and Hornbeam Entities' return rates for initial "application fees" never dropped below 72% and ranged as high as 87%, hundreds of times higher than industry averages for all forms of checks. Moreover, these return rates were as much as eight times above the guidelines iStream claimed to use in monitoring RCC transactions.

501.  While iStream was providing the EDP Entities with a rebate on returned item fees, Andrews prepared a monthly report on the number of returns, by processing account (initial sales, recurring charges, NSF Redeposits), that he forwarded to the EDP Entities and to Axberg.

502.  The specific categories of returns also alerted iStream that it was processing unauthorized charges.  Most glaring, the EDP and Hornbeam Entities' "not authorized" returns far exceeded the industry average of 0.0047% for all forms of checks.

503.  Indeed, from November 2010 through May 2016, the EDP and Hornbeam Entities averaged more than 3.5% in "not authorized" returns for Discount Club charges, almost 800 times the industry average.  The EDP and Hornbeam Entities' unauthorized return rate also vastly exceeded the NACHA thresholds for

unauthorized ACH debit returns, a guideline iStream claimed it applied to its review of RCC transactions.

504.  iStream also ignored the EDP and Hornbeam Entities' exceptionally high return rates for NSF.  From November 2010 through May 2016, more than 1,000,000 Discount Club Electronic Checks were returned as "NSF," almost 38% of the checks processed by iStream for the Discount Clubs.

505.  The EDP and Hornbeam Entities' extraordinarily high return rates, both total and for the specific processing accounts and return reasons, made iStream aware it was processing a large number of unauthorized transactions.

506.  iStream also reduced the number of returns it classified as "unauthorized" by excluding return reasons such as "Refer to Maker."  Banks may use "Refer to Maker" as the return reason when they believe the attempted RCC debit is unauthorized.  Indeed, consumers' banks returned more than 130,000 Discount Club RCCs using the "Refer to Maker" return reason.  Had iStream included "Refer to Maker" in its calculation, the EDP and Hornbeam Entities' percentage of unauthorized returns would have more than doubled.

### iStream Helped Mask the High Return Rates with Loyalty Leads RCCs

507.  Knowing that the Discount Clubs' actual return rates remained exceptionally high, iStream actively helped the Hornbeam Entities mask that fact from banks.

As discussed in Paragraphs 278-284, Andrews helped the Hornbeam Entities and Jerry Robinson develop the idea for the Loyalty Leads transfers and repeatedly encouraged the Hornbeam Entities to start the program for the specific purpose of artificially reducing the company's return rates.

508.  In the course of getting approval for the Loyalty Leads transactions from iStream, in October 2014, Andrews forwarded to Joachim and numerous other iStream employees Martha Leon's September 2014 email (*see supra* ¶ 283) acknowledging that the purpose was the "obvious benefit to our [the Hornbeam Entities'] rates, rather than cost effectiveness."

509.  In October 2014, Joachim approved the reduced transaction processing fees for the Loyalty Leads transactions.

510.  Prior to getting approval for iStream to process Loyalty Leads transactions, Andrews had a "discussion" with Joachim, asking for his assistance in pushing the request through.  By Friday, October 11, 2014, Joachim was assuring Andrews that "we will get this done Monday or at least get to the cause of the delay!"  At that point, the Hornbeam Entities had not completed iStream's standard form for requesting new processing account names, nor had iStream performed any due diligence on Loyalty Leads.

511.  Within one day of the Hornbeam Entities providing the standard application form, iStream approved the Loyalty Leads transactions.

512.  On December 17, 2014, Leon forwarded to Andrews a copy of the Hornbeam Entities' periodic "Compliance Update" on the Discount Clubs.  On page 3 of the Update, the Hornbeam Entities described the new Loyalty Leads program, explaining that it involved selling leads from the Discount Clubs program and that "[s]ales begun in October to Gyroscope's sister company first, Clear Compass Digital Group, which uses the leads to market other offers in its advertising network."  They claimed additional "clients" for Loyalty Leads transactions were "on the horizon," but processing those Clear Compass Digital Group transactions through iStream had already "greatly improve[d] the blended return rate."

513.  On page 11 of the Update, the Hornbeam Entities provided a graph showing total return rates from June 2013 through November 2014, as well as the effect the Loyalty Leads transactions had on that return rate.  As the Update explained, Loyalty Leads decreased the blended total monthly return rate from 51.8% to 33%.

514.  Andrews forwarded the Compliance Update to Joachim and emphasized that adding a new account verification filter and the Loyalty Leads program "have

helped to lower their overall returns percentage to about 32%, which is down from 75% at the beginning of the year."

515.  When Andrews left iStream in January 2015, iStream Vice President of Transaction Processing Kim Olszewski assumed primary responsibility for managing the Hornbeam Entities' accounts.  As a starting point, she attempted to review iStream files on the various processing accounts and to write an analysis of each one, which she forwarded to Axberg and Joachim, among others.

516.  In her analysis of Loyalty Leads, Olszewski noted that, while Andrews had suggested there would be multiple business consumers, all of the transactions appeared to be with one company:  "Clear Compass."  Olszewski also questioned why each transaction was processed separately, "resulting in hundreds to thousands of transactions each day to the same merchant."  She noted that it was entirely likely Clear Compass' bank would raise concerns of suspicious activity when it saw such activity.

517.  On January 16, 2015, before Olszewski wrote the Loyalty Leads analysis, Joachim forwarded to her the December 2014 Hornbeam Entities' Compliance Update that highlighted the fact that the Loyalty Leads transactions were between Gyroscope and "Gyroscope's sister company . . . Clear Compass Digital Group."

518. Thus, at the time she wrote the memo in January 2015, Olszewski had been informed that Clear Compass was a d/b/a for another Hornbeam Special Situations subsidiary.

519. Moreover, by the end of January 2015, she had forwarded the memo to Axberg, as well as to Joachim, who knew that Clear Compass Digital Group was the d/b/a of a Hornbeam Special Situations subsidiary and the sister company to Gyroscope, which operated the Discount Clubs.

520. At the same time, Olszewski also forwarded her Loyalty Leads memo to fellow iStream employee, Julie Kimball, who immediately pointed out that their main Gyroscope contact, Martha Leon, also worked for Clear Compass.

521. Thus, by the end of January 2015, Olszewski, who was newly responsible for managing the relationship with the Hornbeam Entities, as well as other iStream personnel, including Joachim, had actual knowledge that the Loyalty Leads program involved one subsidiary of Hornbeam Special Situations sending RCCs to another subsidiary.

522. In fact, in April 2015, Olszewski responded to an email from Leon, introduced herself as the new account manager, and noted that she, along with other iStream employees, "will be managing the Clear Compass relationship, or as is more commonly known around here as Gyroscope, going forward."

523. iStream, Andrews, Joachim, and other iStream personnel knew that the Hornbeam Entities were sending RCCs to themselves; yet, they did nothing to stop the Hornbeam Entities from continuing to send the Loyalty Leads transactions.

524. Moreover, in 2016, when iStream was trying to find a new processing bank for the Hornbeam Entities, Olszewski created and shared with prospective bank partners a summary of the various processing accounts.  With regard to the Loyalty Leads account, she noted that an entity called "Clear Compass" was the primary customer for Loyalty Leads but intentionally did not disclose that Clear Compass Digital Group was a sister company to Gyroscope and part of the Hornbeam Entities.

525. By failing to disclose the connection between Gyroscope and Clear Compass Digital Group, Olszewski masked the fact that the Hornbeam Entities were sending RCCs to themselves for the purpose of artificially lowering their return rates.

<u>iStream Ignored Bank and Consumer Complaints</u>

526. Kenney Bank and WestSide Bank regularly provided to iStream collection letters from banks returning as unauthorized Electronic Checks for Discount Club charges.  Over the course of the processing relationships, Kenney Bank and WestSide Bank forwarded more than four thousand collection letters to iStream.  These letters included affidavits or other consumer statements attesting that

144

consumers did not authorize the Discount Club debits.  iStream personnel

forwarded the collection letters to EDP and Hornbeam Entities employees, tracking

each one and and charging the companies more than $20 apiece.

527.  As discussed above in Paragraphs 110-133, iStream also received numerous

complaints from consumers' banks, including Wells Fargo, Wachovia, and Bank of

America, about the overwhelming number of unauthorized returns.  In some

instances, the banks raised concerns that WestSide Bank was ignoring OCC and

FDIC guidance regarding risks associated with processing transactions for

telemarketers and online merchants.

528.  Andrews typically handled iStream's response to such complaints, usually

by asking the EDP or Hornbeam Entities to pause in submitting any transactions to

accounts at the complaining bank and then drafting a response letter on behalf of

WestSide Bank, denying that the transactions were unauthorized but agreeing to

refund the consumers' money.

529.  Moreover, Andrews often falsely claimed that WestSide Bank was

performing extensive due diligence to confirm the validity of the transactions.

530.  In response to concerns with Chase Bank, Andrews negotiated an agreement

between iStream, WestSide Bank, and Chase, whereby returns would be sent

directly between the banks and not through the Federal Reserve.  In May 2012,

Joachim signed the agreement on behalf of iStream.  As Andrews later explained to Jerry Robinson and Merrill, he "set up a direct send relationship with WestSide [and JPChase] for all returned items so to keep their item count away from FED eyes and analysis."

531.  In addition to the Bank letters alleging hundreds of unauthorized transactions, iStream also received notice of specific issues from numerous banks, often redirected to iStream by WestSide Bank.  For example, the Bank of India complained on multiple occasions of attempts to debit non-existent accounts.  In February 2011, the Federal Reserve provided notice that the EDP Entities had attempted thousands of debits against a routing number belonging to the Federal Reserve Bank of Cleveland.  Andrews forwarded these complaints to the EDP and Hornbeam Entities and instructed them to stop using the specified account and routing numbers.  But no further action was taken to investigate these unauthorized charges or address the broader question of how such clearly unauthorized transactions had been submitted.

532.  As discussed below, iStream also knew that thousands of consumers were filing complaints with the BBB or with online complaint forums.  As former *de facto* iStream Chief Risk Officer Michelle Hemerley noted to then-iTeam and iStream CEO Ken Biel (who forwarded the email to Joachim) as early as February

146

2011, "the Complaints Board and RipOff Report are both filled with pages and pages of complaints . . . . All you need to do is [G]oogle Platinum Online Group and that's all that comes up."

iStream Ignored Its Own Advice

533.  During the course of processing Discount Club transactions, iStream received recommendations to terminate the processing relationship due to the high return rates and the likelihood of fraud from its sister bank, independent compliance auditors, and its own Compliance and Risk Officers.  Despite these repeated recommendations, iStream did not terminate the processing relationship but found ways to extend the relationship in order to continue profiting from it.

534.  In December 2010, shortly after iStream began processing the EDP Entities' Discount Club transactions through its sister bank, Kenney Bank, the bank received a report on a Bank Secrecy Act ("BSA") Audit performed by Crowe Horwath LLP.  As part of its audit, Crowe Horwath reviewed selected accounts for "transactional testing," including the EDP Entities' account.  Crowe Horwath observed that, "[t]hrough our review of RCC activities processed within the account, we observed that approximately 82% of RCC items presented for payment since January of 2010 were returned with approximately 5.1% of total items presented returned as unauthorized."  Crowe Horwath pointed out that

"recent regulatory criticism and money penalties continue to be placed on institutions for failure to properly mitigate the risks posed by similar organizations in which excessive items of returned items originated through institutions."  Crowe Horwath recommended that "management consider expanded due diligence elements to be inclusive of an evaluation of the effectiveness of the Company's consumer compliance processes."

535.  Hemerley, as Chief Compliance Officer for Kenney Bank, asked Crowe Horwath to do an expanded review of the EDP Entities but canceled the request in February 2011, when Kenney Bank decided to terminate its relationship with the EDP Entities.  Nonetheless, Hemerley asked for a "quick summary of potential issues and areas for further investigation" based on Crowe Horwath's "limited review."

536.  Hemerley forwarded Crowe Horwath's response to Ken Biel, then-CEO of iTeam and iStream, James Button, General Counsel for both Kenney Bank and iStream, Joachim, and others.  Crowe Horwath cautioned that the EDP Entities' return rate "exceeded 80%" in large part due to NSF returns.  Because Kenney Bank had reason to know that "well over 70% of accounts charged" would be returned, and the majority of those returns would also result in NSF fees to the consumers, "there could be some concern regarding the fairness of the practice."

In other words, processing for the EDP Entities created a significant risk of regulatory or law enforcement action holding Kenney Bank responsible for ignoring the injury caused to consumers by the unauthorized transactions.

537.  Thereafter, Kenney Bank terminated its processing relationship with the EDP Entities.  Andrews informed the EDP Entities of the likelihood of the suspension of processing on February 17, 2011.  On February 22, Biel informed the Kenney Bank Board of Directors, which included Axberg, that the relationship was being terminated because "we simply do not believe that a 75-80% rate of returns is defensible."

538.  James Button sent the official letter to the EDP Entities, as discussed above in paragraph 76, on February 23, 2011.  In the cover email to Cleveland, he explained that the bank would like to continue to work on bringing down the EDP Entities' return rate, which would "put the bank in a defensible position with its regulators" and allow it to restart the relationship.

539.  After Kenney Bank made the decision to terminate the relationship with the EDP Entities, Biel and Hemerley agreed that they both felt better as a result. Indeed, Biel commented that it felt like they had gotten "the monkey off our backs," a sentiment Hemerley echoed, although she also felt "bad because it is a lot of money . . . ."

149

540.  Yet, by February 25, 2011, Andrews was assuring the EDP Entities, Cleveland, and Wilson that he was working on finding a new bank willing to process the payments.  He pointed out that he had been "talking to some banks about the RipOff Reports, BBB Reports, etc. and these sites create reputational concerns about seeing your name bashed about so much.  This is probably the most important it [sic] which must be addressed."

541.  Among other recommendations, Andrews encouraged the EDP Entities to engage a search engine optimization specialist to "assure that your websites cover the first page of any Google searches for your product or company searches." Andrews also noted that it was the "perfect" time to pursue such changes, since the EDP Entities were working on also changing the name used on the Discount Clubs.

542.  On March 14, 2011, Andrews sent a memo to Biel, Axberg, Joachim, and Button, requesting that Kenney Bank's EDP Entities processing deadline be extended to allow him to complete his efforts to obtain a new bank that would allow iStream to keep the processing business.  Andrews highlighted the potential fee income from the new arrangement he was seeking, where iStream would "own[] the merchant relationship and retain[] the larger portion of the fee income. . . ."

543.  In April 2011, James Button, General Counsel of Kenney Bank and iStream, responded to an FDIC Examiner's comments on Kenney Bank's use of third-party payment processors.  In the final comment, the Examiner noted that, only weeks before March 18, 2011 (the date Kenney Bank purportedly terminated its relationship with the EDP Entities), Andrews, as iStream's account representative, had "outlined an expected increase in processing activity, resulting in fee income more than doubling for the account," yet failed to emphasize "the high level of returns experienced in 2010 and 2011 by this customer."

544.  In response, Button did not clarify that Kenney Bank had agreed to extend its relationship with the EDP Entities past March 18, 2011 – and was, at that time, still allowing the EDP Entities to process payments through Kenney Bank and iStream – but instead argued that Andrews was not in the BSA Department, which had "expressed its concerns on several occasions that the Platinum Online Group (POG) returns were high and were not coming down as originally anticipated, despite the efforts of the Bank to work with POG on that issue."  He explained that "[t]here were also numerous customer complaints reviewed by management. . . . The BSA/AML [Bank Secrecy Act / Anti-Money Laundering] Department recommended, and management concurred, to close the account even prior to

receiving the results of the Crowe Review based on the above factors and

notwithstanding the loss of considerable fee income to the Bank."

545.  Kenney Bank allowed the EDP Entities to continue processing payments

through its bank through at least July 2011.

546.  In June 2011, Ken Biel, then-CEO of iTeam and iStream, reported a "big

win!!" to the iTeam Board of Directors, when iStream was able to continue

processing payments for the EDP Entities through a new relationship with

WestSide Bank.  Biel explained that the business was scheduled to move on June

15, 2011, and that, by "reengineering the relationship," iStream "should be able to

save 50% of the [$75k per month] revenue" it had been expecting to lose.  Biel

forwarded his update to Axberg and Joachim, as well as Board Members.

547.  In early 2012, iStream requested an outside review of two high-return

merchant accounts, the EDP Entities and Membership Services – the two clients

Andrews brought in, both of which were under FTC Orders, "for the purpose of

providing guidance on continuing to process/handle" those accounts.  Regulatory

Compliance Associates, Inc. ("RegCom") provided its analysis in April 2012.

RegCom noted that it had reviewed materials provided by the companies to

iStream as well as the product websites.  The report was provided to Kenney Bank

and iStream General Counsel James Button, who forwarded it to Joachim and Andrews.

548.  With regard to the EDP Entities, RegCom noted that a Google search revealed numerous complaints, including over 2,000 at scambook.com, the "preponderance" of which "related to unauthorized charges, lack of response, inability to contact and many indicated that the individual was attempting to obtain a loan and ended up being charged."

549.  Among other things, RegCom recommended that iStream:  (1) verify how often the EDP Entities were monitoring telemarketing calls and assess the adequacy of processes touted by the EDP Entities as confirming consumer authorization; (2) assess the controls used by the EDP Entities to prevent unauthorized debits; (3) monitor complaint sites, review the EDP Entities' process for responding to complaints, and implement a process to obtain a sampling of complaint resolutions on a recurring basis; (4) monitor for external investigations or legal actions; and (5) continue monitoring volumes and reasons for returns.

550.  In addition, RegCom shared "potential concerns with retaining this customer relationship" including that the "value proposition for the customer is not readily apparent," and the "volume of complaints appears onerous and problematic."

551. The RegCom report also provided a spreadsheet breaking out the recommendations, with columns for an individual at iStream to be assigned responsibility, with due dates, status, completion dates, and verification.

552. In late July 2012, in response to an inquiry from Kenney Bank and iStream General Counsel James Button regarding follow-up on the recommendations, Andrews forwarded the email exchange to Joachim, noting that nothing had happened in the intervening 90 days.  Andrews complained that he was not the Manager of Compliance for iStream and, therefore, had done nothing in response to the report.  He suggested the money had been "wasted," because, as far as he knew, no one had taken any action in response to the report.  Joachim forwarded Andrews' email to then-CEO Ken Biel and asked to discuss the matter.

553. Rather than implement an internal review at iStream, in August 2012, Andrews forwarded the spreadsheet prepared by RegCom to the EDP Entities and asked them to respond to the recommendations.  On behalf of the EDP Entities, EDP Entities Controller Martha Leon forwarded a written response to each recommendation, copying Cleveland and Wilson.

554. Subsequently, iStream indicated it intended to terminate the processing relationship with the EDP Entities.  As Andrews explained his understanding of the decision in a memo to Joachim and Biel, "[t]he decision was due to the fact that

[the EDP Entities'] business is very similar high return processing activity [to Membership Services] and if the FTC was investigating the [Membership Services] business then iStream should terminate the [the EDP Entities] business at the same time based upon the same logic."

555.  Andrews argued against that decision, suggesting that the EDP Entities should be given an extension of time to make changes to the Discount Club program and reduce total returns percentages.  Ultimately, Andrews met directly with the iTeam Board to recommend the extension.

556.  On October 24, 2012, Andrews informed the EDP Entities, Cleveland, and Wilson that the iTeam Board had approved an extension on the processing relationship, "dependent upon your reducing the overall returned items rate." Andrews conveyed no other requirements for continuing to process, despite the RegCom recommendations.

557.  In November 2012, iStream's parent company, iTeam, hired Jeff Kelly to be iTeam's Vice President of Risk Management and Compliance.  One of the first tasks assigned to Kelly was to perform a review of the Membership Services and EDP Entities' businesses.

558.  The iTeam Board directed Kelly to evaluate the "value proposition" of the businesses to consumers, whether there was harm to consumers, and the high level

of returns.  The iTeam Board indicated that whether iStream would continue to process RCCs for these clients depended on Kelly's review.

559.  At a December 19, 2012 meeting of the iTeam Enterprise Risk Management Committee, attended by Joachim and Axberg, along with Biel and other iStream and Kenney Bank officers, Kelly presented his findings, as recorded in the Minutes:

> Mr. Kelly offered that he views both companies as outliers on the risk spectrum in the iStream Financial Services customer portfolio (they are very high risk).  He has reviewed both companies on the numerous factors identified in his assessments [handed out separately] and has several critical issues.  Reputation Risk is probably Mr. Kelly's largest concern, although the value proposition, compliance risk (fee disclosure in particular) and large return rates are also concerns.  In Mr. Kelly's opinion, he does not know how to mitigate the risks he identifies to an acceptable level and that would help these customers fit within the iSFS risk profiles previously set by the Committee and Board.  Mr. Kelly does not think these are relationships we should continue with under the current scenarios.  He is concerned that the rate of returns he has seen may be an indication of some level of fraud and we have not tested to rule that out. . . .  Mr. Kelly discussed the recent Delaware Bank matter, similarities to it that he sees and that in the Delaware Bank case a return rate greater than 10% was stated to be evidence of fraud.  It may be that the consumers

156

are confused/do not understand or that consumers are perpetuating

fraud but we cannot prove this today.

560. Kelly's written assessment of the EDP Entities' business activities mirrored

his summary report.  He noted the prior FTC actions, as well as the Iowa AVC.

Kelly found that "[t]ransactions being processed for POG [Platinum Online Group]

have consistently yielded very high return rates. . . .  High return rates are often

evidence of fraudulent activity.  To protect iSFS from a potential failure to act on

such evidence, we must effectively demonstrate strong due diligence; the results of

which must evidence there is no fraudulent activity taking place."

561. If the business were to continue despite his recommendation, Kelly

recommended "frequent auditing of authorizations," as well as required annual

third-party compliance audits.  Kelly noted the risk of "regulatory penalties from

any size operation of this high-risk nature."  He also noted that the return rates

were well above the 10% threshold, which he cautioned would "provide the

regulators significant leverage should they pursue action against any parties

associated with this operation."

562. Kelly also provided a risk rating analysis, comparing his assessment of the

risks associated with the EDP Entities' business with the approved iStream risk

profile.  According to Kelly's analysis, the residual risk rating (after mitigation)

remained 30 points above the maximum iStream tolerance level of 13 – in other words, processing for the EDP Entities posed more than three times the amount of risk iStream purported to be willing to accept.

563.  Based on this assessment, the Committee voted to recommend termination of both merchant clients and forwarded that recommendation to the iTeam Board for decision.  That same day, the iTeam Board, with Axberg and Joachim in attendance, voted to terminate the relationships, giving the EDP Entities' 90 days' notice.

564.  On January 17, 2013, Joachim sent a letter to the EDP Entities, to the attention of Cleveland, notifying them that iStream was terminating the processing relationship effective March 31, 2013.

565.  By the end of March, however, iStream had agreed to extend the termination to the end of April.  Andrews explained to Cleveland and EDP Entities Controller Martha Leon that "[w]e are working on another solution to allow us to continue to process the [EDP Entities'] transactions and should have that solution completed prior to the end of April."

566.  On April 3, 2013, Andrews reported to Joachim and Axberg that he had assured the EDP Entities that he "would have another solution for them prior to that new [April 30] deadline."

567.  As discussed above, prior to the April 30 deadline, iStream learned of the FTC's settlement with AEC, as well as the EDP Entities' settlement with the Oregon Department of Justice.  Because iStream had not finalized the "solution" to continue processing for the EDP Entities, Andrews requested another extension on the termination of processing.  Despite Joachim's report to Andrews of an "ugly" discussion among iTeam Board Members "not happy about the press release," iStream extended the termination again, subject to another iTeam Board meeting in early May 2013.

568.  On May 2, 2013, Jeff Kelly tendered his resignation as Vice President of Risk Management and Compliance for iTeam.  iStream Chief Operating Officer James Gorst reported to an iTeam Board Committee, including Biel, Axberg, and Joachim, that he had conducted an exit interview with Kelly, where Kelly was "not . . . entirely complimentary of the company overall."  According to Gorst's report, "one of the comments made by Mr. Kelly was that he felt his position had not been well-supported during his period of employment," specifically addressing "a lack of support by management."

569.  On May 8, 2013, Joachim notified the EDP Entities and Cleveland that iStream would not be authorizing any further extensions of the termination date, and iStream would cease processing effective May 31, 2013.

570. At a May 20, 2013 iTeam Board of Directors meeting, Axberg and Joachim proposed the "solution" to allow iStream to continue as the payment processor for the Discount Clubs.  According to the Minutes, Axberg and Joachim "proposed that, if in the future [the EDP Entities] sign[] with a bank directly, and iStream is the designated processor (i.e., a processing-only relationship solely between iStream and the bank, and not between iStream and [the EDP Entities]), this scenario would place iStream into an independent third party relationship with [the EDP Entities]."  CEO Biel confirmed that iStream management "believes in the business" and wanted to continue the relationship.

571. On May 28, 2013, Andrews emailed Cleveland to confirm that iStream General Counsel was drafting a new services agreement that would allow iStream to continue to process for the EDP Entities.

572. At a June 19, 2013 iTeam Board Meeting, Ken Biel, then-CEO of iTeam and iStream, explained the proposed new relationship again.  Board Members raised concerns regarding whether such an approach would "pass regulatory muster," but they voted to allow the processing relationship to continue under that scenario.

573. The next day, iStream Senior Vice President and COO James Gorst, who was appointed Acting Chief Risk Officer for iTeam in the wake of Kelly's departure and who had lobbied in favor of continuing the processing relationship,

asked another iStream employee to provide him with a "history of the returns that we have had on this account," a request he prefaced as an "afternoon laugh for you."

574. On behalf of iStream, Joachim signed the new processing agreement between iStream and WestSide Bank.  According to the Addendum to the agreement, the EDP Entities were the only client for which iStream would be providing processing services to WestSide Bank.

575. WestSide Bank never entered into a separate agreement with either the EDP or Hornbeam Entities.

576. Functionally, nothing changed in how the processing relationships worked. As discussed above, iStream continued to "approve" requests to open new processing accounts, such as the Loyalty Leads account, without discussing the matter with WestSide Bank or seeking its approval.  iStream continued to have signatory authority over the processing reserve account held at WestSide Bank and to authorize the release of funds to the EDP and Hornbeam Entities.

577. When the Hornbeam Entities took control of the Discount Clubs, iStream and Andrews worked with them to maintain the relationship with WestSide Bank.

578. iStream continued to serve as the payment processor for the Hornbeam Entities' Discount Club and Loyalty Leads charges through at least April 2016.

iStream stopped only when WestSide Bank terminated the banking relationship and it could not find a replacement bank for the business.

579.  Even after iStream knew of a possible FTC investigation and WestSide Bank had provided notice that it intended to terminate the banking relationship as of March 2016, iStream tried to maintain its position as the payment processor.

580.  In February 2016, when iStream VP of Transaction Processing Kim Olszewski learned from Hornbeam Entities Director of Accounting and Administration Martha Leon that WestSide Bank had indicated it was terminating the relationship, she forwarded the email to Joachim and Axberg and asked to discuss the matter immediately.  As she explained, "[i]f we don't actively assist Gyro in finding a new clearing partner for this activity, even if it is temporary, we are going to be out a boatload of cash each month.  I think we would all agree it is in our best interest to work on this immediately."

581.  Thereafter, Olszewski worked with the Hornbeam Entities to find a new processing bank for the Discount Club business.  In March 2016, when she reported positively to Joachim and Axberg on the status of her efforts to recruit Opus Bank, Axberg and Joachim were thrilled with the possibility that iStream might be able to continue processing Discount Club RCCs.

582.  When Axberg and Joachim were notified in March 2016 by Olszewski that the FTC had requested business records related to Jerry Robinson's businesses and an FTC investigation was possibly ongoing, their response was to encourage Olszewski to continue her efforts to find a new processing bank for the Hornbeam Entities.

583.  In April 2016, Olszewski reported to Joachim and Axberg that WestSide Bank had extended the termination date for the Hornbeam Entities "without giving them a hard date" because they were close to finalizing a relationship with a new bank.  Olszewski was still hoping to convince Opus Bank to take the Discount Club business, so that iStream could continue to be the payment processor. Joachim responded that it "would be a big save to say the least!" if she could do so.

<u>iStream Ignored the Risks to Consumers to Generate Profits for Itself</u>

584.  Throughout its processing relationship with the EDP Entities and the Hornbeam Entities, iStream disregarded the risk of harm to consumers and focused on the profits it was generating from the Discount Club transactions.

585.  In 2010, iStream lobbied for additional EDP Entities' business, despite the exceptionally high return rates, in order to increase its income.  As Hemerley confirmed to Joachim, if iStream was going to have a high risk account, like the

EDP Entities' account, then it should get as much of the business as possible; otherwise it would have only "half the money but the same risk."

586. From 2010 through May 2016, iStream generated a substantial portion of its revenues from processing high-risk RCCs for the EDP and Hornbeam Entities.

587. In fact, processing fees from the Discount Clubs, along with fees generated by processing payments for Membership Services (another high-risk RCC merchant under FTC Order during its relationship with iStream), accounted for more than 25% of iStream's total revenues in 2011.

588. In 2014, processing RCCs for the Hornbeam Entities alone accounted for almost 10% of iStream's annual revenues.

589. When iStream entered into a processing relationship with WestSide Bank in 2011, after the termination by Kenney Bank, so that it could continue processing Discount Club RCCs, then-CEO Ken Biel lauded the "big win" that enabled iStream to maintain the revenue stream.

590. In 2013, after the iTeam Board had determined to terminate the relationship because of the high likelihood of fraud and the risk of legal or regulatory action resulting from continuing to process RCCs for the EDP Entities, iStream management – including Axberg and Joachim – convinced the Board that altering

the contractual relationship with WestSide Bank would insulate iTeam from the legal risk and allow it to keep generating income from the processing relationship.

591.  As discussed above, when iStream faced the loss of the business in 2016, as a result of WestSide Bank's termination due to consistently high return rates, Olszweski worked to find a new processing bank for the Hornbeam Entities so that iStream would not be "out a boatload of cash each month."

### iStream's Payment Processing for Other High Risk Customers

592.  The EDP and Hornbeam Entities were not the only high risk customers that iStream has assisted with payment processing services.  iStream has previously processed payments for other customers with high return rates or a history of law enforcement cases such as PacNet Services, Ltd.; Essentia Financial Services, Inc.; Global Client Solutions, LLC; and Membership Services, LLC.

593.  iStream does not follow fixed guidelines for suspending or terminating customers that have particularly high return rates, but instead makes such decisions on a case-by-case basis.

594.  iStream continues to process ACH, remote deposit, and credit card payments for customers and could easily resume processing RCCs for high risk customers.

<u>iStream Individual Defendants' Control, Participation, and Knowledge</u>

595.  Axberg, who was first CFO and then CEO, and Joachim, who was President, had authority over all day-to-day decisions at iStream when the company was processing for the EDP and Hornbeam Entities.  Axberg and Joachim also currently serve as CEO and President of iStream.

596.  Andrews, as Senior Vice President for New Business Development, was directly responsible for bringing the EDP Entities to iStream, as well as overseeing the processing relationship with the EDP Entities and then the Hornbeam Entities. He had significant authority to manage the account and even made unilateral decisions regarding the relationship, such as changing the pricing structure in 2012 to increase iStream's "Money in the bank."

597.  Throughout his time at iStream, Andrews regularly reported to Axberg and Joachim on all aspects of his management of the EDP and Hornbeam Entities' processing relationships.

598.  On behalf of iStream, Joachim signed the January 2010 processing agreement with the EDP Entities, the May 2012 "direct send" agreement with Chase Bank, and the July 2013 processing agreement with WestSide Bank, where the EDP Entities were the only merchant client.

599.  Axberg was a signatory on the EDP Entities' and Hornbeam Entities' processing reserve accounts at WestSide Bank and approved the opening of processing accounts.  Axberg had authority to approve wire transfers from that account, including for payments to the EDP and Hornbeam Entities and iStream. Axberg expressly approved transferring $500,000 from that account into a separate reserve account held in the name of WestSide Bank, to assuage the bank's concerns that future legal actions against the EDP Entities would result in the accounts being frozen, as they had been during the FTC's 2007 case, putting WestSide Bank at risk of loss.

600.  Axberg and Joachim attended numerous iTeam and Kenney Bank Board meetings where the EDP Entities and Hornbeam Entities were discussed, concerns were raised, and high return rates were noted.

601.  As discussed above, Andrews, Joachim, and Axberg were extensively involved in the processing relationship with the EDP and Hornbeam Entities. When iTeam's Board or officers, including multiple Risk Officers, or outside consultants raised concerns about or actively tried to terminate the processing relationship, Andrews, Axberg, and Joachim defended it and lobbied for it to continue.

602.  While he was at iStream and thereafter, Andrews provided specific guidance to the EDP and Hornbeam Entities regarding what information to provide iStream and WestSide Bank – as well as potential processing banks – to support their claim that the Discount Clubs were a legitimate business.  For example, he encouraged them to engage in search engine optimization to prevent consumer complaints from appearing on the first pages of Internet searches for the companies or Discount Clubs, he suggested that they cherry-pick examples of consumer interactions to support a narrative that consumers authorized the charges and then denied authorizing them for personal reasons (e.g., changing their minds, attempting to avoid NSF charges, or attempting to get a "double refund"), and he coached the EDP and Hornbeam Entities and employees prior to compliance visits by other iStream officers.

603.  Andrews repeatedly counseled the EDP Entities on reducing NSF Redeposit returns by being more selective in when they were submitted for processing.  As he explained to EDP Entities employees in September 2011, "I know that we have discussed this in the past, but your best date to collect on any NSF redeposit is on the 15th and the 30th of the month as that is a payday for most people.  Some folks get paid every Friday so that is the next best opportunity to collect on NSF checks."

604.  Andrews explicitly encouraged the development of the Loyalty Leads program and concealed its existence and nature from WestSide Bank.  Indeed, when the Loyalty Leads transactions initially started and the Hornbeam Entities' total return rates appeared to drop substantially, Andrews reached out to WestSide Bank to suggest that these results were from implementing new account verification procedures.  In multiple emails to WestSide Bank touting the reduced return rates, not once did Andrews acknowledge the existence or role of the Loyalty Leads transactions.  Instead, as he said in December 2014, "I think we will all agree that they [the Hornbeam Entities] are making impressive progress in their efforts to reduce their returned item count."

605.  Each time the EDP Entities faced the possible termination of their processing relationship with iStream, Andrews assured them that he would resolve the problems or find other solutions, including restarting his own payment processing company to take over that account.

606.  After Andrews left iStream, he continued to work with the Hornbeam Entities, as described above, to preserve the relationship with WestSide Bank and to search for new banking partners, including assisting in the creation of the fake Total Savings Now Discount Club materials.

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

607.  Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

608.  Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.  Acts or practices are unfair under Section 5 of the FTC Act if they cause, or are likely to cause, substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

### COUNT I – Unfair Billing Practices By EDP and Hornbeam Defendants

609.  In numerous instances from July 2010 through September 2013, the EDP Defendants, as described in Paragraphs 54-154, and in numerous instances since October 2013, the Hornbeam Defendants, as described in Paragraphs 202-310, obtained consumers' bank account information and caused billing information to be submitted for payment on those accounts without consumers' express informed consent.

610.  These Defendants' actions caused substantial injury to consumers that consumers could not reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

611. Therefore, the EDP and Hornbeam Defendants' practices as described in Paragraphs 609-610 of this Complaint constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

## COUNT II – Deception By EDP and Hornbeam Defendants

612. In numerous instances from July 2010 through September 2013, the EDP Defendants, as described in Paragraphs 100-106, and in numerous instances since October 2013, the Hornbeam Defendants, as described in Paragraphs 239-253, have represented, directly or indirectly, expressly or by implication to consumers who contacted the EDP and Hornbeam Defendants to seek refunds that those consumers are not entitled to a refund because, as confirmed by the fact the EDP and Hornbeam Defendants had the consumers' personal and financial information as well as their order details, the consumers agreed:  (i) to purchase the products or services, or (ii) to authorize the Defendants to debit money from consumers' bank accounts to pay for the Defendants' products or services.

613. As described in Paragraphs 54-154 and 202-310, in truth and in fact, in numerous instances in which the EDP and Hornbeam Defendants made these representations, consumers did not agree:  (i) to purchase the Defendants' products or services, or (ii) to authorize the Defendants to debit money from consumers' bank accounts to pay for the Defendants' products or services.

614.  Therefore, the EDP and Hornbeam Defendants' representations set forth in Paragraphs 612-613 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT III – Unfair Billing Practices By iStream Defendants

615.  The iStream Defendants' acts or practices in processing fraudulent and unauthorized debit transactions to consumers' bank accounts, as described in Paragraphs 448-591, above, have caused or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

616.  Therefore, the iStream Defendants' acts or practices, as alleged in Paragraph 616, constitute unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

### VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

617.  In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq*., which became effective on December 29, 2010.  Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must

provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  15 U.S.C. § 8401.

618.  Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, (2) obtains the consumer's express informed consent before making the charge, and (3) provides a simple mechanism to stop recurring charges.  *See* 15 U.S.C. § 8403.

619.  The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

620.  As described in Paragraphs 54-154 and 202-310 above, the EDP and Hornbeam Defendants have advertised and sold memberships in Discount Clubs, including the Saving Pays Club, Money Plus Saver, and Saving Makes Money, through a negative option feature as defined by the TSR.  16 C.F.R. § 310.2(w).

621.  Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

## COUNT IV – ROSCA Violation By EDP and Hornbeam Defendants

622.  In numerous instances from January 2011 through September 2013, the EDP Defendants, as described in Paragraphs 54-154, and in numerous instances since October 2013, the Hornbeam Defendants, as described in Paragraphs 202-310, in connection with charging consumers for Discount Clubs sold in transactions effected on the Internet through a negative option feature, have failed to:

a.  clearly and conspicuously disclose all the material terms of the transaction, including the amounts and dates of charges, before obtaining the consumer's billing information; and

b.  obtain the consumer's express informed consent before charging the consumer's financial account for products or services through such transaction.

623.  The EDP and Hornbeam Defendants' practices, as alleged in Paragraph 622, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

## **VIOLATIONS OF THE TELEMARKETING SALES RULE**

624.  Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, in 1994.  The FTC adopted the original Telemarketing Sales Rule ("TSR") in 1995, extensively amended it in 2003, and amended certain sections thereafter.

625.  The EDP and Hornbeam Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

626.  Under the TSR, "preacquired account information" is any information that enables a seller or telemarketer to cause a charge to be placed against a customer's or donor's account without obtaining the account number directly from the customer or donor during the telemarketing transaction pursuant to which the account will be charged.  16 C.F.R. § 310.2(z).

627.  The TSR prohibits any seller or telemarketer from causing billing information to be submitted for payment, or collecting or attempting to collect payment for goods or services, directly or indirectly, without the customer's or donor's express verifiable authorization, except when the method of payment used is a credit card subject to the protections of the Truth In Lending Act, 15 U.S.C.

§ 1601 *et seq.*, and Regulation Z, 12 C.F.R. § 226, or a debit card subject to the protections of the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.*, and Regulation E, 12 C.F.R. § 205.  When an audio recording of the customer's express oral authorization is used to satisfy this requirement, the TSR requires that the recording must evidence clearly the customer's authorization of payment for the goods or services that are the subject of the telemarketing transaction and the customer's receipt of all of the following information, among other information:

    a.  the number of debits, charges, or payments (if more than one);

    b.  the date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;

    c.  the amount(s) of the debit(s), charge(s), or payment(s);

    d.  a telephone number for customer inquiry that is answered during normal business hours; and

    e.  the customer's billing information, identified with sufficient specificity such that the customer understands what account will be used to collect payment for the goods or services that are the subject of the telemarketing transaction.

16 C.F.R. § 310.3(a)(3)(ii).

628.  It is an abusive telemarketing act or practice and a violation of the TSR for any seller or telemarketer to cause billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer or donor.  In any telemarketing transaction, the seller or telemarketer must obtain the express informed consent of the customer or donor to be charged for the goods or services or charitable contribution and to be charged using the identified account. 16 C.F.R. § 310.4(a)(7).

629.  To evidence express informed consent in any telemarketing transaction involving preacquired account information with a free-to-pay conversion, the seller or telemarketer must:

> a.  At a minimum, identify the account to be charged with sufficient specificity for the customer or donor to understand what account will be charged; and

> b.  Obtain from the customer or donor his or her express agreement to be charged for the goods or services and to be charged using the identified account number.

16 C.F.R. § 310.4(a)(7)(ii).

630.  Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR

constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and shall be treated as a violation of a rule promulgated under Section 18, 15 U.S.C. § 57a.

## COUNT V – Failure to Obtain Express Verifiable Authorization in Violation of the TSR by EDP and Hornbeam Defendants (Excluding Mark Ward)

631.  In numerous instances from January 2012 through September 2013, the EDP Defendants, as described in Paragraphs 54-154 above, and in numerous instances from October 2013 through June 2015, the Hornbeam Defendants (excluding Mark Ward), as described in Paragraphs 202-310, in the course of telemarketing their Discount Clubs, have caused billing information to be submitted for payment using a payment method other than a credit card subject to the protections of the Truth In Lending Act, 15 U.S.C. § 1601 *et seq.*, and Regulation Z, 12 C.F.R. § 226, or a debit card subject to the protections of the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq*., and Regulation E, 12 C.F.R. § 205, without the consumer's express verifiable authorization.

632.  The EDP and Hornbeam Defendants' practices as alleged in Paragraph 631 is a deceptive telemarketing practice that violates Section 310.3(a)(3) of the TSR, 16 C.F.R. § 310.3(a)(3).

## **COUNT VI – Failure to Obtain Express Informed Consent**
## **in Violation of the TSR By EDP and Hornbeam Defendants (Excluding Mark Ward)**

633.  In numerous instances from January 2012 through September 2013, the EDP Defendants, as described in Paragraphs 54-154 above, and in numerous instances from October 2013 through June 2015, the Hornbeam Defendants (excluding Mark Ward), as described in Paragraphs 202-310, in the course of telemarketing their Discount Clubs, have caused billing information to be submitted for payment, directly or indirectly:

a.  without the express informed consent of the customer to be charged for the goods or services and to be charged using a specified account; and

b.  where the telemarketing transaction includes preacquired account information:

i.  without identifying the account to be charged with sufficient specificity for the customer or donor to understand what account will be charged; or

ii.  without obtaining from the customer or donor his or her express agreement to be charged for the goods or services and to be charged using the identified account number.

634.  The EDP and Hornbeam Defendants' practices, as alleged in Paragraph 633, are abusive telemarketing practices that violate Section 310.4(a)(7) of the TSR, 16 C.F.R. § 310.4(a)(7).

### COUNT VII – Assisting and Facilitating TSR Violations By iStream Defendants

635.  In numerous instances from January 2012 through June 2015, the iStream Defendants provided substantial assistance or support, including payment processing services, as described in Paragraphs 448-591, above, to the EDP and Hornbeam Defendants who engaged in telemarketing various products and services.  The iStream Defendants did so knowing or consciously avoiding knowing the EDP and Hornbeam Defendants were engaged in violations of the TSR set forth in Counts V and VI, above.

636.  The iStream Defendants' acts or practices alleged in Paragraph 635 constitute deceptive telemarketing acts or practices in violation of Section 310.3(b) of the TSR and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### CONSUMER INJURY

637.  Consumers have suffered substantial injury because of Defendants' violations of the FTC Act, ROSCA, and the TSR.  In addition, Defendants have been unjustly enriched because of their unlawful acts or practices.  Absent

180

injunctive relief by this Court, Defendants are likely to continue to injure

consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

638.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to

grant injunctive and such other relief as the Court may deem appropriate to halt

and redress violations of any provision of law enforced by the FTC.  The Court, in

the exercise of its equitable jurisdiction, may award ancillary relief, including

rescission or reformation of contracts, restitution, the refund of monies paid, and

the disgorgement of ill-gotten monies, to prevent and remedy any violation of any

provision of law enforced by the FTC.

639.  Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the

Telemarketing Act, 15 U.S.C. § 6105(b), authorizes this Court to grant such relief

as the Court finds necessary to redress injury to consumers resulting from

Defendants' violations of the TSR, including the rescission or reformation of

contracts and the refund of money.

640.  Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 5 of ROSCA, 15

U.S.C. § 8404, authorizes this Court to grant such relief as the Court finds

necessary to redress injury to consumers resulting from Defendants' violations of

ROSCA, including the rescission or reformation of contracts and the refund of money.

## **PRAYER FOR RELIEF**

641.  For the foregoing reasons, the Federal Trade Commission has reason to believe that the Defendants are violating or are about to violate laws enforced by the Commission.

642.  Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. § 53(b) and 57b, Section 5 of ROSCA, 15 U.S.C. § 8404, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act, ROSCA, and the TSR by Defendants;

B.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, ROSCA, and the TSR, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.    Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

182

## LR 5.1 CERTIFICATION

Pursuant to LR 7.1(D), I hereby certify that this Second Amended Complaint was prepared with 14-point Times New Roman font in accordance with LR 5.1(C).

Respectfully Submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  November 5, 2018          __s/   Anna M. Burns_____

ANNA M. BURNS
Georgia Bar  #558234
Federal Trade Commission
225 Peachtree Street, NE, Suite 1500
Atlanta, GA 30303
Telephone:  (404) 656-1350
Email:  aburns@ftc.gov


__s/ Korin Ewing Felix_____

KORIN EWING FELIX
ELIZABETH J. AVERILL
HONG PARK
KIMBERLY L. NELSON
*Admitted pro hac vice*
Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC 20580
Telephone:  (202) 326-3556 (Felix),
-2993 (Averill), -2158 (Park); -3304
(Nelson) Email:  kfelix@ftc.gov,
eaverill@ftc.gov, hpark@ftc.gov,
knelson@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 5, 2018, I electronically filed PLAINTIFF FEDERAL TRADE COMMISSION'S SECOND AMENDED COMPLAINT with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Jeffrey L. Mapen, Esq.
Michael L. Mallow, Esq.
Lauren M. DeLilly, Esq.
Alexis Miller Buese, Esq.
*Counsel for Defendants Dale P. Cleveland, William R. Wilson, and EDebitPay, LLC*

Bryan B. Lavine, Esq.
Keith J. Barnett, Esq.
Tiffany Nichols Bracewell, Esq.
Katie Balthrop, Esq.
*Counsel for Defendant James McCarter*

Leonard L. Gordon, Esq.
Mary M. Gardner, Esq.
Michael A. Caplan, Esq.
Julia Blackburn Stone, Esq.
*Counsel for Defendants iStream Financial Services, Inc., Richard Joachim, and Kris Axberg*

Andrew Case, Esq.
Richard Lawson, Esq.
Julia Blackburn Stone, Esq.
Michael A. Caplan, Esq.
*Counsel for Defendant Chet Andrews*

Allison S.H. Ficken, Esq.
Edward Dovin, Esq.
*Counsel for Defendant Patricia Brandmeier Robinson, as Executor of the Estate of Jerry L. Robinson*

I certify that I served these documents by email to the following non-CM/ECF participants:

Defendant Mark Ward

Defendant Earl G. Robinson

Defendant Keith Merrill

 s/      Korin Ewing Felix
Counsel for Plaintiff the Federal Trade Commission

Federal Trade Commission
600 Pennsylvania Avenue NW, CC-9528
Washington, DC 20580
Telephone:  (202) 326-3556
Email:  kfelix@ftc.gov