# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | CIVIL ACTION FILE NO. 1:17-cv-03094-WMR |
| HORNBEAM SPECIAL SOLUTIONS, LLC, et al., | |
| Defendants. | |

## <u>ORDER</u>

This case comes before the Court on Plaintiff's Motions for Summary Judgment against Defendants [Docs. 375, 376, 377, 378, 379, 381] and certain Defendants' Motions for Summary Judgment [Docs. 387, 388, 390]. Upon consideration of the arguments presented by the parties, the applicable law, and all appropriate matters of record, the Court GRANTS IN PART and DENIES IN PART the Motion for Summary Judgment filed by Defendants EDebit Pay, LLC, Dale Cleveland, and William Wilson [Doc. 388], and the Court DENIES the rest of the Motions. [Docs. 375, 376, 377, 378, 379, 381, 387, and 390].

## I.   FACTUAL ALLEGATIONS

In its Second Amended Complaint [Doc. 223] ("Complaint"), the Federal Trade Commission ("FTC") has asserted claims involving three categories of defendants:

1. **Hornbeam Defendants** - Hornbeam Special Situations, LLC; Cardinal Points Holdings, LLC; Cardinal Points Management, LLC d/b/a Clear Compass Digital Croup; and Gyroscope Management Holdings, LLC (corporate entities together, the "Hornbeam Entities"); and individual Defendants Patricia Robinson, as Executor for the estate of Jerry L. Robinson, Earl G. Robinson, Mark Ward, and James McCarter;

2. **EDP Defendants** - EDebitPay, LLC; Platinum Online Group, LLC d/b/a Premier Membership Clubs; and clickXchange Media (corporate entities together, the "EDP Entities"). Also included are individual Defendants Dale Paul Cleveland and William R. Wilson;[1] and

3. **iStream Defendants**- iStream Financial Services, Inc., along with individual Defendants Kris Axberg, Richard Joachim, and Guadalupe L. Andrews, as Personal Representative of the Estate of Chet L. Andrews.[2]

---

[1] Defendant Keith Merrill was also among the EDP Defendants, but the claims against him have been resolved by a Stipulated Order [Doc. 105].

[2] The FTC's claims against iStream Financial Services, Inc., Kris Axberg, and Richard Joachim have been resolved by a Stipulated Order [Doc. 445].

In its Complaint, the FTC alleges violations of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8401 *et seq*., and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101–6108 [Doc. 223 ¶ 1].  The Complaint describes a scheme by which Defendants acquired the financial information of subprime customers and made allegedly unauthorized debits to their bank accounts to pay for online coupons that went largely unused. [Doc. 223 ¶ 43-45].  The EDP Defendants operated this scheme from July 2010 to September 2013 [Doc. 223 ¶ 25] before selling the operation to the Hornbeam Defendants, which operated the scheme until June 2016. [Doc. 223 ¶ 32-33].

In its Complaint, FTC alleges facts and circumstances which demonstrate the ongoing nature of Defendants' activities.  Prior to this current action, the EDP Defendants had been under FTC scrutiny in another matter.  After resolving the conflict with a stipulated order, the EDP Defendants were held in contempt after the court found they violated the order and continued the illegal activity from at least the day of the order. [Doc. 223 ¶¶ 50-53]. Similarly, the EDP Defendants settled investigations into their scheme from the states of Oregon and Iowa [Doc. 223 ¶¶ 142-43, 148, 186], yet continued to operate the scheme.  After selling the operation to the Hornbeam Defendants, Defendant Wilson formed a new company,

AdMediary, LLC, which began targeting the financial information of subprime customers and recruiting present and former employees of the EDP Defendants and Hornbeam Defendants. [Doc. 223. ¶¶ 194-99, 265].

FTC further alleges that, after purchasing the operation with full knowledge of its practices and the legal scrutiny that it was under, the Hornbeam Defendants continued to operate the scheme and worked to prolong it. [Doc. 223 ¶¶ 225-25, 234-37, 310].  According to FTC, the Hornbeam Defendants made fake transactions to mask high return rates, sought a new processing bank, and only stopped the scheme when their replacement bank stopped cooperating. [Doc. 223 ¶¶ 344-45].

After the benefit of discovery, the parties have now filed their respective motions for summary judgment on FTC's claims and allegations.  The Court's findings of fact with regard to these motions will be set forth in the discussion below.

## II.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is proper when the record evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A dispute is "genuine" if evidence suggests a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome

of the case." <u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d 1256, 1259 (11th Cir. 2004).

The moving party bears the burden of demonstrating that there is no genuine issue of material fact that should be decided at trial. <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). If the moving party carries the initial burden, then the burden shifts to the non-moving party to demonstrate that there is an issue of material fact that precludes summary judgment. <u>Id</u>.  Then, summary judgment is only appropriate if the non-moving party fails to meet its burden of presenting evidence sufficient to create a genuine issue of material fact as to an essential element of its claim. <u>Celotex Corp.</u>, 477 U.S. at 323.

On summary judgment, the Court views the evidence and any inferences that may be reasonably drawn in the light most favorable to the non-movant. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-159 (1970).

## III.    DISCUSSION

### A.    FTC's claims against Defendants EDebitPay, LLC, William Wilson, and Dale Paul Cleveland

Defendant EDebitPay, LLC operated nationwide during the relevant period through two wholly-owned subsidiaries, Defendant clickXchange Media, LLC and Defendant Platinum Online Group LLC (collectively, "EDP Entities"). [Doc. 223 at ¶¶ 10-12, 26; Doc. 265 at ¶¶ 10-12, 26]. Defendants William Wilson and Paul

Cleveland were the joint owners of EDebitPay and managing members of all three EDP Entities. [Doc. 223 at ¶¶ 20-21; Doc. 265 at ¶¶ 20-21, 47].

The EDP Defendants launched a discount club program in July 2010 as a way to salvage leads on loan-seeking consumers that the EDP Defendants were not able to sell to lenders or others. [Doc. 384-6 at 172-73, 266-67, 332; Doc. 383-2 at 617 ¶8, 620-21 ¶¶16-18; Doc. 375-7 at 3 (Transcript pp. 26:22-27:20); Doc. 223 at ¶ 29; Doc. 265 at ¶ 29]. The EDP Defendants ran this "lead generation" business, primarily by operating hundreds of websites advertising payday and other short-term loans. [Doc. 383-2 at ¶¶8-9; Doc. 384-6 at 226-27, 230-32; Doc. 375-4 at 9 (Transcript pp. 91:23-92:16)].  Consumers who sought short-term loans online found the EDP Defendants' websites, where consumers entered their personal information, including bank account and routing numbers, in the hopes of obtaining a loan. [Doc. 382-7 at 270, 274; Doc. 375-14 at 27-28 (Transcript pp. 259:12-262:6); Doc. 375-4 at 4 (Transcript pp. 35:15-36:4); PX 1208 at 1; PX 715 ¶ 12]. The EPD Defendants would then use the loan-seeking consumers' banking information to enroll them in discount club memberships, which are characterized by automatically-recurring monthly charges against the consumers' bank accounts without any invoice being sent. [Doc. 382-7 at 270, 274].

There is also evidence that the EPD Defendants used the discount club webpages and telemarketing to monetize the bottom tier leads, which often included

consumers' bank account and bank routing numbers, that they received from third-party loan-finding websites. [Doc. 375-2 at 10-11 ¶¶46-57 (referencing evidence)].

However, the EDP Defendants contend that all the enrollments in the discount club were authorized by the consumers themselves. [Doc. 388-2 at 5 ¶16]. During the EDP loan application process, bottom tier loan-seeking consumers were redirected to a webpage that looked like a loan application form. [Doc. 388-5 at 3 (Transcript pp. 49:13-51:17); Doc. 383-3 at 194; Doc. 383-2 at 353]. On the discount club webpages, the application form appeared in the most prominent location immediately under a reference to a "CASH ADVANCE" loan offering. [Doc. 383-3 at 194; Doc. 383-2 at 353]. Beneath the application form was a small check box beside a statement, in fine print, which indicated that, by checking the box, the consumer was enrolling in the discount club and authorizing charges to their bank account. As the discount club offer is far less prominent and blends into the overall "CASH ADVANCE" loan theme of the webpage, the FTC argues that it makes it appear that consumers needed to check the box as a step in the process of submitting their loan applications. [Id.] This inference is bolstered by the fact that loan-seeking consumers were redirected to the discount club webpage during the loan application process. While the contents of the discount club webpages are not disputed, the inferences to be drawn from those contents are vigorously disputed, and that dispute is the heart of this case.

Furthermore, there is evidence that suggests that loan-seeking consumers were deceived by the EPD Defendants' loan application process and webpages. The FTC points to evidence showing that: (1) a vast majority of the loan-seeking consumers never wanted or used the coupons offered by the discount club; (2) there was an extraordinarily high number of consumer complaints about the unauthorized charges to their bank accounts; and (3) banks returned the charges for the discount club at astronomical rates, with one payment processing bank terminating its relationship with the EPD Defendants due to the high number of return rates. [*See* Doc. 375-1 at 8-13 (referencing evidence)].

Considering all of the above evidence together, the Court finds that there is a genuine issue of material fact as to whether the EDP Defendants' loan application process, discount club webpages, and telemarketing practices were deceptive.

Furthermore, as there is a genuine issue of material fact as to whether the EDP Defendant's conduct violated the ROSCA and Telemarketing Acts, the FTC is not entitled to judgment as a matter of law on its claim for injunctive relief under 15 U.S.C. § 53(b) or equitable monetary relief under § 57b. Under 15 U.S.C. § 53(b), the FTC is authorized to obtain an injunction "[w]henever the [FTC] has reason to believe . . . that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the [FTC]." In addressing a request for injunctive relief, a district court may also consider the defendant's past conduct in

determining whether there is a reasonable likelihood of further violations. *See* FTC v. Lalonde, 545 F. App'x 825, 841 (11th Cir. 2013).  Under 15 U.S.C. § 57b, the FTC is authorized to obtain equitable monetary relief that is "necessary to redress injury to consumers" resulting from unfair or deceptive trade practices or acts.

In regard to Defendant EDebitPay, LLC, the evidence is undisputed that Defendants Wilson and Cleveland sold the entirety of EDebitPay's assets and business operations to the Hornbeam Defendants on September 30, 2013. [Doc. 375-2 at 13 ¶67]. Since that time, EDebitPay, LLC has not engaged in any business activities and its entity status has been revoked [*see* Doc. 388-2 at 3 ¶¶5-6; Doc. 375-2 at 52 ¶283].  The FTC has failed present evidence to establish any reasonable basis for it to believe that this now-defunct entity is violating, or is about to violate, the law.  Furthermore, as for EDebit Pay's past conduct, the Court notes that the FTC filed this action more than three years after the EDebitPay, LLC ceased all operations. [*See* Doc. 1]. 15 U.S.C. § 57b(d) provides for a three-year statute of limitations for bringing an action based on rule violations respecting unfair or deceptive acts or practices.  Therefore, the Court finds that EDebitPay, LLC is entitled to judgment as a matter of law on the FTC's claims.

As for Defendants Wilson and Cleveland, however, a genuine issue of material fact remains as to whether the FTC has reasonable basis to believe that these individuals are violating, or are about to violate, provisions of the law enforced by

the FTC.  The evidence shows that, as part of the sale of EDebitPay's assets to the Hornbeam Defendants, Wilson and Cleveland had an agreement and were paid to assist the Hornbeam Defendants with the operation of the business for a period of 18 months. [Doc. 375-2 at 50-51 ¶¶270-72].  During this time, Wilson and Cleveland requested regular financial reporting from the Hornbeam Defendants so that they could monitor and advise the Hornbeam Defendants in their continued operation of EDebitPay's former assets, which included the discount club sales component. [Id. at 51 ¶274, 52 ¶279].  The Court finds that this evidence suggests that Wilson and Cleveland have the propensity to continue the conduct for which they had been under FTC scrutiny when they operated EDebitPay, LLC. Further, in addition to helping the Hornbeam Defendants, there is evidence to show that Wilson formed a new company, AdMediary, LLC, which targeted the financial information of subprime loan-seeking consumers in a similar manner from 2013 to 2014. [Doc. 375-2 at 252-53 ¶¶284-87]. Admediary, LLC, also sent leads of sub-prime loan consumers, including the consumers' bank account and Social Security numbers, to the Hornbeam Defendants from 2014 to 2015. [Id. at 253 ¶288].  Although the conduct of Wilson and Cleveland, albeit past conduct, is more recent than that of EDebitPay, the record is unclear as to whether Wilson and Cleveland have continued to engage in any alleged violative conduct.  Therefore, the Court finds that a genuine issue of

material fact remains as to the FTC's claims against Defendants Wilson and Cleveland.

For the above reasons, the FTC's Motion for Summary Judgment [Doc. 375] is DENIED, and the EPD Defendants' Motion for Summary Judgment [Doc. 388] is GRANTED IN PART as to the FTC's claims against EDebitPay, LLC and DENIED IN PART as to the FTC's claims against Defendants William Wilson and Paul Cleveland.

**B.    FTC's claims against Defendants Earl G. Robinson, James McCarter, Mark Ward, and the Estate of Jeremy L. Robinson**

Hornbeam Special Situations, LLC operated during the relevant period through its wholly-owned subsidiaries, Defendants Cardinal Points Holdings LLC, Cardinal Points Management LLC, and Gyroscope Management Holdings, LLC (the "Hornbeam entities"). [Doc. 376-2 at 2-3 ¶¶3-4]. Defendants Earl G. Robinson, Jerry L. Robinson, and James McCarter were owners and managing members of Hornbeam Special Situations, LLC. [Id. at 5 ¶15].  In addition, Earl Robinson was the Chief Revenue Officer and Jerry Robinson was the Chief Strategy Officer for Hornbeam's operating companies –– Cardinal Points Management, LLC and Gyroscope Management Holdings, LLC. [Id. at 7-8 ¶¶25, 27-28].  Defendant Mark Ward was the President of Cardinal Points Management and Gyroscope Management Holdings. [Id. at 8 ¶30]. There is evidence to show that the Hornbeam

entities acted as a single, consolidated entity with regard to the management and conduct of its business activities. [Id. at 3-8 ¶¶7- 26 (referencing evidence)].

After acquiring EDebitPay's assets and business operations, the evidence shows that, from October 2013 through May 2016, Hornbeam Defendants continued to run the lead generation and online discount club scheme started by the EPD Defendants even though Earl Robinson and Jerry Robinson had knowledge of the prior and ongoing legal actions involving the EDP Defendants' use of the scheme. [Doc. 376-2 at 10-15 ¶35 and ¶¶41-48, at 19 ¶63, and at 20-27 ¶¶ 69-103 (referencing evidence)]. Although the Hornbeam Defendants rebranded the discount club, they retained the consumers who were enrolled in the discount club and did not any make significant changes to the scheme. [Id. at 15-17 ¶¶52-54 and ¶62].  The Hornbeam Defendants retained EDebitPay's discount club websites and telemarketing call centers, which they used to monetize the bottom tier leads of loan-seeking consumers. [Id. at 17-18 ¶57 and ¶59]. Lastly, there is evidence to suggest that loan-seeking consumers were deceived by the Hornbeam Defendants' loan application process, telemarketing, and webpages. [Id. at 34-65 ¶¶139-236].

However, the fact remains that the loan-seeking consumers still had to check the box on the discount club webpage, ostensibly acknowledging that they were enrolling in the discount club and were authorizing charges to their bank accounts.

.

Considering all the evidence together, the Court finds that there is a genuine issue of material fact as to whether the Hornbeam Defendants' loan application process, discount club webpages, and telemarketing practices were deceptive.

In response to the FTC's separate motions for summary judgment against Earl Robinson [Doc. 376], James McCarter [Doc. 377], the Estate of Jeremy L. Robinson [Doc. 378], and Mark Ward [Doc. 379], the Defendants essentially argue two main points: (i) that they had a general lack of knowledge of (or authority to control) the alleged violative conduct; and (ii) that the FTC does not have the right to seek equitable monetary relief. [*See* Docs. 400, 412, 428, 429, 430]. Patricia Robinson, on behalf of the Estate of Jeremy L. Robinson, likewise argues monetary relief issues as the main basis for her cross-motion for summary judgment.[3] [Doc. 387].

As for the arguments concerning the lack of knowledge or lack of authority to control, the Court finds that there are disputed issues of material fact as to these matters which should be decided by the trier of fact. The FTC's claim for equitable monetary relief, however, requires further analysis.

In AMG Capital Management, LLC v. FTC, 141 S. Ct. 1341 (2021), the Supreme Court held that the FTC cannot obtain equitable monetary relief under 15

---

[3] Ms. Robinson also contends that the Estate is entitled to summary judgment on the FTC's request for a permanent injunction against Jeremy Robinson because he is now deceased. [Doc. 387-1 at 11]. However, the FTC has made clear that it is not seeking a permanent injunction against Jeremy Robinson or his Estate. [*See* Doc. 239 at 15; Doc. 406 at 2 n.2]. Therefore, the Court finds that this issue is moot.

U.S.C. § 53(b), but may obtain such relief under 15 U.S.C. § 57b(d) if it has invoked its administrative procedures — i.e., obtained a cease-and-desist order. Id. at 1349. However, the Supreme Court's references to § 57b expressly related to civil actions under 11 U.S.C. § 57b(a)(2). Id. at 1349-52.

In this action, however, the FTC has not sought relief under § 57b(a)(2). Instead, the FTC's claims are premised on subsection § 57b(a)(1). Unlike subsection (a)(2), subsection (a)(1) authorizes the FTC to commence a civil action in federal court *directly* against a person or entity that violates a rule subject to the subchapter. [*See* Doc. 223 at 174 ("Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a."); at 177-78 ("Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and shall be treated as a violation of a rule promulgated under Section 18, 15 U.S.C. § 57a."); at 181-82 (noting the Court's power to grant relief and seeking relief, including equitable  monetary relief, under Section 19 of the FTC Act for violations of the TSR and ROSCA)].

Patricia Robinson, on behalf of the Estate of Jeremy L. Robinson, further argues that the Estate is entitled to summary judgment as to the FTC's claims for

equitable monetary relief because the FTC failed to timely disclose the amount it seeks for the alleged violations or the basis for calculating the amount. [See Doc. 387-1 at 9-10].   However, the FTC's Third Amended Initial Disclosures and amended response to Interrogatory No. 85 from Defendants' Joint 30(b)(6) Interrogatories provide the specific calculation of the exact amount of equitable monetary relief sought by the FTC after conforming its request to the ruling in AMG Cap. Mgmt. [Doc. 374-3 at 15-19; Doc. 374-4]. The FTC simply amended its disclosure and interrogatory response to remove the amount its was requesting under §53(b), and the ruling in AMG provided a sufficient basis to justify the amendments at this stage of the litigation.   Therefore, the Estate is not entitled to summary judgment on this basis.

For the foregoing reasons, the FTC's motions for summary judgment against the individual Hornbeam Defendants [Docs. 376, 377, 378, 379] are DENIED and Patricia Robinson's cross-motion for summary judgment on behalf of the Estate of Jeremy L. Robinson [Doc. 387] is DENIED.

## C.      Claims against the Estate of Chet Andrews

During the relevant time period, iStream processed Remotely Created Checks (RCCs) that were used to debit the loan-seeking consumers' accounts during the operation of the EDP and Hornbeam Defendants' discount club scheme. [Doc. 381-

2 at 10 ¶37, at 30 ¶151]. Chet Andrews served as a Senior Vice President at iStream from late 2009 through January 2015 [Doc. 386-4 at 6 (Transcript pp. 15:25-19:1)].

To establish Andrews' liability, the FTC does not have to show he had authority to control all of iStream or that he had ultimate decision-making authority. Instead, the FTC may show the necessary authority to control by establishing Andrews' authority to control the specific acts and practices at issue in this case. *See* FTC v. Gem Merch. Corp., 87 F.3d 466, 470 (11th Cir. 1996) (for individual liability, the "FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them"). Direct participation does not require showing "day-to-day involvement" in the violative scheme. FTC v. Pointbreak Media, LLC, 376 F. Supp. 3d 1257, 1271 (S.D. Fla. 2019). Instead, direct participation may be shown if the defendant "actively participated in certain acts crucial to the success of" the scheme. FTC v. J.K. Publications, Inc., 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000).

Here, there is evidence to show that Andrews was primarily responsible for managing iStream's relationship with the EDP Defendants and was the primary contact between iStream and the Hornbeam Defendants. [Doc. 383-8 at 480, 495, 501; Doc. 386-10 at 18 (Transcript p. 68:14-20; Doc. 386-4 at 73 (Transcript p. 189:11-13)]. In that capacity, Andrews handled, or was involved in, most of communications between iStream and EDP (and later Hornbeam), including in-

16

person meetings. [Doc. 383-8 at 499-502; Doc. 386-4 at 100 (Transcript p. 299:15-19) (confirming he often reminded the people at EDebitPay or Gyroscope that they should copy him on their communications so that he would be "in the loop on everything"); Doc. 386-11 at 46 (Transcript p. 179:10-24); Doc. 386-5 at 30 (Transcript p. 114:19-25); *see also* Doc. 386-17 at 5 (Transcript p. 15:11-16)].

In addition, Andrews was primarily responsible for managing iStream's relationship with its processing bank and served as the primary contact person at iStream for communications with the bank regarding transactions generated from EDP and Hornbeam. [Doc. 383-3 at 347 ¶ 3; Doc. 386-31 at 95 (Transcript pp. 262:18-263:2].

Andrews was working with the EDP Defendants and processing payments for them in 2007 when the FTC obtained a temporary restraining order against EDebitPay and froze its bank accounts. [Doc. 386-4 at 5, 32-33 (Transcript pp. 13-14, 123-125)]. He was also aware of the FTC's 2008 Stipulated Final Judgment and the contempt order against EDP. [Id.]

Andrews monitored return rates and was aware that the discount club return rates were significantly higher than what would be considered normal in the payments industry. [Doc. 382-2 at 429; Doc.382-3 at 113-14, 127; Doc. 386-4 at 7-8 (Transcript pp. 24:12-25:10)]. He knew the rates were too high to use any other payment system, like debit and credit or ACH. [Doc. 386-4 at 44, 133-34 (Transcript

pp. 170:2-6, 431:19-432:2].  Andrews knew of the numerous complaints relating to the discount club, including collection letters, [Doc. 386-4 at 86 (Transcript pp. 241-243)], online complaints, [Doc. 386-4 at 21 (Transcript pp. 78-79)], and complaints from consumers' banks, [Doc. 382 (*see* PX 14; PX 28; PX 29; PX 32; PX 33; PX 269; PX 276)]. Although Andrews was aware of the high rate of returns and consumer complaints regarding the Defendants' discount club, Andrews never asked the Defendants for any proof of consumer authorizations, nor did he sample authorizations for the discount club transactions. [Doc. 386-4 at 127 (Transcript p. 406:13-21)].

There is also evidence to show that Andrews advised the EDP and Hornbeam Defendants on how to make their business look better to banks and regulators and provided guidance on preparing information ("Compliance Updates") that would "create a defensible position" if they were scrutinized. [Doc. 386-4 at 31, 95, 104, 135 (Transcript pp. 118:18-119:4, 278:18-25, 315:13-17, 436:10-15]. Additionally, there is evidence to show that Andrews advised EDP personnel on how to respond to any inquiries regarding EDP's high return rates. [Doc. 382 (*see* PX 56; PX 84); Doc. 384 (*see* PX 1129; PX 1138)]. When consumers' banks complained the return rates, Andrews warned EDP or Hornbeam to stop using identified routing numbers in order to protect the business. [Doc. 382 (see PX 14; PX 28; PX 29; PX 32; PX 276); Doc. 384 (*see* PX 1177; PX 1178)].

There is evidence to show that the discount club's high return rates were a significant concern to iStream's processing bank. [Doc. 381-2 at 37 ¶187].  Andrews took the lead in responding to complaints about the discount club, reassuring iStream's processing bank that the concerns were being addressed and drafting responses on behalf of the processing bank touting the Defendants' compliance efforts that, arguably, did not exist. [Doc. 382 (*see* PX 28; PX 35; PX 270-72); Doc. 383 (*see* PX 822; PX 994); Doc. 386-31 at 24, 26-29, 42 (Transcript pp. 91:24-92:23, 99-106, 109-111, 161:4-13, 163:1-14); Doc. 386-25 at 51 (Transcript p. 197:3-9); Doc. 386-4 at 29 (Transcript p. 112:12-15); Doc. 386-11 at 39 (Transcript pp. 149:24-150:23)].

There is evidence to show that Andrews not only counted on the discount club return rates to increase profits, [Doc. 382 (*see* PX 27; PX 45; PX 419); Doc. 383 (*see* PX 738; PX 742-43); Doc. 386-4 at 8-81 (Transcript pp. 219:23-220:24)], but also encouraged Hornbeam to mask the high return rates with questionable "Loyalty Leads" transactions. Andrews knew that Hornbeam was sending the Loyalty Leads transactions to itself for the express purpose of benefitting the company-wide return rate. [Doc. 382 (*see* PX 44; PX 70; PX 124; PX 375); Doc. 386-4 at 120, 122 (Transcript pp. 376:19-24, 378:5-22, 387:6-22)]. There is evidence to suggest that Andrews assisted in the plan [Doc. 385-7 at 137] and later referenced the artificially-reduced return rates as evidence that Hornbeam was making improvements to the

discount club business. [*Compare* Doc. 382-2 at 285 (Return rate cited in December 10, 2014 Compliance Update is 51.8% without Loyalty Leads and 33.0% with Loyalty Leads) *with* Doc. 384-4 at 6 (emailing the processing bank and commending Hornbeam's "impressive progress" in reducing its return rate to 32.9% for November, without mentioning Loyalty Leads)].  Further, there is evidence to show that Andrews encouraged Hornbeam to increase the volume of discount club transactions it was processing in reliance on the ability of Loyalty Leads to lower the return rates artificially. [Doc. 382 (see PX 68; PX 70; PX 137)].

After leaving iStream in early 2015, Andrews continued to assist Hornbeam with its alleged discount club scheme. [Doc. 381-2 at 216 ¶¶1080-83].  Among other things, Andrews continued to manage Hornbeam's relationship with the processing bank [id. at 218 ¶1090], helped to look for a new processing bank [id. at 218-19 ¶¶1091-93], and provided guidance on how to prolong the alleged discount club scheme [id. at 220 ¶1098].  He also dissuaded Hornbeam from adding an e-signature requirement to the Discount Club transactions, recognizing that it was unlikely the target consumers would complete the necessary additional steps. [Id. at 221-22 ¶¶1103-04].

The Court finds that the above evidence, notwithstanding the other evidence in the record not specifically referenced herein, is sufficient to authorize the trier of fact to conclude that Andrews knowingly and actively participated in acts that were

crucial to the success of the EPD and Hornbeam Defendants' alleged discount club scheme. However, as discussed in Section III A and B of this Order, there is still a genuine issue of material fact as to whether the EDP and Hornbeam Defendants' loan application process, discount club webpages, and telemarketing practices were deceptive. Therefore, the FTC is not entitled to judgment as a matter of law as to its claims against the Estate of Chet Andrews.

The Court finds that the Estate of Chet Andrews is not entitled to summary judgment either. Guadalupe L. Andrews, on behalf of the Estate of Chet Andrews, filed a cross-motion for summary judgment, arguing that: (i) monetary relief is not a remedy for the FTC in actions brought under 11 U.S.C. § 53(b); and (ii) the FTC failed to timely identify any monetary relief that it is seeking pursuant to its claims under 11 U.S.C. § 57b. [*See* Doc. 390]. For the reasons discussed in Section III B of this Order, Ms. Andrews' arguments are without merit.

Based on the foregoing findings, the FTC's motion for summary judgment against the Estate of Chet L. Andrews [Doc. 381] is DENIED and Guadalupe L. Andrews' cross-motion for summary judgment on behalf of the Estate of Chet Andrews [Doc. 390] is DENIED.

## IV.   CONCLUSION

For the above reasons, **IT IS HEREBY ORDERED** as follows:

- The FTC's Motion for Summary Judgment and Entry of Permanent Injunction against Defendants EDebitPay LLC, Dale Paul Cleveland, and William R. Wilson [Doc. 375] is **DENIED**.

- The FTC's Motion for Summary Judgment, Entry of Permanent Injunction, and Award of Equitable Monetary Relief against Defendant Earl G. Robinson [Doc. 376] is **DENIED**.

- The FTC's Motion for Summary Judgment, Entry of Permanent Injunction, and Award of Equitable Monetary Relief against Defendant James McCarter [Doc. 377] is **DENIED**.

- The FTC's Motion for Summary Judgment and Award of Equitable Monetary Relief against the Estate of Jeremy L. Robinson [Doc. 378] is **DENIED**.

- The FTC's Motion for Summary Judgment, Entry of Permanent Injunction, and Award of Equitable Monetary Relief against Defendant Mark Ward [Doc. 379] is **DENIED**.

- The FTC's Motion for Summary Judgment and Award of Equitable Monetary Relief against the Estate of Chet L. Andrews [Doc. 381] is **DENIED**.

- Defendant Patricia Robinson as Executor of the Estate of Jeremy L. Robinson's Motion for Summary Judgment [Doc. 387] is **DENIED**.

- ▪ The EDP Defendants' Motion for Summary Judgment [Doc. 388] is **GRANTED** as to the FTC's claims against EDebitPay, LLC and **DENIED** as to the FTC's claims against Defendants William Wilson and Paul Cleveland.

- ▪ Defendant Guadalupe L. Andrews as Personal Representative of the Estate of Chet Andrews' Motion for Summary Judgment [Doc. 390] is **DENIED**.

IT IS SO ORDERED, this 28th day of March, 2022.

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE