## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | CASE NO. 1:17-cv-03094-WMR |
| v. | |
| HORNBEAM SPECIAL SITUATIONS LLC, *et al.*, | |
| Defendants. | |

## <u>Order</u>

The Federal Trade Commission ("FTC") filed this action alleging violations of Section 5(a) of the FTC Act, 15 U.S.C. §§ 53(b), 57(b); the Restore Online Shoppers Confidence Act ("ROSCA"), 15 U.S.C. § 8401 *et seq.*; and the Telemarketing Sales Rule ("TSR"), 15 U.S.C. §§ 6101–6108. [Doc. 223].[1] At a bench trial occurring from January 9 to February 2, 2024, the Court held the EDP Entities[2] ("EDP") and Hornbeam Entities[3] ("Hornbeam") (collectively, the "Companies") in default. Following this default and because several defendants were dismissed prior to trial, liability for only four Defendants remained to be

---

[1] The Court notes that the final record and transcript are unavailable to it as of this filing. Thus, it has relied on its notes and the parties' citations to the record.

[2] These include EDebitPay, LLC; Platinum Online Group, LLC d/b/a Premier Membership Clubs; and clickXchange Media.

[3] These include Hornbeam Special Situations, LLC; Cardinal Points Holdings, LLC; Cardinal Points Management, LLC d/b/a Clear Compass Digital Croup; and Gyroscope Management Holdings, LLC.

determined: Paul Cleveland, William Wilson, James McCarter, and Earl Robinson. The Court concludes that the FTC failed to establish its case by a preponderance of the evidence and finds in favor of the remaining Defendants.

## I.    Factual Findings

### A. The Discount Clubs

This lawsuit arises from EDP and Hornbeam's marketing and selling of Discount Club memberships. The names and ownerships of the various Discount Clubs changed over time,[4] but the process remained essentially the same during the tenure of both EDP and Hornbeam. Consumers of the Discount Clubs paid an initial fee and then incurred a monthly charge[5] to access online coupons for restaurants, travel, and retail businesses.[6]

The Discount Clubs were marketed in one of two ways: online landing pages or telemarketing. The Discount Clubs' landing pages varied slightly, but the process remained the same. Consumers were redirected to a Discount Clubs' landing page after being denied cash loan applications from other websites. [*See, e.g.*, Pl. Exs. 164

---

[4] EDP marketed and sold the Discount Clubs from July 2010 to September 2013 through various names, including Saving Pays and Money Plus Saver. [Pl. Ex. 1873]. Hornbeam operated the Discount Clubs from September 2013 to June 2016 through various names, including Money Plus Saver, Saving Makes Money, and Total Savings Now. [Pl. Ex. 43, 188, 609]. Although the names changed, the product sold remained the same. However, because there were multiple names used by the Companies, this Order will generally refer to the Discount Clubs in the plural.

[5] The fees varied. For example, the initial enrollment fees varied from $49.95 to $99.95, and the recurring payments varied from $14.00 to $19.95 per month.

[6] The coupons were provided via another website, owned and controlled by Access VG, LLC.

at 1; 307; 310 at 1; 313 at 2; 321 at 2; 710 at 17; 1246 at 1]. When the consumers arrived at the landing page, they saw "$1,000 Cash Advance" at the top of the website in large font next to a picture of a stack of money. [Pl. Exs. 88; 111; 761]. Then, "No Credit Required. No Faxing – 100% Online. Easy, Safe & Secure" was written next to the image of money. Below this text, on the left side of the page, a reference to the Discount Club described that consumers can "SAVE up to 50% OFF YOUR PURCHASES" with "Instant Access to Valuable Benefits Shopping Savings & Coupon Offers!" listing "Grocery Coupons. Dining Discounts. Hotel Discounts. Movie Discounts. Shopping Discounts. Live Support Chat." [*See*, *e.g.*, Pl. Ex. 111]. On some, but not all, of the landing pages, the prospective buyer could hover over part of the offer to preview some of the available coupons.

In the middle of the page, consumers were prompted to provide personal and banking information. The information required varied, but typically included name, address, contact information, bank account information, date of birth, and Social Security Number. [*Id.*]. Below this information, there was a box titled "Separate & Optional Offer" stating, "Upon completion of your [Discount Club] Application, you will be offered a separate loan on the Thank You Confirmation page." [*Id.*].

Under that, there was a box stating the following:

By Checking the Box, You Understand & Authorize:

[The Discount Club] will electronically debit your checking account for our one-time [$99.49/$89.00/$87.00] Application and Processing fee.

> [The Discount Club] will debit your bank account for your [$14.00/$19.95] monthly membership fee. Please make sure you have sufficient funds in your bank account. You may be charged an overdraft/NSF fee by your Bank. When you complete the application, and upon approval, you will be entitled to receive your [Discount Club] Benefits. You certify that you are at least 18 years old and have read and agree to the [Discount Club] Terms & Conditions and Privacy Policy, and membership usage fees.

[*See, e.g.*, Pl. Ex. 111]. To complete the transactions, consumers were required to check this box acknowledging the one-time application and processing fee as well as the monthly membership fee before clicking "SUBMIT."

Importantly, the Companies never provided payday loans to consumers, and submitting the application did not allow the prospective buyer to apply for a loan. [*See*, *e.g.*, Tr. 2520–22]. At best, after submitting the enrollment form, consumers might have been redirected to a page with more loan applications, but not loan offers. [Tr. 3313–14].

For telemarketing sales, the Companies contracted with a third party, Ennovate, to market and sell the Discount Clubs through phone calls. Ennovate, a call center based in India, would use a script provided by EDP or Hornbeam that disclosed the fees associated with the Discount Club and required express authorization for the transaction. [Pl. Ex. 42, 769, 1213]. Ennovate also marketed to consumers seeking payday or short-term loans, and requested personal information, including the consumer's Social Security Number. [Pl. Ex. 667; Tr. 1785]. Neither EDP nor Hornbeam had access to review the full length of the recorded phone calls

4

because Ennovate would also market loan offers from other companies prior to marketing the Discount Clubs on these calls. Instead, the Companies only had access to the call recordings at the point of the call when the Discount Club disclaimer began.

After a consumer opts into the Discount Club, their account would be debited with remotely created checks. The Discount Clubs all had extraordinarily low usage rates and high return rates.[7] For examples of the usage rates, while EDP ran the Discount Club, only 396 coupons or discounts were downloaded or otherwise accessed despite 212,799 consumers being enrolled. [Pl. Ex. 894, 1098, 1723]. And, while Hornbeam operated the Discount Club, there were only 455 coupons or discounts downloaded. [Pl. Ex. 894, 895].

For examples of the return rates, EDP typically saw a return rate for initial fees of over 75% every month and at least 57% for all transactions, including the monthly Discount Club transactions. [Pl. Ex. 933, 1723]. And, Hornbeam's return rate for initial fees was typically over 75% and at least 20% for all transactions, including the monthly Discount Club charges. While Hornbeam's overall return rate may appear lower, it is worth noting that from October 2013 through May 2016, Hornbeam implemented a "Loyalty Leads" program involving intra-company

---

[7] A return rate is the percentage of transactions rejected by consumers' banks divided by the number of attempted transactions.

transactions geared towards lowering the return rate. Before implementing the program, the return rate was 47% per month. [Pl. Ex. 1723].

Consumers complained to EDP and Hornbeam's customer service, Access VG, the consumers' banks, the Companies' processing banks, the Better Business Bureau ("BBB"), the FTC, and the respective State Attorney Generals. Consumers consistently complained that they did not enroll in the Discount Club, that they thought they were applying to a payday loan, and that they did not authorize the account charges. [*See*, *e.g.*, Pl. Exs. 178–180; 1189; 1192; 1224b; 1225b; 1286–1293; 1396; 1437; 1657; 1658; 1721]. For example, the FTC's expert, Dr. Devesh Raval, found that more than 80% of a sampling of customer service calls involved consumers complaining about unauthorized charges and/or demanding cancellations or refunds.

While obtaining refunds was possible, the process was not easy and seemingly was designed that way intentionally. The Companies generally provided refunds to consumers who complained to third parties,[8] but consumers that called the Companies' customer service centers were not as lucky. Customer service

---

[8] The third parties complained to typically included State Attorney Generals, the BBB, and banks reaching out on behalf of their customers. The Companies received hundreds of complaints between the State Attorney Generals and the BBB. For example, EDP received 19 Attorney General complaints in 2010, 51 in 2011, and 79 in 2012, and Hornbeam received 81 complaints in 2012 and 2013, 57 in 2014, and 19 in 2015. [Pl. Ex. 247, 212]. Additionally, several banks reached out to EDP and Hornbeam, citing concerns from unauthorized debits and asking the Companies to investigate and correct the issue. [Pl. Ex. 14, 29, 30, 33, 89, 264, 268, 269, 276, 1177, 1458].

representatives were trained to repeatedly assert that the complaining consumers had authorized the charges and to only provide refunds in accordance with the refund policy. [*See*, *e.g.*, Tr. 1771:10–1772:3, 1796:3–1797:20; Pl. Exs. 185, 190, 192, 193, 194]. According to the refund policy, refunds were only available for the initial enrollment fees, which were only refundable if: (1) the consumer requested a refund within five days of the date of receiving a bank statement showing the enrollment fee being debited from his or her account; (2) the consumer provided a copy of that bank statement to the company; (3) the consumer had not yet "activated" the membership; (4) the consumer completed a "Cancellation & Refund" form requiring personal information; and (5) the information on the "Cancellation & Refund" form matched the information in the Companies' records. [*See*, *e.g.*, Pl. Exs. 185 at 46, 200 at 4, 1213 at 83]. This difficult system proved hard to satisfy. For example, Hornbeam's customer service manager, Velia Murillo, reported that from January 2013 through February 2014, fewer than one-fourth of the requested refunds were granted. [Pl. Ex. 202].

### B. EDP, Wilson, and Cleveland

Although the Discount Clubs did not begin operation until 2010, EDP was founded in 2001. During this time, Wilson and Cleveland were sole owners of EDP, with Wilson serving as President and Cleveland serving as Chief Executive Officer.

i.   *Lawsuits*

Before it transitioned to operating the Discount Club, EDP faced a prior FTC lawsuit related to its practice of selling pre-paid cards to consumers. In 2008, Judge Otis D. Wright, II issued a Stipulated Final Order for Permanent Injunction and Monetary Relief ("Consent Order"), resolving the FTC's allegations that EDP, Cleveland, and Wilson, violated Section 5(a) of the FTC Act by debiting consumer accounts without authorization. [Pl. Ex. 732]; *FTC v. EDebitPay, LLC,* Case No. CV-07-4880 (C.D. Cal. 2008). The Consent Order prohibited Wilson and Cleveland from debiting consumers' bank accounts without first obtaining express informed consent; misrepresenting material facts regarding a consumer's decision to apply for or purchase of any product or service offered by EDP or Defendants Wilson and Cleveland; failing to disclose clearly and conspicuously the details of the financial transaction prior to the time when a consumer applies for or purchases any good or service offered; and failing to investigate and resolve, within thirty days of receipt, any consumer complaint or request for refund pertaining to them. [*Id.* at 5–7].

In 2010, the FTC initiated a contempt proceeding, alleging EDP's marketing and sale of a catalog club product violated the Consent Order by debiting customer accounts without express authorization. [Pl. Ex. 736 at 3]. Judge Wright held EDP, Wilson, and Cleveland in contempt for violating certain portions of the Consent Order, including misrepresenting a material fact regarding a consumer's application

for or purchase any product or service and failing to clearly and conspicuously disclose the material attributes of a product or service. But, Judge Wright rejected the FTC's assertion that EDP, Wilson, and Cleveland charged consumer accounts or submitted payment information without consumers' express informed consent because EDP provided the amounts that would be debited. [*Id.* at 11]. The Ninth Circuit affirmed Judge Wright's decision. *FTC v. EDebitPay LLC,* 695 F.3d 938, 945 (9th Cir. 2012). But, Judge Wright ultimately granted EDP's motion to stay execution and required EDP to make monthly payments. [Pl. Ex. 1227]. EDP made the required payments from September 2011 to July 2013, totaling over $1.4 million. [Pl. Ex. 1875, 1226].

Separately, EDP entered into an Assurance of Voluntary Compliance with both the State of Iowa's Attorney General[9] in 2012 and the State of Oregon's Department of Justice[10] in 2013 to settled alleged violations that the Discount Clubs debited customer accounts without authorization. [Pl. Exs. 291, 874]. And, in 2011, EDP settled a class action alleging unauthorized charges for the Discount Clubs. [Pl. Ex. 1216, Wilson Ex. 14].

---

[9] The agreement required EDP to pay restitution to Iowa consumers and $5,000 to the consumer fraud enforcement fund. Following this agreement, EDP ceased marketing the Discount Clubs to Iowa residents.

[10] The agreement required EDP to cease permanently doing business in Oregon, pay restitution to all Oregon consumers who were members of the Discount Clubs, and pay $50,000 to the Oregon Consumer Protection & Education Account.

ii.    *Sale of EDP*

On September 30, 2013, the sale of EDP to Hornbeam was finalized. [Pl. Ex. 1194]. A cash down payment was made at closing, followed by two promissory notes: a Joint Owner Seller Note to Wilson and Cleveland, totaling $1.26 million, and a Seller Note payable to Cleveland, totaling $240,000. [Pl. Ex. 1354]. The Joint Owner Seller Note was paid in October 2013, and the Seller Note was paid in monthly installments until fully paid in October 2015. [Tr. 2462]. The purchase agreement included a Transition Services Agreement, providing Wilson and Cleveland with observation rights. [Pl. Ex. 1354]. But, no transition services were actually provided. In fact, Wilson and Cleveland had no further involvement with managing, overseeing, or decision making for Hornbeam after the sale was finalized.

iii.    *Wilson and Cleveland's Work Since EDP*

Following their involvement in EDP, Wilson and Cleveland were involved in other businesses. Wilson is a part owner and operator of an internet marketing company called AdMediary and a part owner of North America Autocare, a third-party administrator of auto warranty policies. Cleveland is now 79 years old and retired. Before he retired, he invested in a business, Sol Sol, that manufactured and marketed hats with solar panels to charge phones. This business was unsuccessful.

## C. The Hornbeam Entities

### i.     Hornbeam's Inception

Defendants McCarter and Earl Robinson became involved with Hornbeam through another investor, Jerry Robinson.[11] Jerry described EDP to McCarter and Earl as being involved in payday lending. Earl and Jerry were aware of the high return rates prior to finalizing the sale, but Jerry intimated plans to expand the Discount Clubs' business. [Pl. Exs. 62, 87, 590, 592; Tr. 2717:8–2724:12]. For example, Jerry told McCarter that he planned to expand the Discount Club offerings and allowed Earl to believe that the Discount Clubs could ultimately be marketed to businesses rather than to consumers. Both McCarter and Earl were also aware of EDP's litigation history before investing, but Jerry assured them that the FTC enforcement actions were resolved and that Hornbeam would have a clean slate with the FTC. [*See*, *e.g.*, Pl. Ex. 590; Tr. 2717–24].

Ultimately McCarter and Jerry each invested $380,714.29, with Jerry obtaining a 36% interest and McCarter obtaining a 23.77% interest in Hornbeam. Earl did not invest funds, but obtained a 20% interest in Hornbeam. The remaining

---

[11] Jerry was a Defendant in this case. However, following his death, the FTC dismissed all claims against his estate, and this Court adopted a stipulated order resolving those claims in June 2022. [Doc. 459]. For clarity, Earl and Jerry are not related.

interest was held by Ananke Capital Partners, LLC and another investor, Ed Greco,[12] who provided a $263,561.42 investment. [Pl. Ex. 515].

The remaining capital for the purchase of EDP was provided via a $2.75 million loan from Jefferson Capital Partners II, LP ("Jefferson Capital"). [Pl. Ex. 1850]. In exchange for the loan, Jefferson Capital obtained extensive rights from and to the Hornbeam Entities, including:

- A secured interest in all of their personal property;

- A pledge of "all outstanding membership units" and "an irrevocable proxy to vote" those interests "and to exercise all other rights, powers, privileges and remedies" available to the members, with such proxy being "effective automatically upon any payment-related Event of Default," with that right terminating only "upon the termination of" the loan;

- A requirement that the borrowers "continue to engage in a business of the same general type and manner as conducted by" the Hornbeam Entities as of the date of the loan; and

- A prohibition against changing their "present business activity from the activities in which" they were engaged at the closing of the loan.

---

[12] Ed Greco was never a defendant in this action.

ii.   *Hornbeam's Operations*

Following the sale, very little changed regarding the business, including the personnel and its location in California. [*See*, *e.g.*, Tr. 91:1–16, 99:6–11, 108:18–109:25, 109:23–25, 110:8–10, 1106:12–1108:17, 350; Pl. Exs. 606, 686]. Hornbeam continued to operate the Discount Club, which provided the primary source of revenue for Hornbeam. [Pl. Exs. 491, 1246 at 1; Tr. 1084:2–9, 3680:18–3681:20].

The Operating Agreement provided that Hornbeam would be member managed, but it was widely understood that Jerry was acting as Chairman of Hornbeam and any meaningful change could only be made with his consent. [*See*, *e.g.*, Tr. 3545:15–3546:1; 3900:10–16]. The Operating Agreement also designated that a Management Committee would have "discretion over any and all decision of the Company not otherwise delegated to the province of" the Members of Hornbeam. [Pl. Ex. 515 at 31]. This Committee consisted of "any Member who beneficially owns greater than 15% of the Membership Interests," as well as the President of the company. [*Id.*]. But, it specifically provided that Earl and Jerry would be members of the Committee so long as they possessed greater than 10% interest. [*Id.*].

Jefferson Capital, through its managing director, Lester Alexander, played an active role in Hornbeam's management. Alexander attended every member meeting and regularly met with the President of Hornbeam. Throughout virtually all of

Hornbeam's operation, it was in default on its loan with Jefferson Capital. Due to the default, Jefferson Capital had the right to take total control of each member's voting rights and take complete operational control of Hornbeam. And, while Jefferson Capital did not exercise this right, Jefferson Capital still had tremendous influence on Hornbeam's operations.

For example, following Jefferson Capital's suggestion, Jerry and Earl agreed to terminate their owners' payments in 2015. [Pl. Ex. 1301]. Thereafter, Hornbeam entered into an amendment to its Limited Liability Company Agreement (the "First Agreement") in September 2015, which reconstituted Hornbeam's Board of Managers to include three managers selected by Jefferson Capital and two managers selected by Hornbeam. [Pl. Ex. 1857; Tr. 3788:3–3789:15]. Although it does not appear that Jefferson Capital actually specified members, this agreement remained until February 2016, when Jefferson Capital became aware of the FTC investigation.

Due to the high return rates, Hornbeam struggled to find and maintain banks willing to process payments. WestSide Bank was the processing bank for the majority of the time for both EDP and Hornbeam. But, WestSide continuously showed that its discomfort with the high return rates. In fact, it had EDP place $500,000 in a reserve account to protect WestSide in case of potential court action and/or any type of regulatory review. [Pl. Ex. 34]. And, after working with Hornbeam for over a year, WestSide had Hornbeam add an additional $150,000 to

this account. [Pl. Ex. 166]. But, even with the reserve accounts, WestSide eventually terminated its involvement with Hornbeam. Hornbeam struggled to find another bank to process its payments. For a short time in 2016, Hornbeam used the Bank of Montreal Harris as a processing bank, but that bank terminated this relationship two months later due to the high return rates and complaints. [Pl. Exs. 571, 572, 539; Tr. 3826:23–3827:3]. After terminating this relationship and failing to find another processing bank, Hornbeam closed its doors in mid-2016.

## II.     Discussion

The Court finds that the operation of the Discount Clubs violated the FTC Act, ROSCA, and the TSR. However, the Court also concludes that the FTC failed to establish individual liability for Wilson, Cleveland, McCarter, and Earl.

### A. The Discount Clubs' Violations of the FTC Act, ROSCA, and TSR

#### i.     The FTC Act

Section 5(a) of the FTC Act authorizes the FTC to protect consumers by preventing persons, partnerships, or corporations from using "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1); *see also LabMD, Inc. v. FTC*, 894 F.3d 1221, 1227 (11th Cir. 2018). The Court concludes that the Discount Clubs were both unfair and deceptive.

### a. Unfair Acts or Practices

To establish that a practice was unfair under Section 5, the FTC must show that the company "cause[d] substantial injury to consumers which [wa]s not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). *See also LabMD, Inc.*, 894 F.3d at 1226 n.10. In doing so, the Court may consider established public policies. 15 U.S.C. § 45(n).

The first part of this analysis is easily met; substantial injury to consumers occurred. Millions of dollars were debited from consumer accounts with around 70–80% of the transactions being disputed. *Cf. Am. Fin. Servs. Assoc. v. FTC*, 767 F.2d 957, 972 (D.C. Cir. 1985) ("An injury may be sufficiently substantial, however, if it does a small harm to a large number of people, or if it raises a significant risk of concrete harm"); *FTC v. Glob. Mktg. Grp., Inc.*, 594 F. Supp. 2d. 1281, 1288–89 (M.D. Fla. 2008). The second part of the analysis—whether the injuries were reasonably avoidable—is a closer call. On first glance, the website may seem adequately to inform consumers of the material terms of the Discount Club: consumers had to affirmatively check a box authorizing the Discount Club to debit their checking account with a one-time application fee and monthly membership fees. [*See, e.g.*, Pl. Exs. 89, 111].

16

But, focusing only on that one feature ignores the overall impression that the landing page would have on the consumer. The target audience was desperate and undereducated individuals seeking payday loans. After being denied payday loans on other websites, the consumer is brought to a Discount Club's landing page. The first thing they see is "$1,000 Cash Advance" in large font, with a picture of a stack of money and "No Credit Required" written next to it. The consumer then adds personal information typically required in loan applications, including their bank account information and Social Security Number—information that would not be expected in an application for a monthly coupon club.

Given all of the indications that the consumer is applying for yet another payday loan when they arrive at the landing page, it is not outlandish that the consumer would fail to consider that the thing they were actually applying for was described in a box on the side of the landing page. And, although authorization was required, consumers may have thought that the application fee and membership was a necessary part of the payday loan process or simply failed to review what appeared to be a terms and conditions section. The only way to avoid the membership was to forgo the loan application all together. And, when considering that even if the consumer reads the authorization section, they would likely agree to the $99 fee in order to obtain the expected cash advance of $1,000.

However, the application was never for a payday loan. Instead, the Companies were charging fees to consumers for a product that most customers did not understand and did not want. This is particularly clear given the extraordinarily high return rates and low usage rates. The Court has a hard time imagining that between 70 and 80% of the consumers consistently intended to apply solely for a coupon program they did not use before demanding a refund. Instead, it is clear that the Discount Clubs prayed on the consumers' confusion. [*See, e.g.*, Tr. 399 (Keith Merrill, the President of Hornbeam, describing the Discount Clubs as "predatory"), 568:8–569:3, 577:7–578:18, 2832:11–2833:25]. In fact, Hornbeam tested marketing the Discount Clubs without the payday loan offer on the webpage and realized that it was not successful. [Pl. Ex. 326; *see also* Pl. Ex. 688 (email from an employee responsible for marketing, Michael Wilson, referring to this marketing attempt and commenting that its "not sexy for payday consumers if they know it's something they have to pay for")].

Once their accounts were debited, consumers faced a nearly impossible refund policy and were left with no recourse unless they complained to a third party like the BBB or their bank. So, while there was a way for consumers to avoid the injury by simply not applying for what appeared to be a payday loan application, the Court finds that it was not reasonable and that the second prong of the analysis is met.

18

For the third prong of the analysis, the Court cannot determine any benefit of the misleading nature of the website to consumers. In fact, as evidenced by the low usage rates, consumers rarely received any benefit at all from the Discount Clubs. Therefore, the third prong of the analysis is easily satisfied.

Importantly, in considering the relevant public policies, the Court notes that the Companies were essentially debiting the consumers' accounts without obtaining their consent because the website was so misleading. And, debiting consumer accounts without their express authorization is against public policy. *See, e.g.*, *FTC v. Willms*, No. C11-828, 2011 U.S. Dist. LEXIS 103160, *25 (W.D. Wash. Sept. 12, 2011). Accordingly, the Court finds that the Discount Clubs constituted an unfair practice under Section 5.

### b.  Deceptive Acts or Practices

The Discount Clubs' practices were deceptive for the same reasons that they were unfair. To prove that an act was deceptive under Section 5(a), the FTC must demonstrate that: "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances[;] and (3) the representation was material." *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1079 (11th Cir. 2021) [hereinafter "On Point"]. *See also FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). These elements are easily met.

To further paint the picture, after viewing a string of payday loan application websites, consumers arrived at the landing page and were greeted with "$1,000 Cash Advance" and a picture of a big stack of money. The consumers then provided personal information typically required for loan applications and were informed that they would be "offered a separate loan on the Thank You Confirmation page" after completing the application. The consumer had no choice but to agree to the authorized Discount Club payments to submit what they thought was a payday loan with a $1,000 cash advance. *Cf. FTC v. Johnson*, 96 F. Supp. 3d 1110, 1143–45 (D.C. Nev. 2015) (concluding that website was misleading in part because the website did not provide an opportunity to complete the survey without opting into the membership fees). Then, after not receiving a loan offer and experiencing unexpected charges, 70–80% of consumers demanded refunds and were met with a nearly impossible refund policy. *See FTC v. Ideal Fin. Sols., Inc.*, No. 2:13-cv-00143, 2015 U.S. Dist. LEXIS 86348, *30 (D.C. Nev. June 29, 2015) ("A deceptive practice may be inferred from the presence of high cancellation, refund, and chargeback rates." (internal quotation marks omitted)).

With this picture in mind, the Court finds that the first prong is met: the Discount Clubs effectively represented to consumers that they were applying for a payday loan. But, the application was never for a payday loan. Instead, consumer could only enroll in a Discount Club. Yet, the references to the Discount Clubs on

the landing page were at best secondary to the references to a payday loan. Given the substantial indications that a consumer was applying for a payday loan, this representation was likely to mislead consumers into thinking that they had to check the box to enroll in a Discount Club to obtain a payday loan. Therefore, the second prong is met. And, given that the consumers were only brought to the landing page because they had shown interest in obtaining a payday loan, the representation was material, and the third prong is met. Accordingly, the practice was deceptive.

*c.  ROSCA*

Section 4 of ROSCA prohibits charging consumers for "goods or services sold in transactions effected on the Internet through a negative option feature"[13] unless the seller (1) "clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information"; (2) obtains the "consumer's express informed consent" before making the charge; and (3) "provides simple mechanisms for a consumer to stop recurring charges . . . ." See 15 U.S.C. § 8403. A violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a. 15 U.S.C. § 8404. As already discussed, due to the misleading nature of the landing page, the Discount Clubs failed to obtain the

---

[13] A "negative option feature" is defined as "an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. 310.2(w).

consumers' express informed consent. Accordingly, the Discount Clubs violated ROSCA.

### d. TSR

The FTC alleges that EDP and Hornbeam violated the TSR by charging payment in a telemarketing transaction without the consumers' express verifiable authorization, 16 C.F.R. § 310.3(a)(3), or express consent, 16 C.F.R. § 310.4(a)(7). A violation of the TSR is treated as an unfair or deceptive act or practice in violation of the FTC Act. 15 U.S.C. § 6102(c); 15 U.S.C. § 57a(d)(3); 15 U.S.C. § 45(a); *FTC v. Simple Health Plans LLC*, 58 F.4th 1322, 1329 (11th Cir. 2023).

Like the landing page, EDP and Hornbeam's telemarketing was misleading. The Companies contracted with a call center in India, Ennovate. This call center would begin the calls by making payday offers from other companies. Once those offers were finished, Ennovate would turn to the Discount Club. It is only after the transition to discussing the Discount Club that the Companies had access to the recordings. The Companies themselves indicated that there was something off about the Ennovate calls and noted that it was suspicious that the consumers readily agreed to the terms of the Discount Club. This suspicion is compounded by the extraordinarily high return rates that the telemarking calls had, as well as the fact that several of the sample complaints heard showed that the consumers thought the Discount Club was connected with a payday offer. The Court finds that given the

ambiguity of how the terms were presented to the consumers and the high return rates, Ennovate failed to obtain express authorization or consent before the Discount Club charged the customer accounts.

## B. Individual Liability

The Court's determination that the Discount Clubs violated the FTC Act, ROSCA, and TSR does not end the analysis. Instead, the operative question is whether the remaining Defendants can be held individually liable for the Companies' practices. Individuals are liable for a corporate entity's violations of the FTC Act if they (1) had some knowledge of the practices and (2) participated directly in the practices or had the authority to control them. *See On Point*, 17 F.4th at 1083; *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996). The FTC's claims fail as to all four Defendants left in this case.

### i. Wilson and Cleveland

As an initial matter, the Court notes that the FTC can only pursue injunctive relief against Wilson and Cleveland. 15 U.S.C. § 57b(d) provides for a three-year statute of limitations for bringing an action based on rule violations respecting unfair or deceptive acts or practices, and no evidence was presented that Wilson and Cleveland actually participated in any Discount Club scheme within three years of

the initial Complaint being filed.[14] Under 15 U.S.C. § 53(b), the FTC is authorized to obtain an injunction "[w]henever the [FTC] has reason to believe . . . that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the [FTC]." *See also* 15 U.S.C. § 57b ("The court in an action under subsection (a) shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnership, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be."). "The ultimate test for an injunction is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *United States CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1328 (11th Cir. 2018). *See also FTC v. USA Fin., LLC*, 415 F. Appx. 970, 975 (11th Cir. 2011) ("[P]ermanent injunctive relief is appropriate if the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future."). The FTC has failed to show that there is a reasonable likelihood of further violations for either Wilson or Cleveland.

The Court will first dispose of two of the FTC's broader arguments in this respect. First, the FTC argues that because there are no tangible barriers to Wilson

---

[14] This Court already determined that EDP was entitled to judgment as a matter of law on the FTC's claims due to the three-year statute of limitations and the fact that EDP has ceased operations. [Doc. 428 at 9]. The Court reserved judgment on whether Wilson and Cleveland "are violating or are about to violate, provisions of the law enforced by the FTC." [*Id.* at 9–10].

and Cleveland reentering the market and committing similar violations, the Court should order injunctive relief. But, the law is not whether there is a possibility, or even whether there is a remote possibility, of future violations. Instead, it is whether there is a *reasonable likelihood* of future violations. And, a mere lack of barriers to entry will not suffice. This is particularly true considering that, if the Court were to adopt this standard, the FTC could obtain broad injunctions against almost any defendant, regardless of their current conduct.

Second, the FTC argues that the large scale of EDP violations and lack of remorse shown by Cleveland and Wilson lead to a finding that future violations are likely. But, the Court cannot ignore that Wilson and Cleveland have had no relation to the Discount Clubs for over a decade.[15] The Court cannot in good conscience conclude that there is a reasonable likelihood of future violations when such a large amount of time has passed with no violations. *See, e.g.*, *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 159–60 (3d Cir. 2019) (concluding that the FTC failed properly to allege that the defendant "is violating or is about to violate the law" where "the FTC waited until five years after [the defendant] stopped its allegedly illegal conduct before seeking an injunction").

Moving on to Wilson and Cleveland's actual conduct since the sale of EDP,

---

[15] The FTC looks to Hornbeam's continued payments to Cleveland in relation to the sale of EDP as evidence of his further involvement. But, completion of the sale terms, without more, is not enough to establish that Cleveland was still involved with the Companies.

the FTC's evidence comes up short. To establish Wilson's likelihood of future violations, the FTC points to his current involvement in AdMediary and North America Autocare. Admediary generates consumer leads online, including leads for consumers seeking payday loans, and North America Autocare is a third-party administrator of auto warranty policies. The FTC argues that because AdMediary is also within the payday lending business, there is a likelihood of future violations. But, the Court has seen no evidence tending to show that AdMediary is currently engaging in unfair or deceptive practices similar to the Discount Clubs. Alternatively, the FTC alleges that there is a likelihood of future violations related to North America Autocare because there are instances of consumer fraud in the auto warranty loans business. But, the Court will not issue a permanent injunction based on such speculation without any indication that the company is actually deceiving customers in a similar fashion as the Discount Clubs did, or deceiving customers at all.

As to Cleveland, the FTC cannot point to any current activities to establish Cleveland's likelihood of future violations. Cleveland is 79 years old and retired, and he testified that he has no plans to end his retirement. The FTC presented evidence that Cleveland was involved in a failed business, Sol Sol, and that his former business partner is involved in the medical marijuana business. But, it has provided no evidence that there was any wrongdoing while Cleveland was at Sol

Sol, that Cleveland has any involvement with his former partner's current business, or that his former partner's business is actually violating the law.

Accordingly, the FTC has failed to establish a reasonable likelihood of future violations by either Wilson or Cleveland. Instead, if the FTC wanted to hold Wilson and Cleveland accountable for the actions of EDP, it should have brought this action within the statute of limitations. It did not.

### ii.   McCarter

To establish individual liability, the FTC must show that McCarter "had some knowledge of" the Discount Club practices and participated directly in the practices or had the authority to control them. *See On Point*, 17 F.4th at 1083. First, McCarter certainly meets the required showing of having "some knowledge" of the Discount Club's practices. This threshold is met by showing that the individual defendant (1) had "actual knowledge," (2) was "recklessly indifferent," or (3) had an "awareness of a high probability" of the unlawful practices, but "intentionally avoided knowing the truth." *FTC v. Primary Grp., Inc.*, 713 F. Appx. 805, 807 (11th Cir. 2017) (quoting *FTC v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014)).

McCarter testified that he never actually saw a Discount Club landing page. But, he was certainly aware of the prior FTC litigation, high return rates, low usage rates, and complaints alleging fraud. [Tr. 363, 2760; Pl. Exs. 62, 87, 530, 610]. *Cf. On Point*, 17 F.4th at 1083–84 ("Even assuming [the defendant] never once visited

an *On Point* website, his presentation slides show that [the defendant] knew *On Point* was capturing a great deal of personal information (which *On Point* sold for over seventeen million dollars) despite supposedly offering only guides drawn from publicly available information."). These facts show that even if McCarter did not know the Discount Club's exact processes, he at least knew there was a high probability of unlawful practices.

This is particularly true when one considers just how unreasonable the return rates were. For example, the FTC presented testimony that return rates do not typically exceed 1% and that the National Automated Clearinghouse Association sets the total return rate limit as 15% for all transactions. [Tr. 1990:2–1991:6; Pl. Ex. 1188]. Even iStream, EDP and Hornbeam's payment processor that specialized in high-risk companies, considered the return rates to be too high. In fact, Chet Andrews, the Companies' representative from iStream, testified that over 25% indicated a high risk of fraud. [Tr. 2088, 2126]. And yet the Discount Clubs consistently returned return rates over 70%.

McCarter knew about the high return rates. And, even if he did not know the standard return rates, the exorbitantly high return rates coupled with the fact that Hornbeam was having trouble keeping its processing bank due to the high return rates should have tipped him off that something was awry. Given this, the FTC has established that McCarter at least had "some knowledge" of the Discount Club's

practices. [*Cf.* Pl. Ex. 529 (McCarter referring to Hornbeam's business as consisting of "a shitty coupon product that is approximately 75% of our product")].

However, that does not end the inquiry. The FTC must also demonstrate that McCarter participated directly in the practices or had the authority to control them. *See On Point*, 17 F.4th at 1083. This is where its case falls short. McCarter did not participate directly in the Discount Clubs. As noted, he never even visited the website. And, while he did look at Hornbeam's financials and attended meetings, he did not focus on the day-to-day activities thereof, assist in the actual functioning of, or make any decisions regarding the Discount Club. In fact, McCarter only visited Hornbeam's office in California a few times. He lived in Georgia and held a full-time position as President of Sharp Georgia throughout his involvement with Hornbeam.

The best evidence that the FTC pointed to was that McCarter met with WestSide in an attempt to maintain the relationship and tried to help find a new processing bank after WestSide ended the business relationship. [Tr. 3642–43, 3826; PL. Ex. 568, 1757]. But, McCarter's limited, unsuccessful attempts to save the overall business by preserving the Companies's processing bank are not enough to establish that he participated directly in the Discount Clubs' deceptive practices. Instead, his involvement only shows that McCarter was an interested investor.

29

Therefore, the only remaining inquiry is whether he had the authority to control the Discount Clubs' practices. Importantly, when determining whether a defendant "had the authority to control," the true question is whether he "could have ended the deceptive practices." *See On Point*, 17 F.4th at 1083. *See also FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 13 (1st Cir. 2010) ("The question is whether he could have nipped the offending [practice] in the bud"). It is clear that McCarter could not have made any meaningful changes to the Discount Club. The only people with any real power at Hornbeam were Alexander, on behalf of Jefferson Capital, and Jerry.

It was well known within Hornbeam that major changes could occur only with Jerry's consent. To combat this, the FTC focused on McCarter's financial contributions, but his contributions were miniscule compared to the defaulted loan from Jefferson Capital. Jefferson Capital was actively involved in the management of Hornbeam and had considerable power. The loan agreement gave Jefferson Capital a right to take total control of each member's voting rights and take complete operational control of Hornbeam. The agreement also prohibited Hornbeam from changing its "present business activity from the activities in which" it was engaged in at the closing of the loan. [Pl. Ex. 1850]. The Discount Clubs were the only thing keeping Hornbeam afloat and allowing the business to make any possible payments

to Jefferson Capital. Therefore, it is not realistic to find that Jefferson Capital would have allowed McCarter to make any meaningful changes to the program.[16]

      *iii.*    *Earl*

Similar to McCarter, the FTC established that Earl "had some knowledge" of the Discount Club's practices, but failed to show that Earl participated directly in the practices or had the authority to control them. *See On Point*, 17 F.4th at 1083. First, like McCarter, Earl knew about the prior FTC litigation, high return rates, low usage rates, and allegations of fraud by consumers. [Tr. 363, 2760; Pl. Exs. 62, 87, 530, 609, 610 (Earl noting in an email that "[t]he MoneyPlus Saver Google results are fairly brutal . . . and 'scam' surfaces more than once")]. He certainly knew enough to be concerned of a "high probability" of unlawful practices.

The second inquiry, whether Earl participated directly in the practices, is a closer call. Like McCarter, Earl participated in member meetings, but he lived far away and did not take part in the decision making for the day-to-day practices of the Discount Clubs. However, Earl did participate in responding to the consumer complaints regarding the Discount Clubs. Earl would meet with Murillo, the customer service representative for Hornbeam, and help her craft responses to the complaints, particularly for the BBB and Attorney General complaints. [*See, e.g.*,

---

[16] The Court questions why the FTC did not bring an enforcement action against Jefferson Capital and notes that Jefferson Capital's investment included money loaned by the United States.

Tr. 2817:17–20; Pl. Exs. 221, 231, 236, 240, 243, 245, 673, 1357]. The question before this Court now is whether Earl's assistance with the complaints establishes direct participation with the Discount Club. The Court concludes that it does not. Even though this work was related to the Discount Clubs, it was on the backend and was not related to the actual practices of the Discount Clubs themselves.

Last, the FTC failed to show that Earl had authority to control the Discount Club's practices. In the FTC's favor, Earl was the Chief Financial Officer, participated in member meetings, and signed binding legal documents on behalf of Hornbeam. *See FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014) ("Authority to control . . . may be established by active involvement in business affairs and the making of corporate policy and by evidence that the individual had some knowledge of the practices."); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) ("[The defendant's] assumption of the role of president [ ] and her authority to sign documents on behalf of the corporation demonstrate that she had the requisite control over the corporation."); *FTC v. Moses*, 913 F.3d 297, 307 (2d Cir. 2019) ("Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer."). But, while these facts weigh in favor of finding that Earl had authority to control the Discount Club practices, other

evidence shows that Earl had absolutely no power to make any meaningful change. None.

Instead, Jerry and Jefferson Capital steamrolled Earl throughout his time with Hornbeam. For example, Earl was initially promised a salary of $240,000, but it was quickly reduced to $120,000 before his salary was removed altogether and he was left with only health benefits. [Pl. Ex. 604, 605]. Earl also initially had a 20% ownership interest in Hornbeam, but that interest was reduced to 11% without his consent or any consideration for the reduction. And, even if this was insufficient to convince the Court that Earl had no real power within the corporation, the Court notes that Earl actually tried and failed to make changes to the Discount Club. Earl wanted to market the Discount Clubs to businesses rather than directly to consumers. He made several attempts to bring this idea to fruition, including obtaining a viable contract with a business. But, Jerry ultimately vetoed the idea and the contract. At the end of the day, the ultimate question is whether Earl "could have ended the deceptive practices," *On Point*, 17 F.4th at 1083, and Earl could not even protect his own salary or ownership interests. Accordingly, the Court finds that the FTC failed to establish that Earl participated directly in or had authority to control the Discount Clubs' practices.

### III.    Conclusion

The Court enters Default Judgment against the Hornbeam and EDP entities, but enters Judgment in favor of Defendants Wilson, Cleveland, McCarter, and Earl in this case. The Defendants will have 30 days from the date of this Order to file any requests for attorneys' fees.

IT IS SO ORDERED, this 21st day of March, 2024.

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE